FILED
September 24, 2015
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-15-00305-CV
5651450
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/12/2015 10:06:06 AM
JEFFREY D. KYLE
CLERK

**APPELLATE CASE NO. 03-15-00305-CV**

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/12/2015 10:06:06 AM
JEFFREY D. KYLE
Clerk

## JOHN BRYAN LANGDON
**Appellant**

v.

## LESLIE MATHISON GILBERT
**Appellee**

---

### On Appeal from the
### County Court at Law Number Two of Travis County, Texas

---

## APPELLANT BRIEF

---

Identity of Parties and Counsel

| | |
|---|---|
| Leslie Mathison Gilbert | John Bryan Langdon |
| Defendant at the Trial Court Level | Plaintiff at the Trial Court Level |
| | |
| Evans Kosut Davidson, PLLC | Law Office of Tom Murphy |
| Attn: John M. Davidson | Attn: Tom Murphy |
| 16000 Stuebner Airline Rd., Ste. 200 | 9600 Great Hills Trail, Ste. 150W |
| Spring, Texas 77379 | Austin, Texas 78759 |
| (281) 251-7900 | (512) 477-5680 |
| (281) 251-7909 Fax | (512) 493-0691 Fax |
| Email: jdavidson@ekklaw.com | Email: tom@tommurphyslaw.com |
| Trial Attorney and | Trial Attorney and |
| Presumed Appellee Counsel for Gilbert | Appellate Counsel for Langdon |

1

# **TABLE OF CONTENTS**

PAGE

Identity of Parties and Counsel …………………………………………………....... 1

Table of Contents ………………………………………………………………… 2

Index of Authorities ……………………………………………………………… 3

Statement of Case ………………………………………………………………… 6

Issues Presented ………………………………………………………………....... 7

Statement of Facts ………………………………………………………………… 8

Summary of Arguments ……………………………………………………….. 11

Argument …………………………………………………………………………… 13

    I.    Are attorneys' fees awardable to a prevailing
          party for a Bill of Review …………........................ 13

    II.    Was the trial court's Granting of an Order for the
          Notice of Non-Suit without Prejudice
          in the Underlying Suit Appropriate? ……………… 19

    III.    Did the trial court improperly enter a Final,
          Appealable Order/Judgment? ……………….....…… 21

Conclusion and Prayer…………………………………………………………… 23

Certificate of Compliance ………………………………………………………... 25

Certificate of Service ……………………………………………………………… 26

Appendix ………………….…………………………………………………………… 27

## INDEX OF AUTHORITIES

**PAGE**

1A TexJur Actions §49 and §62 …………………………………………………… 17

34 TexJur Equity §2 …………………………………………………………………...17

*Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884
(Tex. App. – Dallas 209, no pet.) ………………………………………………….. 14

*Bakali v. Bakali*, 830 S.W.2d 251, 257 (Tex. App. —Dallas 1992, no writ) …… 18

Black's Law Dictionary, 10th ed. (2014) ………………………………................. 16

*CenterPlace Props., Ltd. v. Columbia Med. Ctr.*, 406 S.W.3d 674, 688
(Tex. App. – Fort Worth 2013, pet. granted, judgm't vacated w.r.m.) …. 13 and 15

*Fitzgerald v. Schoeder Ventures II, LLC*, 345 S.W.3d 624, 627
(Tex. App. – San Antonio 2011, no pet.) …………………………………………….. 14

*Franzetti v. Franzetti*, 120 S.W.2d 123, 125-26
(Tex. App. – Austin 1938, no writ) ……………………………………………….17

*G. Richard Goins Constr. Co. v. S.B. McLaughlin Assocs.*,
930 S.W.2d 124, 130 (Tex. App. – Tyler 1996, writ denied) ............................... 15

*Greathouse v. Charter Nat'l Bank-Sw.*, 851 S.W.2d 173, 174
(Tex. 1992) …………………………………..…………………………………… 15

*Hill v. Thompson & Knigh*t, 756 S.W.2d 824, 826
(Tex. App. – Dallas 1988, no writ) ……………………………………………….. 15

*In Re Smith*, 2007 Tex. App. LEXIS 1153 *4
(Tex. App. – Houston [1st Dist.] 2007, no pet.) …………………………………... 17

*Intercontintental Grp. v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 655
(Tex. 2009) ………………………………………………………………………….. 16

*Kessler v. Kessler*, 693 S.W.2d 522, 525
(Tex. App. - Corpus Christi 1985, writ ref'd n.r.e.) …………………………………..20

*Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 799
(Tex. 1974) ...………….…..………………………………………………….......... 13

*Lowe v. Farm Credit Bank of Texas*, 2 S.W.3d 293, 299
(Tex. App. —San Antonio 1999, pet. denied) ……………………………..18 and 19

*Martin v. Tex. Dept. of Family & Protective Servs.*, 176 S.W.3d 390, 392
(Tex. App.-Houston [1st Dist.] 2004, no pet.) …………………………… 20 and 21

*MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 663
(Tex. 2009) …………………………………………………………………….…... 13

*Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 58
(Tex. 2008) ……………………………………………………………………. 13

*Meece v. Moerbe*, 631 S.W.2d 729, 730 (Tex. 1982) ……………………….. 18 and 19

*Mitchell v. LaFlamme*, 60 S.W.3d 123, 130
(Tex. App. – Houston [14th Dist.] 2000, no pet.) …………………………….…... 14

*Moore Landrey, L.L.P. v. Hirsch & Westheimer, P.C.*,
126 S.W.3d 536, 538-39 (Tex. App.-Houston [1st Dist.] 2003, no pet.) ……….. 19

*Rodriguez v. Holmstrom*, 627 S.W.2d 198, 202-03
(Tex. App.--Austin 1981, no writ) ……………………………………………….. 18

*Shahbaz v. Feizy Imp. & Exp. Co.*, 827 S.W.2d 63, 64
(Tex. App.-Houston [1st Dist.] 1992, no writ) …………………………… 20 and 21

*Solar Applications Eng'g v. T.A. Oper. Corp.*, 327 S.W.3d 104, 108
(Tex. 2010) ...………………………………………………………………….…... 14

*Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593
(Tex. 1996) …………………………………...…..……………………………. 13

*Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 866
(Tex. 2010) ………………………………………………………………...16 and 17

**TEXAS RULES OF CIVIL PROCEDURE** **PAGE**

TEX. R. CIV. P. §54 …………………………………………………….. 14 and 15

TEX. R. CIV. P. §329b(d) …..………………………………………….... 19

TEX. R. CIV. P. §329b(f) …………………………………………….…...16

## STATEMENT OF CASE

1) **N**ature of the case. This is an appeal of a summary judgment for a Bill of Review. The Underlying Suit is related to the rental of real property with a cause of action for failure to return rental security deposit and unjust enrichment related to a leasehold.

2) **Name of the trial judge.** Honorable Todd T. Wong

3) **Trial court.** County Court at Law Number Two of Travis County, Texas

4) **Disposition in the trial court.** The trial court rendered a summary judgment against Appellee, Leslie Mathison Gilbert entering an Agreed Order to grant a Bill of Review. The underlying judgment was in Cause No. C-1-CV-13-009444, styled, "*Leslie Mathison Gilbert v. John Bryan Langdon*" with a default judgment rendered on or about March 19, 2014.

   After granting the Bill of Review, Appellee non-suited the Underlying Suit after the trial court's plenary power expired in the Underlying Suit.

   Appellee subsequently filed a Motion for Summary Judgment for an Order determining whether or not attorneys' fees can be awarded for a Bill of Review. The Order granting Appellee's Motion for Summary Judgment regarding the issue of attorneys' fees also included a Mother Hubbard Clause that made the Order/Judgement final and appealable without a determination of the merits of the Underlying Suit.

5) **Parties in the trial court.** John Bryan Langdon was the Plaintiff; Leslie Mathison Gilbert was the Defendant.

## ISSUES PRESENTED

1.      Are attorneys' fees awardable to a prevailing party for a Bill of Review?

2.      Was the trial court's granting of an Order for the Notice of Non-Suit without Prejudice in the Underlying Suit Appropriate?

3.      Did the trial court improperly enter a Final, Appealable Order/Judgment?

## STATEMENT OF FACTS

The Appellee filed suit against the Appellant for damages related to the failure to provide an accounting and refund of a security deposit in Cause No. C-1-CV-13-009444, styled, "*Leslie Mathison Gilbert v. John Bryan Langdon*" with a default judgment rendered on or about March 19, 2014.

In that cause, Appellant was found liable for bad faith in failing to provide an accounting and refund of Appellee's security deposit of $4,000.00, as well as retaining an overpayment of rents in the amount of $1,500.00. Attorney's fees, a civil penalty of $100.00 and trebling of damages of $12,000.00 was entered against Appellant.

In filing the Underlying Suit, Appellee tendered service of process to the Texas Secretary of State, alleging that the Secretary of State was the agent for Appellant because Appellant had not designated or maintained a resident agent for service in Texas, that he engaged in business in Texas, does not maintain a regular place of business in Texas, and that the lawsuit arose from Appellant's business in Texas. As such, Appellee alleged that the Secretary of State was the proper agent for service.

Upon serving the Secretary of State, Appellee was required to provide the Secretary of State a document that contains a statement of the name and address to deliver Notice of Citation to Appellant.

Appellee provided the Secretary of State the following address: 275 2nd Ave., Long Branch, New Jersey 07740. This address was not the address of Appellant.

Appellant's correct address was 275 2nd Ave. **Front**, Long Branch, New Jersey 07740.

On April 24, 2014, thirty-six (36) days after the Default Judgment, Appellant filed a Bill of Review to set aside or vacate the Default Judgment alleging due process violation for improper service by providing the Secretary of State the wrong address to serve Appellant.

On July 28, 2014, the trial court denied Appellant's Motion for Summary Judgment for a Bill of Review and granted Appellee's Motion for Summary Judgment to deny a Bill of Review.

Appellant filed an appeal of the trial court's original Order granting Appellee's Motion for Summary Judgment denying a Bill of Review.

On December 31, 2014, this Court issued a Memorandum Opinion that reversed the trial court's judgment and remanded for further consideration.

On January 30, 2015, Appellant filed another Motion for Summary Judgment to have a Bill of Review granted. On March 27, 2015, Appellee conceded that a Bill of Review should be granted. On April 2, 2015, the trial court entered an Agreed Order granting Summary Judgment for a Bill of Review. However, the Agreed Order denied attorneys' fees with a later trial date to determine the amount of attorneys' fees, if any, were to be awarded. There was not a determination of the merits of the Underlying Suit.

On April 2, 2015, Appellant filed a Notice of Non-Suit without Prejudice. On April 8, 2015, the trial court signed an Order granting the Non-Suit without Prejudice for the Underlying Suit.

On April 20, 2015, Appellee filed a Motion for Summary Judgment seeking a ruling that attorneys' fees are not awardable for a Bill of Review. On May 12, 2015, the trial court entered an Order granting Appellee's Motion for Summary Judgment ruling that recovery of attorneys' fees in a Bill of Review is not recoverable for a Bill of Review. In the Order granting Appellee's Summary Judgment, the trial court signed the Order with a Mother Hubbard Clause making it a final, appealable order without a determination of the merits of the causes of action in the Underlying Suit.

## SUMMARY OF ARGUMENT

The general rule is that litigants must pay their own attorneys' fee. However, when authorized by statute, contract, or equity, then attorneys' fees may be awarded.

The parties entered into a contract that provided that the prevailing party in any legal proceeding is to be awarded attorneys' fees and cost, thereby creating an exception to the general rule and authorizes an award of attorneys' fees.

Additionally, on April 8, 2015, the trial court signed an Order granting a Notice of Non-Suit without Prejudice in the Underlying Suit. The trial court did not have authority to enter an Order of Dismissal for the Underlying Suit because the trial court's plenary power had expired. The only way to make a determination of the causes of action in the Underlying Suit, is in a Bill of Review, and where the movant in a Bill of Review prevails, the judgment previously entered is set aside, and a new judgment, based on the evidence heard on the bill of review, must be entered. Resultantly, the trial court had no authority to enter an Order of Dismissal for the Underlying Suit.

Appellant pled for attorneys' fees and prevailed on the Bill of Review, and, therefore, should have been awarded attorneys' fee. In the alternative, the trial court improperly entered an Order that included a Mother Hubbard Clause that prevented a determination of the merits of the causes of action in the Underlying Suit, and therefore, a determination of the prevailing party, which would also determine an

award of attorneys' fees based upon the merits because attorneys' fees can be awarded in a Bill of Review to the same extent that attorneys' fees could be awarded in the Underlying Suit.

## **ARGUMENT**

I.    *Are Attorneys' Fees Awardable to a Prevailing Party for a Bill of Review?*

1.    General Rule to Award Attorneys' Fees

The general rule is that litigants must pay their own attorneys' fee. *MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 663 (Tex. 2009). However, recovery of attorneys' fees is permitted when authorized by statute, contract between the litigants, or under equity. *Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 58 (Tex. 2008); *Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 799 (Tex. 1974). Such authorization must be express and cannot be implied. *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996).

The parties entered into a lease agreement that provided that "[a]ny person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, attorney's fees, cost of service, and all other costs of the legal proceeding from the non-prevailing party." *Lease Agreement at ¶29* (Appendix # 1)*.* Since the parties entered into a contractual agreement that authorized an award of attorneys' fee, then an exception to the general rule is created. Accordingly, attorneys' fee can be awarded to the prevailing party of a legal proceeding provided the legal proceeding was related to the contract. *See, e.g.*, *CenterPlace Props., Ltd. v. Columbia Med. Ctr.*, 406 S.W.3d 674, 688 (Tex. App. – Fort Worth 2013, pet. granted, judgm't

vacated w.r.m.).  Whether attorneys' fees are available under a contract is a question of law that is reviewed de novo. *Fitzgerald v. Schoeder Ventures II, LLC*, 345 S.W.3d 624, 627 (Tex. App. – San Antonio 2011, no pet.)

    2.    <u>Prerequisites for Recovery of Attorneys' Fee Met</u>

A party must plead for attorneys' fee. *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App. – Dallas 209, no pet.).  A party should also specify the authority under which the party claims it is entitled to recover attorneys' fee, but if the party fails to do so, the party may still recover attorneys' fee only if (1) the party pleads facts that support a claim for attorneys' fee or (2) the opposing party does not object to the failure to identify the authority. *Mitchell v. LaFlamme*, 60 S.W.3d 123, 130 (Tex. App. – Houston [14th Dist.] 2000, no pet.) Appellant pled for attorneys' fees in his Second Amended Petition for Bill of Review at ¶30 (Appendix #2) and identified the Lease Agreement as the authority. Moreover, Appellee made no objection to any failure to identify the authority for attorneys' fees.  Consequently, Appellant satisfactory pled for attorneys' fee.

 Appellant must also satisfy all conditions precedent. *Solar Applications Eng'g v. T.A. Oper. Corp.*, 327 S.W.3d 104, 108 (Tex. 2010).  In Appellant's Second Amended Petition for Bill of Review at ¶4, he specifically pled "All conditions precedent to Plaintiff's right to recover has been performed or has occurred."  This satisfies the requirement of all conditions precedent. *Tex. R. Civ. P.* §54.  A Rule 54

pleading, shifts the burden of pleadings (not of proof) to the Appellee to specifically deny conditions precedent that have not occurred and a simple denial that some conditions precedent have not occurred is not satisfactory. *Id*.; *Greathouse v. Charter Nat'l Bank-Sw.*, 851 S.W.2d 173, 174 (Tex. 1992); *Hill v. Thompson & Knigh*t, 756 S.W.2d 824, 826 (Tex. App. – Dallas 1988, no writ). At no time did Appellee specifically deny any conditions precedent. Resultantly, all conditions precedent have been satisfied for the recovery of attorneys' fees.

It is further axiomatic that Appellant was represented by an attorney, as evidenced by the trial court record and appellate record. There is also evidence of attorneys' fees being incurred, as evidenced by the Attorneys' Fee affidavit submitted as part of Appellant's second Motion for Summary Judgment as Exhibit B (Appendix #3). As for proving whether or not the fees were reasonable and necessary, that question could not be answered because of the trial court's Order ruling that attorneys' fee could not be recovered in a Bill of Review.

The final requirement that must be met is whether or not a Bill of Review is a legal proceeding related to the contract instituted and meet the requirement of the contractual provisions. *See, e.g.*, *CenterPlace Props., Ltd.*, 406 S.W.3d at 688; *G. Richard Goins Constr. Co. v. S.B. McLaughlin Assocs.*, 930 S.W.2d 124, 130 (Tex. App. – Tyler 1996, writ denied). The Lease Agreement provides for "[a]ny person who is a prevailing party in any legal proceeding brought under or related to the

15

transaction described in this lease is entitled to recover prejudgment interest, attorney's fees, cost of service, and all other costs of the legal proceeding from the non-prevailing party." *Lease Agreement at ¶29* (Appendix # 1).

### 3.    Prevailing Party

The Lease Agreement does not define "prevailing party". If the Lease Agreement does not define who is a prevailing party, the trial courts will apply the term's ordinary meaning. *Intercontintental Grp. v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 655 (Tex. 2009). A plaintiff is a prevailing party, under an ordinary meaning, if the trial court awarded plaintiff an enforceable judgment in the form of monetary damages or equitable relief. *Id.* at 653. The trial court granted Appellant equitable relief by signing an Agreed Order granting a Bill of Review.[1] Accordingly, Appellant was the prevailing party.

### 4.    Legal Proceeding Related to the Contract

Likewise, there can be no question that a Bill of Review, although occasionally described as an 'equitable remedy', nonetheless qualifies as a "legal proceeding". *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 866 (Tex. 2010). Black's Law Dictionary, 10th ed. defines the term "legal proceeding" as follows:

> Any proceeding authorized by law and instituted in a court or tribunal to acquire a right or to enforce a remedy.

---

[1] Appellee conceded that a Bill of Review should be granted with the filing of her Response to Appellant's second Motion for Summary judgment filed on March 27, 2015. (Appendix #4)

16

Given that the Bill of Review procedure is specifically authorized by TRCP 329b(f), to acquire the right to belatedly set aside an invalid judgment, there can be little question that Appellant's Bill of Review qualifies as a "legal proceeding" under the Black's definition. *Travelers*, ibid.

This is especially so in Texas – despite any superficial labelling of Bill of Review as an equitable remedy – because our state's unique legal heritage means that it does not, and never has, recognized any meaningful division between law and equity. See 1A TexJur Actions §49 and §62, and 34 TexJur Equity §2, citing *Franzetti v. Franzetti*, 120 S.W.2d 123, 125-26 (Tex. App. – Austin 1938, no writ):

> The distinctions between law and equity have never obtained in Texas…At most, the distinction in this states is a narrow one. In some aspects it may be said to be more one of form than of substance.

Given such antecedents, it is of little surprise that a Texas court has explicitly stated that "[a] ***bill of review is an independent legal proceeding*** brought to set aside a judgment that is no longer appealable" (emphasis added). *In Re Smith*, 2007 Tex. App. LEXIS 1153 *4 (Tex. App. – Houston [1st Dist.] 2007, no pet.). Resultantly, a Bill of Review is a legal proceeding.

Furthermore, this legal proceeding is related to the transaction of renting the leasehold. Appellee originally sued, in the Underlying Suit, for a cause of action related to the security deposit. *See* Appellee's First Amended Petition (Appendix #5). Subsequently, Appellant filed his Bill of Review to set aside the default

judgment, which too is related to the security deposit, and therefore related to the transaction of renting the leasehold. As such, the legal proceeding was related to the transaction, and therefore, Appellant was entitled to a determination of his attorneys' fees for being the prevailing party in the Bill of Review.

5. Attorneys' Fees are Awardable in a Bill of Review

There is authority allowing for the recovery of attorneys' fees in a Bill of Review. A party who successfully prosecutes a Bill of Review is entitled to recover attorney's fees if attorneys' fees are authorized in the prosecution or defense of the Underlying Suit. *Bakali v. Bakali*, 830 S.W.2d 251, 257 (Tex. App. - Dallas 1992, no writ) citing *Meece v. Moerbe*, 631 S.W.2d 729, 730 (Tex. 1982). Attorney's fees are recoverable in a Bill of Review proceeding to the same extent as attorneys' fees were recoverable at trial of the Underlying Suit. *Lowe v. Farm Credit Bank of Texas*, 2 S.W.3d 293, 299 (Tex. App. —San Antonio 1999, pet. denied); *See also Meece,* 631 S.W.2d at 730; *Bakali*, 830 S.W.2d at 257; *Rodriguez v. Holmstrom*, 627 S.W.2d 198, 202-03 (Tex. App.--Austin 1981, no writ).

In the Underlying Suit, there is a basis for an award of attorneys' fees. Appellee sued for failure to provide an accounting of a security deposit. On February 18, 2014, Appellee filed a Motion for Default Judgment Motion for Default Judgment and presented as evidence the lease agreement. (Appendix #6). Appellant has recognized that attorneys' fees were awardable to the prevailing party based

18

upon the lease agreement. The lease agreement is the authority for an award of attorneys' fees for either party in the Underlying Suit.

Since the trial court could have awarded Appellant attorney's fees at the trial of the Underlying Suit, then Appellant is entitled to attorneys' fees in this Bill of Review. *Lowe*, 2 S.W.3d at 299; *Meece*, 631 S.W.2d at 730. In our case, Appellant could have been awarded attorney's fees under the terms of the lease agreement. Therefore, attorneys' fees are awardable to Appellant, if he is the prevailing party in his Bill of Review because there is authority for an award of attorneys' fees in the Underlying Suit based on the lease agreement.

II.     *Was the Trial Court's Granting of an Order for the Notice of Non-Suit without Prejudice in the Underlying Suit Appropriate?*

The trial court did not have authority to enter an Order granting a Non-Suit without Prejudice. On March 19, 2014 (Appendix #7), the trial court granted a default judgment. Absent a motion that extends the trial court's plenary power, the trial court has plenary power to modify its final judgment or order within 30 days of signing it, and the trial court loses jurisdiction to modify its judgment after the 30 days had expired. TEX. R. CIV. P. 329b(d); *Moore Landrey, L.L.P. v. Hirsch & Westheimer, P.C.*, 126 S.W.3d 536, 538-39 (Tex. App. - Houston [1st Dist.] 2003, no pet.). Since there was not any filing that would extend the trial court's plenary power, then its plenary power expired on April 18, 2014.

Once plenary power has expired, the trial court loses jurisdiction to modify its judgment. *Martin v. Tex. Dept. of Family & Protective Servs.*, 176 S.W.3d 390, 392 (Tex. App. - Houston [1st Dist.] 2004, no pet.).

However, on April 8, 2015 the trial court entered the Order granting the Non-Suit without Prejudice (Appendix #8). This was not an effective modification of the March 19, 2014 judgment because it was outside the trial court's plenary power. *Id.* at 392. Accordingly, the trial court had no authority to sign an Order granting Non-Suit without Prejudice.

This is important because Appellee's Non-Suit without Prejudice in the Underlying Suit, was an attempt on the part of Appellee to cut off attorneys' fees by trying to contend that because of the Non-Suit without Prejudice in the Underlying Suit occurred, there was no basis for an award of attorneys' fees in the Underlying Suit.

However, any subsequent determination of Appellee's cause of action in the Underlying Suit can only be determined through the Bill of Review. "[A] final judgment in a bill of review action should either deny any relief to the petitioner or grant the bill of review and set aside the former judgment, insofar as it is attacked, and substitute a new judgment which properly adjudicates the entire controversy." *Shahbaz v. Feizy Imp. & Exp. Co.*, 827 S.W.2d 63, 64 (Tex. App. - Houston [1st Dist.] 1992, no writ) (citing *Kessler v. Kessler*, 693 S.W.2d 522, 525 (Tex. App. -

Corpus Christi 1985, writ ref'd n.r.e.).

Appellee's attempt to Non-Suit the Underlying Suit is ineffective because the trial court lacked plenary power to modify its Orders/Judgment after plenary power has expired. *Martin*, 176 S.W.3d at 392. Resultantly, attorneys' fees can be awarded in a Bill of Review because the issues in the Underlying Suit must now be determined with a new judgment through the Bill of Review.

III.    *Did the trial court Improperly Enter a Final Order/Judgment?*

The trial court should not have entered an Order/Judgment that was final and appealable because it prevents an adjudication of the issues of Underlying Suit.

As stated above, "[A] final judgment in a bill of review action should either deny any relief to the petitioner or grant the bill of review and set aside the former judgment, insofar as it is attacked, and substitute a new judgment which properly adjudicates the entire controversy." *Shahbaz*, 827 S.W.2d at 64. By entering a final and appealable Order/Judgment before an actual determination of the merits of the causes of action, then Court prevented an adjudication of the entire controversy, in violation of Appellant's right to have a determination of the merits of a causes of action in the Underlying Suit in his Bill of Review action.

This of course would lead to a fact that neither party was not a prevailing party at the time the trial court entered its final and appealable in the Bill of Review action. However, this is acceptable because this matter would be remanded back to the trial

court to permit the parties to have a determination of the merits of the causes of action in the Underlying Suit, determine who the prevailing party is, and a determination of attorneys' fees, which could be awarded in the Underlying Suit, and therefore in the Bill of Review action.

## CONCLUSION AND PRAYER

A party that successfully prosecutes or defends a Bill of Review can be awarded their attorneys' fees if there is a basis to award them in the Underlying Suit.

The parties entered into a lease agreement that provides for the prevailing party in a legal proceeding be awarded their attorneys' fees. This creates an exception to the general rule is that litigants must pay their own attorneys' fee. Appellant satisfied the conditions required by the lease agreement to be awarded attorneys' fees. Appellant was the prevailing party, as the trial court granted the Bill of Review, which Appellee also conceded that a Bill of Review should be granted. The Underlying Suit and the Bill of Review were related to the transaction of leasing the leasehold, and a Bill of Review is legal proceeding. Moreover, it is clear that attorneys' fees are permissible in a Bill of review if they could be awarded in the Underlying Suit. In this case, attorneys' fees could have been awarded to Appellant in the Underlying Suit based on the lease agreement.

The trial court's granting of the Order for the Notice of Non-Suit without Prejudice is without effect because the trial court's plenary power had expired, and therefore, had no authority to modify the judgment in the Underlying Suit. As such, a determination of the merits of the causes of action of the Underlying Suit can only be made through a Bill of Review, which means a determination of the prevailing

23

party and that attorneys' fees are awardable in a Bill of Review because attorneys' fees could be awarded in the Underlying Suit.

In the alternative, the trial court improperly entered a final appealable Order that prevented a determination of the merits of the causes of action in the Underlying Suit, and a determination of the prevailing party. As such, this matter should be remanded back to the trial for a determination of the amount of attorneys' fees to be awarded; or remanded back for a trial on the merits for a determination of the merits of the causes of action for the Underlying Suit, including a determination of attorneys' fees for the prevailing party.

CERTIFICATE OF COMPLIANCE

I, Tom Murphy, certify that this computer-generated document that is subject to a word limit under Tex. R. App. P. 9.4(i) that the number of words in the document is 5248. I hereby certify that I am relying on the word count of the computer program used to prepare the document.

By: _____
Tom Murphy

Respectfully submitted,

LAW OFFICE OF TOM MURPHY

By: _____
Tom Murphy
TSB # 24013217
9600 Great Hills Trail, Ste. 150W
Austin, Texas 78759
(512) 477-5680
(512) 493-0691 Fax
Email: tom@tommurphyslaw.com
Attorney for Appellant Langdon

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above was delivered to the following parties or their attorneys of record pursuant to the TRCP on June 11, 2015.

Evans Kosut Davidson, PLLC
Attn: John M. Davidson
16000 Stuebner Airline Rd., Ste. 200
Spring, Texas 77379
(281) 251-7900
(281) 251-7909 Fax
Email: jdavidson@ekklaw.com
Trial Attorney and Presumed
Appellate Counsel for Gilbert

Court of Appeals
Third District of Texas
Attn: Jeffrey D. Kyle, Clerk of the Court
PO Box 12547
Austin, Texas 78711-2547

_____
Tom Murphy

# APPENDIX

Appendix #1.     Copy of the Lease Agreement

Appendix #2.     Copy of the Second Amended Petition for Bill of Review

Appendix #3.     Copy of Exhibit B (Attorneys' Fees) of Motion for Summary Judgment

Appendix #4.     Appellee's Response to Appellant's Motion for Summary Judgment

Appendix #5.     Appellee's First Amended Petition

Appendix #6.     Motion for Default Judgment

Appendix #7.     Final Judgment in the Underlying Suit

Appendix #8.     Order Granting Appellee's Notice of Non-Suit without Prejudice

Appendix #9.     TEX. R. CIV. P. 54

Appendix #10.    TEX. R. CIV. P. 329b(d)

Appendix #11.    TEX. R. CIV. P. 329b(f)

Appendix #12.    1A TexJur Actions §49 and §62

Appendix #13.    34 TexJur Equity §2

Appendix #14.    *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App. – Dallas 209, no pet.)

Appendix #15.    *Bakali v. Bakali*, 830 S.W.2d 251, 257 (Tex. App. —Dallas 1992, no writ)

Appendix #16.    Black's Law Dictionary, 10th ed. (2014)

Appendix #17.    *CenterPlace Props., Ltd. v. Columbia Med. Ctr.*, 406 S.W.3d 674, 688 (Tex. App. – Fort Worth 2013, pet. granted, judgm't vacated w.r.m.)

Appendix #18.    *Fitzgerald v. Schoeder Ventures II, LLC*, 345 S.W.3d 624, 627 (Tex. App. – San Antonio 2011, no pet.)

Appendix #19.    *Franzetti v. Franzetti*, 120 S.W.2d 123, 125-26 (Tex. App. – Austin 1938, no writ)

Appendix #20.    *G. Richard Goins Constr. Co. v. S.B. McLaughlin Assocs.*, 930 S.W.2d 124, 130 (Tex. App. – Tyler 1996, writ denied)

Appendix #21.    *Greathouse v. Charter Nat'l Bank-Sw.*, 851 S.W.2d 173, 174 (Tex. 1992)

Appendix #22.    *Hill v. Thompson & Knight*, 756 S.W.2d 824, 826 (Tex. App. – Dallas 1988, no writ)

Appendix #23.    *In Re Smith*, 2007 Tex. App. LEXIS 1153 *4 (Tex. App. – Houston [1st Dist.] 2007, no pet.)

Appendix #24.    *Intercontinental Grp. v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 655 (Tex. 2009)

Appendix #25.    *Kessler v. Kessler*, 693 S.W.2d 522, 525 (Tex. App. - Corpus Christi 1985, writ ref'd n.r.e.)

Appendix #26.    *Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 799 (Tex. 1974)

Appendix #27.    *Lowe v. Farm Credit Bank of Texas*, 2 S.W.3d 293, 299 (Tex. App. —San Antonio 1999, pet. denied)

Appendix #28.    *Martin v. Tex. Dept. of Family & Protective Servs.*, 176 S.W.3d 390, 392 (Tex. App.-Houston [1st Dist.] 2004, no pet.)

Appendix #29.    *MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 663 (Tex. 2009)

Appendix #30.     *Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 58 (Tex. 2008)

Appendix #31.     *Meece v. Moerbe*, 631 S.W.2d 729, 730 (Tex. 1982)

Appendix #32.     *Mitchell v. LaFlamme*, 60 S.W.3d 123, 130 (Tex. App. – Houston [14th Dist.] 2000, no pet.)

Appendix #33.     *Moore Landrey, L.L.P. v. Hirsch & Westheimer, P.C.*, 126 S.W.3d 536, 538-39 (Tex. App.-Houston [1st Dist.] 2003, no pet.)

Appendix #34.     *Rodriguez v. Holmstrom*, 627 S.W.2d 198, 202-03 (Tex. App. - Austin 1981, no writ)

Appendix #35.     *Shahbaz v. Feizy Imp. & Exp. Co.*, 827 S.W.2d 63, 64 (Tex. App.-Houston [1st Dist.] 1992, no writ)

Appendix #36.     *Solar Applications Eng'g v. T.A. Oper. Corp.*, 327 S.W.3d 104, 108 (Tex. 2010)

Appendix #37.     *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996)

Appendix #38.     *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 866 (Tex. 2010)

# APPENDIX
# #1



# TEXAS ASSOCIATION OF REALTORS®
## RESIDENTIAL LEASE

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

1. **PARTIES:** The parties to this lease are:

   the owner of the Property, Landlord,: _____ John Bryan Langdon _____ ; and

   Tenant(s): Leslie Mathison Gilbert _____ .

2. **PROPERTY:** Landlord leases to Tenant the following real property:

   Address: 4109 Michael Neill, Austin, TX 78730
   legally described as: Lot 9; Block B; Section 13; River Place

   in _____ Travis _____ County, Texas, together with the following non-real-property
   items: Outdoor patio, grill, all draperies

   The real property and the non-real-property are collectively called the "Property".

3. **TERM:**

   A. <u>Primary Term</u>: The primary term of this lease begins and ends as follows:

   August 1, 2011

   Commencement Date: _____ July 8, 2011 _____ Expiration Date: _____ July 31, 2012 _____ .

   B. <u>Delay of Occupancy</u>: Tenant must occupy the Property within 5 days after the Commencement Date. If Tenant is unable to occupy the Property by the 5th day after the Commencement Date because of construction on the Property or a prior tenant's holding over of the Property, Tenant may terminate this lease by giving written notice to Landlord before the Property becomes available to be occupied by Tenant, and Landlord will refund to Tenant the security deposit and any rent paid. Landlord will abate rent on a daily basis for a delay caused by construction or a prior tenant's holding over. This paragraph does not apply to any delay in occupancy caused by cleaning, repairs, or make-ready items.

4. **AUTOMATIC RENEWAL AND NOTICE OF TERMINATION:**

   A. This lease automatically renews on a month-to-month basis unless Landlord or Tenant provides the other party <u>written</u> notice of termination not less than: *(Check only one box.)*
   - [x] (1) 30 days before the Expiration Date.
   - [ ] (2) _____ days before the Expiration Date.

   B. If this lease automatically renews on a month-to-month basis, it will continue to renew on a month-to-month basis until either party provides <u>written</u> notice of termination to the other party and the notice of termination will be effective: *(Check only one box.)*
   - [ ] (1) on the last day of the month following the month in which the notice is given. Landlord is not obligated to prorate rent even if Tenant surrenders the Property before the termination date.
   - [x] (2) on the date designated in the notice but not sooner than 30 days after the notice is given and, if necessary, rent will be prorated on a daily basis.

(TAR-2001) 6-1-10    Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____    Page 1 of 14

Keller Williams Realty 4010 River Place Blvd Austin, TX 78730
Phone: 512.576.7344    Fax: .512-623-6123    Tim Moncrief
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

Lease Listing

C. Oral notice of termination is not sufficient under any circumstances. Time is of the essence for providing notice of termination (strict compliance with dates by which notice must be provided is required). The date on which rent is due does not apply to the requirement for providing written notice of termination. If a box is not checked under Paragraph 4A, Paragraph 4A(1) will apply. If a box is not checked under Paragraph 4B, Paragraph 4B(1) will apply.

5. RENT:

A. Monthly Rent: Tenant will pay Landlord monthly rent in the amount of $ 3,000.00 for each full month during this lease. The first full month's rent is due and payable not later than August 1, 2011. Thereafter, Tenant will pay the monthly rent so that Landlord receives the monthly rent on or before:
   [x] (1) the first day of each month during this lease.
   [ ] (2) _____.
   Weekends, holidays, and mail delays do not excuse Tenant's obligation to timely pay rent.

B. Prorated Rent: On or before July 1, 2011 Tenant will pay Landlord $2,400.00 as prorated rent from the Commencement Date through the last day of the month in which this lease begins.

C. Place of Payment: Unless this lease provides otherwise, Tenant will remit all amounts due to Landlord under this lease to the following person or entity at the place stated and make all payments payable to the named person or entity. Landlord may later designate, in writing, another person or place to which Tenant must remit amounts due under this lease.

   Name:  Bryan Langdon
   Address: _____

   **Notice: Place the Property address and Tenant's name on all payments.**

D. Method of Payment:
   (1) Tenant must pay all rent timely and without demand, deduction, or offset, except as permitted by law or this lease.
   (2) Time is of the essence for the payment of rent (strict compliance with rental due dates is required).
   (3) Unless the parties agree otherwise, Tenant may not pay rent in cash and will pay all rent by check, cashier's check, money order, or other means acceptable to Landlord.
   (4) Landlord [x] requires [ ] does not require   Tenant(s) to pay monthly rents by one payment.
   (5) If Tenant fails to timely pay any amounts due under this lease or if any check of Tenant is not honored by the institution on which it was drawn, Landlord may require Tenant to pay such amount and any subsequent amounts under this lease in certified funds. This paragraph does not limit Landlord from seeking other remedies under this lease for Tenant's failure to make timely payments with good funds.

E. Rent Increases: There will be no rent increases through the primary term. Landlord may increase the rent that will be paid during any month-to-month renewal period by providing at least 30 days written notice to Tenant.

6. LATE CHARGES:

A. If Landlord does not actually receive a rent payment in the full amount at the designated place of payment by the __5__ day of each month at 11:59pm, Tenant will pay Landlord for each late payment:
   (1) an initial late charge equal to (check one box only): [x] (a) $100.00 ; or [ ] (b)_____ % of one month's rent; and
   (2) additional late charges of $ 25.00 per day thereafter until rent and late charges are paid in full. Additional late charges for any one payment may not exceed more than 30 days.
   **Notice: §92.019, Property Code prohibits assessing a late fee until rent has remained unpaid for at least one full day after the date on which the rent is due.**

B. For the purposes of paying rent and any late charges, the mailbox is not the agent for receipt for Landlord (the postmark date is not the date Landlord receives the payment). The parties agree that the late charge is based on a reasonable estimate of uncertain damages to the Landlord that are incapable of precise calculation and result from late payment of rent. Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 27.

7. **RETURNED PAYMENT:** Tenant will pay Landlord $ 25.00 _____ for each payment Tenant tenders to Landlord which is returned or not honored by the institution on which it is drawn for any reason, plus any late charges until Landlord receives payment. Tenant must make any returned payment good by paying such amount(s) plus any associated charges in certified funds.

8. **APPLICATION OF FUNDS:** Regardless of any notation on a payment, Landlord may apply funds received from Tenant first to any non-rent obligations of Tenant, including but not limited to, late charges, returned payment charges, repairs, brokerage fees, periodic utilities, pet charges, and then to rent.

9. **PETS:**

A. Unless the parties agree otherwise in writing, Tenant may not permit, even temporarily, any pet on the Property (including but not limited to any mammal, reptile, bird, fish, rodent, or insect).

B. If Tenant violates this Paragraph 9 or any agreement to keep a pet on the Property, Landlord may take all or any of the following action:
   (1) declare Tenant to be in default of this lease and exercise Landlord's remedies under Paragraph 27;
   (2) charge Tenant, as additional rent, an initial amount of $ _____ and $ _____ per day thereafter per pet for each day Tenant violates the pet restrictions;
   (3) remove or cause to be removed any unauthorized pet and deliver it to appropriate local authorities by providing at least 24-hour written notice to Tenant of Landlord's intention to remove the unauthorized pet; and
   (4) charge to Tenant the Landlord's cost to:
      (a) remove any unauthorized pet;
      (b) exterminate the Property for fleas and other insects;
      (c) clean and deodorize the Property's carpets and drapes; and
      (d) repair any damage to the Property caused by the unauthorized pet.

C. When taking any action under Paragraph 9B Landlord will not be liable for any harm, injury, death, or sickness to any pet.

10. **SECURITY DEPOSIT:**

A. Security Deposit: On or before execution of this lease, Tenant will pay a security deposit to Landlord in the amount of $ 3,000.00 _____ . "Security deposit" has the meaning assigned to that term in §92.102, Property Code.

B. Interest: No interest or income will be paid to Tenant on the security deposit. Landlord may place the security deposit in an interest-bearing or income-producing account and any interest or income earned will be paid to Landlord or Landlord's representative.

C. Refund: Tenant must give Landlord at least thirty (30) days written notice of surrender before Landlord is obligated to refund or account for the security deposit.

**Notices about Security Deposits:**
(1) §92.108, Property Code provides that a tenant may not withhold payment of any portion of the last month's rent on grounds that the security deposit is security for unpaid rent.

(TAR-2001) 6-1-10     Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____ _____     Page 3 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          Lease Listing

(2) Bad faith violations of §92.108 may subject a tenant to liability up to 3 times the rent wrongfully withheld and the landlord's reasonable attorney's fees.

(3) The Property Code does not obligate a landlord to return or account for the security deposit until the tenant surrenders the Property and gives the landlord a written statement of the tenant's forwarding address, after which the landlord has 30 days in which to account.

(4) "Surrender" is defined in Paragraph 16 of this lease.

(5) One may view the Texas Property Code at the Texas Legislature's website which, as of the date shown in the lower left-hand corner of this form, is http://www.statutes.legis.state.tx.us/.

D. Deductions:

(1) Landlord may deduct reasonable charges from the security deposit for:
    (a) damages to the Property, excluding normal wear and tear, and all reasonable costs associated to repair the Property;
    (b) costs for which Tenant is responsible to clean, deodorize, exterminate, and maintain the Property;
    (c) unpaid or accelerated rent;
    (d) unpaid late charges;
    (e) unpaid utilities and utility expenses Landlord incurs to maintain utilities to the Property as required by this Lease;
    (f) unpaid pet charges;
    (g) replacing unreturned keys, garage door openers, security devices, or other components;
    (h) the removal of unauthorized locks or fixtures installed by Tenant;
    (i) Landlord's cost to access the Property if made inaccessible by Tenant;
    (j) missing or burned-out light bulbs and fluorescent tubes (at the same location and of the same type and quality that are in the Property on the Commencement Date);
    (k) packing, removing, and storing abandoned property;
    (l) removing abandoned or illegally parked vehicles;
    (m) costs of reletting (as defined in Paragraph 27), if Tenant is in default;
    (n) attorney's fees, costs of court, costs of service, and other reasonable costs incurred in any legal proceeding against Tenant;
    (o) mailing costs associated with sending notices to Tenant for any violations of this lease;
    (p) any other unpaid charges or fees or other items for which Tenant is responsible under this lease; and
    (q) cost to restore walls, flooring, landscaping or any alteration to the Property not approved in writing by Landlord.

(2) If deductions exceed the security deposit, Tenant will pay to Landlord the excess within 10 days after Landlord makes written demand.

## 11. UTILITIES:

A. Tenant will pay all connection fees, service fees, usage fees, and all other costs and fees for all utilities to the Property (for example, electricity, gas, water, wastewater, garbage, telephone, alarm monitoring systems, cable, and Internet connections) except the following which Landlord will pay: __HOA dues__

_____.

Unless otherwise agreed, amounts under this paragraph are payable directly to the service providers.

B. Unless provided by Landlord, Tenant must, at a minimum, keep the following utilities on, if available, at all times this lease is in effect: gas; electricity; water; wastewater; and garbage services.

**Notice: Before signing this lease, Tenant should determine if all necessary utilities are available to the Property and are adequate for Tenant's use.**

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          Lease Listing

Residential Lease concerning: **4109 Michael Neill**
**Austin, TX   78730**

## 12. USE AND OCCUPANCY:

A. Occupants: Tenant may use the Property as a private residence only. The only persons Tenant may permit to reside on the Property during the term of this lease are (include names and ages of all occupants): ~~REDACTED~~ Leslie Gilbert 39
REDACTED PER TRAP 9.9

B. Phone Numbers and E-mail: Tenant must promptly inform Landlord of any changes in Tenant's phone numbers (home, work, and mobile) and e-mail not later than 5 days after a change.

C. HOA Rules: Tenant must comply with any owners' association rules or restrictive covenants affecting the Property. Tenant will reimburse Landlord for any fines or other charges assessed against Landlord for violations by Tenant of any owners' association rule or restrictive covenant.

D. Prohibitions: Unless otherwise authorized by this lease, Tenant may not install or permit any of the following on the Property, even temporarily: a spa, hot tub, above-ground pool, trampoline, or any item which causes a suspension or cancellation of insurance coverage or an increase in insurance premiums. Tenant may not permit any part of the Property to be used for: (1) any activity which is a nuisance, offensive, noisy, or dangerous; (2) the repair of any vehicle; (3) any business of any type, including but not limited to child care; (4) any activity which violates any zoning ordinance, owners' association rule, or restrictive covenant; (5) any illegal or unlawful activity; or (6) activity that obstructs, interferes with, or infringes on the rights of other persons near the Property.

E. Guests: Tenant may not permit any guest to stay on the Property longer than the amount of time permitted by any owners' association rule or restrictive covenant or _____20_____ days without Landlord's written permission, whichever is less.

F. Common Areas: Landlord is not obligated to pay any non-mandatory or user fees for Tenant's use of any common areas or facilities (for example, pool or tennis courts).

## 13. PARKING RULES:
Tenant may not permit more than ___3___ vehicles, including but not limited to automobiles, trucks, recreational vehicles, trailers, motorcycles, all-terrain vehicles, jet skis, and boats, on the Property unless authorized by Landlord in writing. Tenant may not park or permit any person to park any vehicles in the yard. Tenant may permit vehicles to be parked only in drives, garages, designated common parking areas, or in the street if not prohibited by law or an owners' association. Tenant may not store or permit any person to store any vehicles on or adjacent to the Property or on the street in front of the Property. In accordance with applicable state and local laws, Landlord may have towed, at Tenant's expense: (a) any inoperative vehicle on or adjacent to the Property; (b) any vehicle parked in violation of this paragraph or any additional parking rules made part of this lease; or (c) any vehicle parked in violation of any law, local ordinance, or owners' association rule.

## 14. ACCESS BY LANDLORD:

A. Advertising: Landlord may prominently display a "For Sale" or "For Lease" or similarly worded sign on the Property during the term of this lease or any renewal period. Landlord or Landlord's contractor may take interior or exterior photographs or images of the Property and use the photographs or images in any advertisements to lease or sell the Property.

B. Access: Before accessing the Property, Landlord or anyone authorized by Landlord will attempt to first contact Tenant, but may enter the Property at reasonable times without notice to make repairs or to show the Property to prospective tenants or buyers, inspectors, fire marshals, lenders, appraisers, or insurance agents. Additionally, Landlord or anyone authorized by Landlord may peacefully enter the Property at reasonable times without first attempting to contact Tenant and without notice to: (1) survey or review the Property's condition and take photographs to document the condition; (2) make emergency repairs; (3) exercise a contractual or statutory lien; (4) leave written notices; or (5) seize nonexempt property if Tenant is in default.

(TAR-2001) 6-1-10   Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: ____, ____   Page 5 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

Lease Listing

C. Trip Charges: If Landlord or Landlord's agents have made prior arrangements with Tenant to access the Property and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible, Landlord may charge Tenant a trip charge of $ _____ .

D. Keybox: **A keybox is a locked container placed on the Property holding a key to the Property. The keybox is opened by a special combination, key, or programmed access device so that persons with the access device may enter the Property, even in Tenant's absence. The keybox is a convenience but involves risk (such as unauthorized entry, theft, property damage, or personal injury). Neither the Association of REALTORS® nor MLS requires the use of a keybox.**

(1) Tenant authorizes Landlord, Landlord's property manager, and Landlord's broker to place on the Property a keybox containing a key to the Property:
(a) during the last _____ 30 _____ days of this lease or any renewal or extension; and
(b) at any time Landlord lists the Property for sale with a Texas licensed broker.

(2) Tenant may withdraw Tenant's authorization to place a keybox on the Property by providing written notice to Landlord and paying Landlord a fee of $ 3,000.00 _____ as consideration for the withdrawal. Landlord will remove the keybox within a reasonable time after receipt of the notice of withdrawal and payment of the required fee. Removal of the keybox does not alleviate Tenant's obligation to make the Property available for showings as indicated in Paragraph 14B.

(3) If Landlord or Landlord's agents have notified Tenant of their intent to access the Property to show it to prospects and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible, Landlord may charge Tenant a trip charge of $ 100.00 _____ .

(4) Landlord, the property manager, and Landlord's broker are not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses arising from use of the keybox unless caused by Landlord, the property manager, or Landlord's broker.

## 15. MOVE-IN CONDITION:

A. Landlord makes no express or implied warranties as to the Property's condition. Tenant has inspected the Property and accepts it **AS-IS** provided that Landlord: _____
_____
_____ .

B. Tenant will complete an Inventory and Condition Form, noting any damages to the Property, and deliver it to Landlord within _____ 10 _____ days after the Commencement Date. If Tenant fails to timely deliver the Inventory and Condition Form, the Property will be deemed to be free of damages, unless otherwise expressed in this lease. The Inventory and Condition Form is not a request for repairs. Tenant must direct all requests for repairs in compliance with Paragraph 18.

## 16. MOVE-OUT:

A. Move-Out Condition: When this lease ends, Tenant will surrender the Property in the same condition as when received, normal wear and tear excepted. Tenant will leave the Property in a clean condition free of all trash, debris, and any personal property. Tenant may not abandon the Property.

(TAR-2001) 6-1-10     Tenants: _____, _____, _____, _____  & Landlord or Landlord's Representative _____, _____     Page 6 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com     Lease Listing

B. Definitions:

(1) *"Normal wear and tear"* means deterioration that occurs without negligence, carelessness, accident, or abuse.

(2) *"Surrender"* occurs when all occupants have vacated the Property, in Landlord's reasonable judgment, and one of the following events occurs:
   (a) the date Tenant specifies as the move-out or termination date in a written notice to Landlord has passed; or
   (b) Tenant returns keys and access devices that Landlord provided to Tenant under this lease.

(3) *"Abandonment"* occurs when all of the following occur:
   (a) all occupants have vacated the Property, in Landlord's reasonable judgment;
   (b) Tenant is in breach of this lease by not timely paying rent; and
   (c) Landlord has delivered written notice to Tenant, by affixing it to the inside of the main entry door or if the Landlord is prevented from entering the Property by affixing it to the outside of the main entry door, stating that Landlord considers the Property abandoned, and Tenant fails to respond to the affixed notice by the time required in the notice, which will not be less than 2 days from the date the notice is affixed to the main entry door.

C. Personal Property Left After Move-Out:

(1) If Tenant leaves any personal property in the Property after surrendering or abandoning the Property Landlord may:
   (a) dispose of such personal property in the trash or a landfill;
   (b) give such personal property to a charitable organization; or
   (c) store and sell such personal property by following procedures in §54.045(b)-(e), Property Code.
(2) Tenant must reimburse Landlord all Landlord's reasonable costs under Paragraph 16C(1) for packing, removing, storing, and selling the personal property left in the Property after surrender or abandonment.

## 17. PROPERTY MAINTENANCE:

A. Tenant's General Responsibilities: Tenant, at Tenant's expense, must:
   (1) keep the Property clean and sanitary;
   (2) promptly dispose of all garbage in appropriate receptacles;
   (3) supply and change heating and air conditioning filters at least once a month;
   (4) supply and replace all light bulbs, fluorescent tubes, and batteries for smoke detectors, carbon monoxide detectors, garage door openers, ceiling fan remotes, and other devices (of the same type and quality that are in the Property on the Commencement Date);
   (5) maintain appropriate levels of necessary chemicals or matter in any water softener;
   (6) take action to promptly eliminate any dangerous condition on the Property;
   (7) take all necessary precautions to prevent broken water pipes due to freezing or other causes;
   (8) replace any lost or misplaced keys;
   (9) pay any periodic, preventive, or additional extermination costs desired by Tenant;
   (10) remove any standing water;
   (11) know the location and operation of the main water cut-off valve and all electric breakers and how to switch the valve or breakers off at appropriate times to mitigate any potential damage;
   (12) water the foundation of the Property at reasonable and appropriate times; and
   (13) promptly notify Landlord, in writing, of all needed repairs.

(TAR-2001) 6-1-10     Tenants: _____ , _____ , _____ , _____ & Landlord or Landlord's Representative: _____ , _____     Page 7 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          Lease Listing

B. Yard Maintenance:

(1) *"Yard"* means all lawns, shrubbery, bushes, flowers, gardens, trees, rock or other landscaping, and other foliage on or encroaching on the Property or on any easement appurtenant to the Property, and does not include common areas maintained by an owners' association.

(2) *"Maintain the yard"* means to perform activities such as, but not limited to: (a) mowing, fertilizing, and trimming the yard; (b) controlling pests in the yard; and (c) removing debris from the yard.

(3) Unless prohibited by ordinance or other law, Tenant will water the yard at reasonable and appropriate times including but not limited to the following times: _____
_____ . Other than watering, the yard will be maintained as follows:

☐ (a) Landlord, at Landlord's expense, will maintain the yard. Tenant will permit Landlord and Landlord's contractors reasonable access to the yard and will remove any pet from the yard at appropriate times.

☒ (b) Tenant, at Tenant's expense, will maintain the yard.

☐ (c) Tenant will maintain in effect a scheduled yard maintenance contract with:   ☐ a contractor who regularly provides such service; ☐ _____ .

C. Pool/Spa Maintenance: Any pool or spa on the Property will be maintained according to a Pool/Spa Maintenance Addendum.

D. Prohibitions: If Tenant installs any fixtures on the Property, authorized or unauthorized, such as additional smoke detectors, locks, alarm systems, cables, satellite dishes, or other fixtures, such fixtures will become the property of the Landlord. Except as otherwise permitted by law, this lease, or in writing by Landlord, Tenant may not:
(1) remove any part of the Property or any of Landlord's personal property from the Property;
(2) remove, change, add, or rekey any lock;
(3) make holes in the woodwork, floors, or walls, except that a reasonable number of small nails may be used to hang pictures in sheetrock and grooves in paneling;
(4) permit any water furniture on the Property;
(5) install additional phone or video cables, outlets, antennas, satellite receivers, or alarm systems;
(6) alter, replace or remove flooring material, paint, or wallpaper;
(7) install, change, or remove any: fixture, appliance, or non-real-property item listed in Paragraph 2;
(8) keep or permit any hazardous material on the Property such as flammable or explosive materials;
(9) keep or permit any material or item which causes any liability or fire and extended insurance coverage to be suspended or canceled or any premiums to be increased;
(10) dispose of any environmentally detrimental substance (for example, motor oil or radiator fluid) on the Property; or
(11) cause or allow any lien to be filed against any portion of the Property.

E. Failure to Maintain: If Tenant fails to comply with this Paragraph 17 or any Pool/Spa Maintenance Addendum, Landlord may, in addition to exercising Landlord's remedies under Paragraph 27, perform whatever action Tenant is obligated to perform and Tenant must immediately reimburse Landlord the reasonable expenses that Landlord incurs.

18. REPAIRS: (Notice: Subchapter B, Chapter 92, Property Code governs repair obligations).

A. Repair Requests: **All requests for repairs must be in writing and delivered to Landlord. If Tenant is delinquent in rent at the time a repair notice is given, Landlord is not obligated to make the repair. In the event of an emergency related to the condition of the Property that materially affects the physical health or safety of an ordinary tenant, call: (512) 773-1534 .
Ordinarily, a repair to the heating and air conditioning system is not an emergency.**

(TAR-2001) 6-1-10     Tenants: _____ , _____ , _____ , _____   & Landlord or Landlord's Representative: _____ , _____     Page 8 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    Lease Listing

B. **NOTICE:** If Landlord fails to repair a condition that materially affects the physical health or safety of an ordinary tenant as required by this lease or the Property Code, Tenant may be entitled to exercise remedies under §92.056 and §92.0561 of the Property Code. If Tenant follows the procedures under those sections, the following remedies may be available to Tenant: (1) terminate the lease and obtain an appropriate refund under §92.056(f); (2) have the condition repaired or remedied according to §92.0561; (3) deduct from the rent the cost of the repair or remedy according to §92.0561; and (4) obtain judicial remedies according to §92.0563. Do not exercise these remedies without consulting an attorney or carefully reviewing the procedures under the applicable sections. The Property Code presumes that 7 days is a reasonable period of time for the Landlord to make a diligent effort to repair a condition unless there are circumstances which establish that a different period of time is appropriate (such as the severity and nature of the condition and the availability of materials, labor, and utilities). Failure to strictly follow the procedures in the applicable sections may cause Tenant to be in default of the lease.

C. **Completion of Repairs:**

(1) Tenant may not repair or cause to be repaired any condition, regardless of the cause, without Landlord's permission. All decisions regarding repairs, including the completion of any repair, whether to repair or replace the item, and the selection of contractors, will be at Landlord's sole discretion.

(2) Landlord is not obligated to complete a repair on a day other than a business day unless required to do so by the Property Code.

D. **Payment of Repair Costs:** Except as otherwise specified in this lease, Landlord will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures for requesting repairs as described in this Paragraph 18.

(1) Landlord will pay the entire cost to repair the following items not caused by Tenant or Tenant's negligence:
  (a) heating and air conditioning systems;
  (b) water heaters; or
  (c) water penetration from structural defects.

(2) Landlord will NOT pay to repair the following items unless caused by Landlord's negligence:
  (a) conditions caused by Tenant, an Occupant, or any guest or invitee of Tenant;
  (b) damage to doors, windows, and screens;
  (c) damage from windows or doors left open;
  (d) damage from wastewater stoppages caused by foreign or improper objects in lines that exclusively serve the Property;
  (e) items that are cosmetic in nature with no impact on the functionality or use of the item; and
  (f) the following specific items or appliances: _____
  _____
  _____

E. **Trip Charges:** If a repair person is unable to access the Property after making arrangements with Tenant to complete the repair, Tenant will pay any trip charge the repair person may charge, which amount may be different from the amount stated in Paragraph 14C.

F. **Advance Payments and Reimbursements:** Landlord may require advance payment of repairs or payments under this Paragraph 18 for which Tenant is responsible. Tenant must promptly reimburse Landlord the amounts under this Paragraph 18 for which Tenant is responsible.

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    Lease Listing

**19. SECURITY DEVICES AND EXTERIOR DOOR LOCKS:**

A. Subchapter D, Chapter 92, Property Code requires the Property to be equipped with certain types of locks and security devices. Landlord has rekeyed the security devices since the last occupant vacated the Property or will rekey the security devices within 7 days after Tenant moves in. "Security device" has the meaning assigned to that term in §92.151, Property Code.

B. All notices or requests by Tenant for rekeying, changing, installing, repairing, or replacing security devices must be in writing. Installation of additional security devices or additional rekeying or replacement of security devices desired by Tenant will be paid by Tenant in advance and may be installed only by contractors authorized by Landlord.

**20. SMOKE DETECTORS:** Subchapter F, Chapter 92, Property Code requires the Property to be equipped with smoke detectors in certain locations. Requests for additional installation, inspection, or repair of smoke detectors must be in writing. Disconnecting or intentionally damaging a smoke detector or removing a battery without immediately replacing it with a working battery may subject Tenant to civil penalties and liability for damages and attorney fees under §92.2611, Property Code.

**21. LIABILITY:** Unless caused by Landlord, Landlord is not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses to person or property caused by fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, condition of the Property, environmental contaminants (for example, carbon monoxide, asbestos, radon, lead-based paint, mold, fungus, etc.), or other occurrences or casualty losses. Tenant will promptly reimburse Landlord for any loss, property damage, or cost of repairs or service to the Property caused by Tenant, Tenant's guests, any occupants, or any pets.

**22. HOLDOVER:** If Tenant fails to vacate the Property at the time this lease ends Tenant will pay Landlord rent for the holdover period and indemnify Landlord and prospective tenants for damages, including but not limited to lost rent, lodging expenses, costs of eviction, and attorneys' fees. Rent for any holdover period will be three (3) times the monthly rent, calculated on a daily basis, and will be immediately due and payable daily without notice or demand.

**23. RESIDENTIAL LANDLORD'S LIEN:** Landlord will have a lien for unpaid rent against all of Tenant's nonexempt personal property that is in the Property and may seize such nonexempt property if Tenant fails to pay rent. Subchapter C, Chapter 54, Property Code governs the rights and obligations of the parties regarding Landlord's lien. Landlord may collect a charge for packing, removing, or storing property seized in addition to any other amounts Landlord is entitled to receive. Landlord may sell or dispose of any seized property in accordance with the provisions of §54.045, Property Code.

**24. SUBORDINATION:** This lease and Tenant's leasehold interest are and will be subject, subordinate, and inferior to: (i) any lien or encumbrance now or later placed on the Property by Landlord; (ii) all advances made under any such lien or encumbrance; (iii) the interest payable on any such lien or encumbrance; (iv) any and all renewals and extensions of any such lien or encumbrance; (v) any restrictive covenant; and (vi) the rights of any owners' association affecting the Property.

**25. CASUALTY LOSS OR CONDEMNATION:** Section 92.054, Property Code governs the rights and obligations of the parties regarding a casualty loss to the Property. Any proceeds, payment for damages, settlements, awards, or other sums paid because of a casualty loss to the Property will be Landlord's sole property. For the purpose of this lease, any condemnation of all or a part of the Property is a casualty loss.

(TAR-2001) 6-1-10    Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative _____, _____ Page 10 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com                Lease Listing

26. **SPECIAL PROVISIONS:** *(Do not insert a lease-option or lease-purchase clause without the assistance of legal counsel. Special obligations and liabilities under statute apply to such transactions.)*
Tenant and Landlord to set up direct bank payment transfers for rent payment prior to July 1, 2011 for rent payments; Deposit is not the last month's rent and last month's rent to be paid in full.

27. **DEFAULT:**

   A. If Landlord fails to comply with this lease, Tenant may seek any relief provided by law.

   B. If Tenant fails to timely pay all amounts due under this lease or otherwise fails to comply with this lease, Tenant will be in default and:
   (1) Landlord may terminate Tenant's right to occupy the Property by providing Tenant with at least one day written notice to vacate;
   (2) all unpaid rents which are payable during the remainder of this lease or any renewal period will be accelerated without notice or demand;
   (3) Landlord may exercise Landlord's lien under Paragraph 23 and any other rights under this lease or the Property Code; and
   (4) Tenant will be liable for:
      (a) any lost rent;
      (b) Landlord's cost of reletting the Property including but not limited to leasing fees, advertising fees, utility charges, and other fees reasonably necessary to relet the Property;
      (c) repairs to the Property for use beyond normal wear and tear;
      (d) all Landlord's costs associated with eviction of Tenant, including but not limited to attorney's fees, court costs, costs of service, witness fees, and prejudgment interest;
      (e) all Landlord's costs associated with collection of amounts due under this lease, including but not limited to collection fees, late charges, and returned check charges; and
      (f) any other recovery to which Landlord may be entitled by law.

   C. Notice to vacate under Paragraph 27B(1) may be by any means permitted by §24.005, Property Code.

   D. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by attempting to relet the Property to acceptable tenants and reducing Tenant's liability accordingly.

28. **EARLY TERMINATION:** This lease begins on the Commencement Date and ends on the Expiration date unless: (i) renewed under Paragraph 4; (ii) extended by written agreement of the parties; or (iii) terminated earlier under Paragraph 27, by agreement of the parties, applicable law, or this Paragraph 28.

   A. Special Statutory Rights Tenants may have special statutory rights to terminate the lease early in certain situations involving family violence, military deployment or transfer, or certain sex offenses.

   (1) Military: If Tenant is or becomes a servicemember or a dependent of a servicemember, Tenant may terminate this lease by delivering to Landlord a written notice of termination and a copy of an appropriate government document providing evidence of: (a) entrance into military service; (b) military orders for a permanent change of station (PCS); or (c) military orders to deploy with a military unit for not less than 90 days. Termination is effective on the 30th day after the first date on which the next rental payment is due after the date on which the notice is delivered. Section 92.017, Property Code governs the rights and obligations of the parties under this paragraph.

(TAR-2001) 6-1-10    Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____    Page 11 of 14

(2) Family Violence: Tenant may terminate this lease if Tenant provides Landlord with a copy of a court order described under §92.016, Property Code protecting Tenant or an occupant from family violence committed by a cotenant or occupant of the Property. Section 92.016, Property Code governs the rights and obligations of the parties under this paragraph. If the family violence is committed by someone other than a cotenant or co-occupant of the Property, Tenant must give written notice of termination 30 days prior to the effective date of the notice.

(3) Sex Offenses: Tenant may have special statutory rights to terminate this lease in certain situations involving sexual assault or sexual abuse. For more information about the types of abuse and assault covered by this provision, Tenant is advised to review §92.0161, Property Code.

B. Assignment, Subletting and Replacement Tenants:

(1) Tenant may not assign this lease or sublet the Property without Landlord's written consent.

(2) If Tenant requests an early termination of this lease under this Paragraph 28B, Tenant may attempt to find a replacement tenant and may request Landlord to do the same. Landlord may, but is not obligated to, attempt to find a replacement tenant under this paragraph.

(3) Any assignee, subtenant, or replacement tenant must, in Landlord's discretion, be acceptable as a tenant and must sign: (a) a new lease with terms not less favorable to Landlord than this lease or otherwise acceptable to Landlord; (b) a sublease with terms approved by Landlord; or (c) an assignment of this lease in a form approved by Landlord.

(4) At the time Landlord agrees to permit an assignee, subtenant, or replacement tenant to occupy the Property, Tenant will pay Landlord:

(a) if Tenant procures the assignee, subtenant, or replacement tenant:
☐ (i) $ _____ .
☐ (ii) _____ % of one's month rent that the assignee, subtenant, or replacement tenant is to pay.

(b) if Landlord procures the assignee, subtenant, or replacement tenant:
☐ (i) $ _____ .
☐ (ii) _____ % of one's month rent that the assignee, subtenant, or replacement tenant is to pay.

(5) Unless expressly stated otherwise in an assignment or sublease, Tenant will not be released from Tenant's obligations under this lease because of an assignment or sublease. An assignment of this lease or a sublease of this lease without Landlord's written consent is voidable by Landlord.

29. **ATTORNEY'S FEES:** Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, attorney's fees, costs of service, and all other costs of the legal proceeding from the non-prevailing party.

30. **REPRESENTATIONS:** Tenant's statements in this lease and any application for rental are material representations. Each party to this lease represents that he or she is of legal age to enter into a contract. If Tenant makes a misrepresentation in this lease or in an application for rental, Tenant is in default.

31. **ADDENDA:** Incorporated into this lease are the following addenda, exhibits and other information. If Landlord's Rules and Regulations are made part of this lease, Tenant agrees to comply with the Rules and Regulations as Landlord may, at Landlord's discretion, amend from time to time.

☐ Addendum Regarding Lead-Based Paint
☐ Inventory & Condition Form
☐ Landlord's Additional Parking Rules
☒ Pet Agreement
☐ Protecting Your Home from Mold
☐ Agreement for Application Deposit & Hold
☐ _____
☐ _____

☒ Agreement Between Brokers
☐ Landlord's Rules & Regulations
☐ Owners' Association Rules
☐ Pool/Spa Maintenance Addendum
☒ Residential Lease Application
☐ Residential Lease Guaranty
☐ _____
☐ _____

(TAR-2001) 6-1-10     Tenants: _____ , _____ , _____ , _____ & Landlord or Landlord's Representative _____ , _____     Page 12 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com     Lease Listing

**32. NOTICES:** All notices under this lease must be in writing and are effective when hand-delivered, sent by mail, or sent by electronic transmission to *(Do not insert an e-mail address or a fax number unless the party consents to receive notices under this lease at the e-mail address or fax number specified.)*:

Tenant at the Property and a copy to:                   Landlord c/o:

_____          _____

_____          _____

_____          _____

E-mail:_____          E-mail:_____

Fax:_____          Fax:_____

**33. AGREEMENT OF PARTIES:**

A. <u>Entire Agreement</u>: There are no oral agreements between Landlord and Tenant. This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

B. <u>Binding Effect</u>: This lease is binding upon and inures to the benefit of the parties to this lease and their respective heirs, executors, administrators, successors, and permitted assigns.

C. <u>Joint and Several</u>: All Tenants are jointly and severally liable for all provisions of this lease. Any act or notice to, refund to, or signature of, any one or more of the Tenants regarding any term of this lease, its extension, its renewal, or its termination is binding on all Tenants executing this lease.

D. <u>Waiver</u>: Landlord's past delay, waiver, or non-enforcement of a rental due date or any other right will not be deemed to be a waiver of any other breach by Tenant or any other right in this lease.

E. <u>Severable Clauses</u>: Should a court find any clause in this lease unenforceable, the remainder of this lease will not be affected and all other provisions in this lease will remain enforceable.

F. <u>Controlling Law</u>: The laws of the State of Texas govern the interpretation, validity, performance, and enforcement of this lease.

G. <u>Copyright</u>: If an active REALTOR® member of the Texas Association of REALTORS® or an active member of the State Bar of Texas does not negotiate this lease as a party or for one of the parties, either as a party's broker or attorney, this lease is voidable at will by Tenant.

**34. INFORMATION:**

A. Future inquiries about this lease, rental payments, and security deposits should be directed to the person listed for receipt of notices for Landlord under Paragraph 32.

B. It is Tenant's responsibility to determine, before signing this lease, if: (i) all services (e.g., utilities, connections, schools, and transportation) are accessible to or from the Property; (ii) such services are sufficient for Tenant's needs and wishes; and (iii) Tenant is satisfied with the Property's condition.

C. The brokers to this lease have no knowledge of whether Landlord is delinquent in the payment of any lien against the Property.

(TAR-2001) 6-1-10    Tenants: _____ , _____ , _____ , _____ & Landlord or Landlord's Representative _____ , _____    Page 13 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    Lease Listing

Residential Lease concerning: _____
4109 Michael Neill
Austin, TX 78730

D. Unpaid rent and any unpaid amount under this lease are reportable to credit reporting agencies.

E. Landlord is not obligated to respond to any requests for Tenant's rental and payment history from a mortgage company or other prospective landlord until Tenant has given notice of termination of this lease and Tenant is not in breach of this lease. (*Notice: Landlord or Landlord's agent may charge a reasonable fee for processing such information.*)

F. If all occupants over 18 years of age die during this lease, Landlord may: (i) permit the person named below to access the Property at reasonable times in Landlord's or Landlord's agent's presence; (ii) permit the named person to remove Tenant's personal property; and (iii) refund the security deposit, less deductions, to the named person. Section 92.014, Property Code governs procedures to follow in the event of a tenant's death.

Name: _____ Phone: _____
Address: _____
E-mail: _____

G. The Texas Department of Public Safety maintains a database that the public may search, at no cost, to determine if registered sex offenders are located in certain areas (see www.txdps.state.tx.us under on-line services). For information concerning past criminal activity in certain areas, contact the local police department.

H. Landlord's insurance does not cover Tenant from loss of personal property. Landlord recommends that Tenant obtain insurance for casualties such as fire, flood, water damage, and theft. Tenant represents that Tenant ☒ intends ☐ does not intend to purchase such insurance.

I. Landlord's broker, **Keller Williams Realty** _____,
☐ will ☒ will not act as the property manager for landlord.

J. This lease is negotiable between the parties. This lease is binding upon final acceptance. READ IT CAREFULLY. If you do not understand the effect of this lease, consult your attorney BEFORE signing.

K. This lease should not be used in conjunction with executory contracts of any type, such as contracts for deed, leases with options to purchase, or lease options, without the advice of an attorney.

| | | | |
|---|---|---|---|
| Landlord        Date 6/28/11 | | Tenant       Date | |
| John Bryan Langdon | | Leslie Mathison Gilbert | |

Landlord _____ Date      Tenant _____ Date

Or signed for Landlord under written property management agreement or power of attorney:

By: _____
                    Date

Printed Name: _____

Firm Name: _____

Broker's License No.: _____

Tenant _____ Date

Tenant _____ Date

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com



**ADDENDUM TO RESIDENTIAL LEASE CONCERNING THE PROPERTY AT** 4109 Michael Neill, Austin, TX 78730

**A. PET AUTHORIZATION AND PET DESCRIPTION:**

(1) Tenant may not keep any pet on the Property unless specifically authorized by this agreement. "Pet" includes any animal, whether mammal, reptile, bird, fish, rodent, or insect.

(2) Tenant may keep the following pet(s) on the Property until the above-referenced lease ends.

Type: Mini Poodle    Breed: Poodle    Name: Zsa Zsa
Color: White    Weight: 11 pounds    Age: 10    Gender: Female
Neutered? [x] yes [ ] no    Declawed? [ ] yes [x] no    Rabies Shots Current? [x] yes [ ] no

Type: _____    Breed: _____    Name: _____
Color: _____    Weight: _____    Age: _____    Gender: _____
Neutered? [ ] yes [ ] no    Declawed? [ ] yes [ ] no    Rabies Shots Current? [ ] yes [ ] no

**B. CONSIDERATION:** In consideration for Landlord's authorization for Tenant to keep the pet(s) described in Paragraph A on the Property, the parties agree to the following. *(Check any one or any combination of the following.)*

[x] (1) On or before the date Tenant moves into the Property, Tenant will pay Landlord a pet deposit of $ 1,000.00 . The pet deposit is an increase in the security deposit in the lease and is made part of the security deposit for all purposes. This increase in the security deposit is not refundable before the lease ends, even if the pet is removed. Any refund of the security deposit, including this increase, is governed by the terms of the lease.

[ ] (2) The monthly rent in the lease is increased to $ _____ .

[ ] (3) Tenant will, upon execution of this agreement, pay Landlord $ _____ as a one-time, non-refundable payment.

**C. PET RULES: Tenant must:**
(1) take all reasonable action to insure that any pet does not violate the rights of other persons;
(2) comply with all applicable statutes, ordinances, restrictions, owners' association rules, and other enforceable regulations regarding any pet;
(3) keep the rabies shots of any pet current;
(4) confine any pet that is a dog or cat, when outside, by fences or on leashes under Tenant's control;
(5) confine any pet other than a dog or cat in appropriate cages at all times;
(6) promptly remove any pet waste from the Property, including all living areas, garages, storage areas, yards, porches, patios, courtyards, and decks; and
(7) promptly remove from the Property any offspring of any pet.

**D. ACCESS:** Tenant must remove or confine any pet at any time that the pet is likely to limit or prohibit Landlord or other persons access to Property as permitted by the lease.

(TAR-2004) 10-14-03    Initialed for Identification by Tenants: _____, _____, and Landlord _____    Page 1 of 2

Keller Williams Realty 4010 River Place Blvd Austin, TX 78730
Phone: 512.576.7344    Fax: .512-623-6123    Tim Moncrief      Lease Listing
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Pet Agreement concerning _____ 4109 Michael Neill
Austin, TX  78730

E. DISCLOSURE CONCERNING PETS:
   (1) Is Tenant aware of whether any of the pets described under this addendum has ever bitten or injured another person?　☐ Yes ☒ No
       If yes, explain: _____
       _____
       _____ .

   (2) Is Tenant aware of whether any of the pets described under this addendum has any propensity or predisposition to bite or injure someone?　☐ Yes ☒ No
       If yes, explain: _____
       _____
       _____ .

F. TENANT'S LIABILITY:
   (1) Tenant is responsible and liable for:
       (a) any damage to the Property or any item in the Property caused by any pet;
       (b) any personal injuries to any person caused by any pet; and
       (c) any damage to any person's property caused by any pet.
   (2) Tenant will pay all reasonable costs that are necessary to clean, deodorize, deflea, or repair any part of the Property, including but not limited to the carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, sod, yard, fences, or landscaping.

G. INDEMNIFICATION: Tenant will protect, defend, indemnify, and hold Landlord, Landlord's property manager, and Landlord's agents harmless from any damages, costs, attorney's fees, and expenses that are caused by the act of any pet or Tenant.

H. DEFAULT: If Tenant breaches any provision in this pet agreement, Landlord may exercise all or any of the remedies described under Paragraph 9B of the lease.

I. SPECIAL PROVISIONS:

Landlord John Bryan Langdon _____ 6/26/11　Date

Landlord _____ Date

Or signed for Landlord under written property management agreement or power of attorney:

By: _____
Printed Name: _____
Firm Name: _____

Tenant Leslie Mathison Gilbert _____ Date

Tenant _____ Date

Tenant _____ Date

Tenant _____ Date

# APPENDIX
# #2

Filed: 4/21/2015 4:58:55 PM
Dana DeBeauvoir
Travis County Clerk
C-1-CV-14-003653
Sophia Delacroix

| JOHN BRYAN LANGDON | § | IN THE COUNTY COURT |
|---|---|---|
| **Plaintiff,** | § | |
| | § | |
| v. | § | **AT LAW #2** |
| | § | |
| **LESLIE MATHISON GILBERT,** | § | |
| **Defendant.** | § | **TRAVIS COUNTY, TEXAS** |

## PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION FOR BILL OF REVIEW

COMES NOW, John Bryan Langdon, Plaintiff complaining of Leslie Mathison Gilbert, Defendant, and for cause of action would show the following:

### I. DISCOVERY

1. Discovery in this case is intended to be conducted under Level 1 of Rule 190 of the Texas Rules of Civil Procedure. Plaintiffs seeks monetary relief aggregating $50,000 or less, excluding costs, prejudgment interest, and attorney's fees.

### II. PARTIES AND SERVICE

2. Plaintiff is John Bryan Langdon, ("Mr. Langdon" or "Plaintiff") is an individual currently residing at 1004 West Wayne St., Fort Wayne, Indiana 46802.

3. Defendant is Leslie Mathison Gilbert ("Ms. Gilbert" or "Defendant") has already appeared and may be served by delivery to her attorney of record pursuant to the TRCP.

### III. JURISDICTION AND VENUE

4. The amount in controversy, exclusive of interest and costs, is within the jurisdictional limits of this Court. Venue is proper in Travis County, Texas as the real property at issue and the events that gave rise to this lawsuit are located within Travis County, Texas. All conditions precedent to Plaintiff's right to recover has been performed or has occurred.

### IV. FACTUAL BACKGROUND

5. The Defendant filed suit in this Court against the Plaintiff for damages related to a Residential Lease Agreement in Cause No. C-1-CV-13-009444, styled, "*Leslie Mathison Gilbert v. John Bryan Langdon*" with a default judgment rendered on or about March 19, 2014. A copy of the Default Judgment is attached hereto as *Exhibit A*.

6. In such suit, Plaintiff Mr. Langdon was found liable for bad faith in failing to provide an accounting and refund of Ms. Gilbert's security deposit, as well as retaining an overpayment of rents in the amount of $1,500.00. Attorney's fees, civil penalty and trebling of damages were also entered against Mr. Langdon.

7. In filing the suit, Ms. Gilbert tendered service of process to the Texas Secretary of State, alleging that the Secretary of State was the agent for Mr. Langdon because Mr. Langdon has not designated or maintained a resident agent for service of in Texas, that he engaged in business in Texas, does not maintain a regular place of business in Texas, and that the lawsuit arises from Mr. Langdon's business in Texas. As such, Ms. Gilbert alleges that the Secretary of State was the proper agent for service pursuant to Tex. Civ. Prac. & Rem. Code §17.044.

8.     Upon serving the Secretary of State, Ms. Gilbert, she was required to provide the Secretary of State a document that contains a statement of the name and address to deliver Notice of Citation to Mr. Langdon, pursuant to Tex. Civ. Prac. & Rem. Code §17.045. The return of service includes the address provided by Defendant Ms. Gilbert to the Secretary of State. *See Exhibit B*.

9.     Ms. Gilbert provided the Secretary of State the following address: 275 2nd Ave., Long Branch, New Jersey 07740.

10.     This address was not the address of Mr. Langdon.  Mr. Langdon's correct address is 275 2nd Ave. Front, Long Branch, New Jersey 07740.

11.     Accordingly, Ms. Gilbert did not provide effective notice of citation upon Mr. Langdon.

## V. BILL OF REVIEW STANDARD

12.     Mr. Langdon re-allege and incorporates herein by reference, as though set forth in their entirety, the factual statements contained in the preceding paragraphs into this Section V.

13.     A default judgment may be attacked by a Bill of Review after it is too late to file either an appeal or Motion for New Trial. *Mabon Ltd. v. Afri-Carib Enters.*, 369 S.W.3d 809, 812 (Tex. 2012).

14.     Mr. Langdon must file a sworn pleading that states the grounds for the Bill of Review. *Baker v. Goldsmith*, 582 S.W.2d 404, 408 (Tex. 1979).  To be entitled to a hearing, the petition must make a prima facia showing of sufficient cause, which is not defined by TRCP 329(b).

15.     Mr. Langdon claims that his due-process rights have been violated by ineffective or improper service.

16.     Ordinarily for a Bill of Review, a party must prove 1) a meritorious defense; 2) justification for failure to assert the defense; and 3) no fault or negligence on the part of Mr. Langdon for the rendering of the default judgment. *Caldwell v. Barnes*, 154 S.W.3d 93, 96 (Tex. 2004).  However, when to establish sufficient cause when there is a due-process violation claimed, Mr. Langdon is not required to prove the first two elements set out above.  *Mabon Ltd.*, 369 S.W.3d at 812; *Caldwell*, 154 S.W.3d 96-97.

17.     Judgment rendered without proper service is a violation of due process. *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 86-87 (1988).  Further, the third element, no fault or negligence, is conclusively established if Mr. Langdon proves he was not served with process. *Mabon Ltd.*, 369 S.W.3d at 812; *Ross v. National Ctr. For the Empl. Of the Disabled*, 197 S.W.3d 795, 797 (Tex. 2006).  A party that did not get served with process or who did not receive notice cannot be at fault or negligent in allowing a default judgment to be rendered.  *Caldwell* at 154 S.W.3d at 97; *Cash v. Beaumont Dealers Auto Auction, Inc.*, 275 S.W.3d 915, 918-19 (Tex. App. – Beaumont 2009, no pet.).

## VI. ARGUMENT

18.     Mr. Langdon re-allege and incorporates herein by reference, as though set forth in their entirety, the factual statements contained in the preceding paragraphs into this Section VI.

19.     As previously stated, the Secretary of State was served with the citation for the underlying cause, to wit Ms. Gilbert provided an incorrect address for Mr. Langdon, or the Secretary of State delivered citation to an incorrect address.  The Secretary of State delivered citation to 275 2nd Ave., Long Branch, New Jersey 07740.  A copy of the Secretary of State's Return of Service is attached hereto as *Exhibit B* and incorporated herein by reference as if fully set forth at length.

20.	The Return of Service evidences that Citation was delivered to 275 2nd Ave., Long Branch, New Jersey 07740.  However, Mr. Langdon's actual address is 275 2nd Ave. Front, Long Branch, New Jersey 07740.

21.	In *Royal Surplus Lines v. Samaria Baptist Church*, 840 S.W.2d 382, 383 (Tex. 1992), the Secretary of State delivered citation to Defendant addressed to "1201 Bassie", rather than "1201 Bessie".  Even though such error was "a typographical error in the forwarding address typed by the Secretary is grounds to set aside a default judgment based on substituted service."  In doing so, *Royal Surplus* cites to *Uvalde Country Club v. Martin Linen Supply Co.*, 690 SW2d 884, 884 (Tex. 1985), which overturned a default judgment on the hyper-technical 'invalid service' grounds that the citation naming defendant's agent omitted the "Jr." at the end of his name.

22.	In *Commission of Contracts of General Executive Committee of Petroleum Workers Union of Republic of Mexico v. Arriba, Ltd.*, 882 SW2d 576, 585 (Tex. App. – Houston [1st Dist.] 1994, no pet.), is a bill of review case where a default judgment was overturned where SOS service had been to "37 Bahia de *Espiruta Santo Esquira* (at the corner of) Bahia de Ballenas", rather than on the correct "37 Bahia de *Todos Santos* (at the corner of) Bahia de Ballenas", some three blocks away.

23.	In *Salzgitter v. Alexander Steel Sales*, 2011 US Dist. LEXIS 52098 (S.D. Tex. May 16, 2011), long arm service via Texas SOS found defective where address was off by one digit, holding that such does not strictly comply with the Texas long arm statute.  Also notes in dicta at n.13 that if a plaintiff could serve an out-of-state defendant merely by supplying the Texas SOS an incorrect address, "the nonresident's due process rights [appear] to be in significant danger."

24.	In *Marquez v. Greig*, 2012 Tex. App. LEXIS 6551 *6-7 (Tex. App. – Houston [1st Dist.] August 9, 2012, no pet.), a default judgment was overturned via restricted appeal where the correct address was "2155 North Fairview", but SOS had forwarded citation to "2155 Northfairview" and it had been returned marked "unclaimed".  *Marquez* cites both *Royal Surplus* and *Uvalde Country Club* to the effect that where there is evidence that the defendant's actual address differed, IF ONLY SLIGHTLY, from the address to which the Secretary of State forwarded service of process, the court held that the record does not affirmatively show strict compliance with the rules governing service of process.

25.	In *Harper McLeod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 398-99 (5th Cir. 2001), upheld the voiding of a default judgment because, among other things, plaintiff provided the Texas SOS an address that contained an erroneous suite number.  *Harper* also cites to both *Royal Surplus* and *Arriba*, infra, in holding that Texas courts have consistently required strict compliance with the terms of the long arm statute" … and that "a typographical error in the forwarding address …is grounds to set aside a default judgment."  Also states that defendant having ACTUAL NOTICE without proper service is irrelevant, because without such proper service, a court cannot gain jurisdiction over such an out-of-state defendant, whether he has notice or not.

26.	Lastly, in *Shackelford v. Carter Copters*, 2011 Tex. App. LEXIS 7150 *12 (Tex. App. – Fort Worth Aug 31, 2011, no pet.), a party challenging default judgment under bill of review survives summary judgment, which was a case that involved SOS service on out-of-state resident at "333 Howard Street" rather than "333B Howard Street".  Citing *Royal Surplus*, the *Shackelford* court muses that such an address may not be <u>incorrect</u>, but it is incomplete, and allows defendant's case to go forward, despite the fact that the citation came back 'refused' (and not merely undelivered).

27.	In our case, the SOS delivered citation to 275 2nd Ave., Long Branch, New Jersey 07740. However, Mr. Langdon's actual address is 275 2nd Ave. Front, Long Branch, New Jersey 07740. The address is incorrect or at the least incomplete. As such strict compliance with delivery of citation has not been met.  Therefore, Mr. Langdon's due process rights have been violation, and he need not prove the first two elements required by a Bill of Review, and the third element is conclusively proved by establishing that he was not served with process.

28.     Mr. Langdon has no adequate legal remedy now available to avoid the effect of the erroneous Default Judgment.  Mr. Langdon did not have nor acquired actual knowledge of the Default Judgment until he was contacted by opposing counsel in the underlying lawsuit until after the Court's plenary power terminated.  Accordingly, the court should void the underlying judgment, and permit a new trial, after discovery has been conducted, to go forth.

## VII. ATTORNEY'S FEES

29.     Plaintiff seeks all reasonable and necessary attorneys' fees in this case, which include, but are not limited to the following:

(a) Investigation, and other Pre-Trial Matters;
(b) Preparation and trial of this lawsuit;
(c) Post-trial, pre-appeal legal services;
(d) An appeal to the court of appeals;
(e) Making or responding to an application for petition of review to the Supreme Court of Texas;
(f) An appeal to the Supreme Court of Texas in the event application for petition for review is granted; and
(g) Post judgment discovery and collection in the event execution on the judgment is necessary.

30.     A reasonable fee for the attorney's services rendered and to be rendered is at least $7,500.00. Attorney's fees are authorized under Tex. Civ. Prac. & Rem. Code §38.000 *et seq*. and the Lease Agreement at ¶29 attached as *Exhibit C*.

## VIII.

WHEREFORE, Plaintiff requests that Defendant be cited to appear and answer; that a new trial be granted; and that on final trial hereof, the Court order that the Default Judgment be set aside and vacated; that the Court enter judgment that the Defendant Ms. Gilbert take nothing; that Plaintiff recover from the Defendant, his damages and costs herein expended; attorney's fees, and have such other and further relief, at law or in equity, as to which he may be justly entitled.

Respectfully submitted,

LAW OFFICE OF TOM MURPHY

By: _____
Tom Murphy
TSB # 24013217
9600 Great Hills Trail, Ste. 150W
Austin, Texas 78759
(512) 477-5680
(512) 493-0691 Fax
Email: tom@tommurphyslaw.com
Attorney for Langdon

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above was delivered to the following parties or their attorneys of record pursuant to the TRCP on April 21, 2015.

Troup & Bruce, LLP
Attn: Blair Bruce
211 Florence
Tomball, Texas 77375
(281) 516-1100
(281) 516-1180 Fax
blair@troupbruce.com

Evans Kosut Davidson, PLLC
Attn: John M. Davidson
16000 Stuebner Airline Rd., Suite 200
Spring, Texas 77379
(281) 251-7900
(281) 251-7909 Fax
jdavidson@ekklaw.com

_____
Tom Murphy

# APPENDIX
# #3

# EXHIBIT B

CAUSE NO. C-1-CV-14-003653

| | | |
|---|---|---|
| JOHN BRYAN LANGDON | § | IN THE COUNTY COURT |
| **Plaintiff,** | § | |
| | § | |
| v. | § | AT LAW #2 OF |
| | § | |
| LESLIE MATHISON GILBERT | § | |
| **Defendant.** | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF TOM MURPHY

Personally appeared before the undersigned officer, duly authorized by law to administer oaths, came Tom Murphy who, upon being duly sworn, states that the following is true and correct, and deposes of his own personal knowledge as follows:

1.     My name is Tom Murphy. I am a licensed Texas attorney who, at all relevant times, has represented Plaintiff John Bryan Langdon in connection with above-captioned lawsuit. By reason of such representation, I am intimately familiar with the matters giving rise to the present dispute. I am over the age of 18 years, and am fully competent to make this affidavit. The facts stated below are true and correct of my own personal knowledge.

2.     Attached hereto as Exhibit B-1 is a true and correct copy of excerpts of the Default Judgment taken against Mr. Langdon in the underlying lawsuit.

3.     Attached hereto as Exhibit B-2 is a true and correct copy of Citation issued for the First Amended Petition that provided the address for the Texas Secretary of State in the underlying lawsuit.

4.     Attached hereto as Exhibit B-3 is a true and correct copy of the Return of Service from the Texas Secretary of State in the underlying lawsuit.

5.     I am the attorney for John Bryan Langdon.

6.     I am an attorney licensed to practice law in the state of Texas since 1999, and currently in good standing with the State Bar of Texas.

7.     It was necessary for Plaintiff to retain my services for legal representation in this Cause. Plaintiff agreed to pay me a reasonable fee for these services, which I performed in this matter or will perform.

8.     The fee was based on the factors set forth in Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, and the case law interpreting this Rule.

9.     I am of the opinion that $18,500.00 would be a reasonable fee for the services required to perform Investigation, Pre-Trial Matters, including discovery, and handling this matter on the original appeal that resulted in Plaintiff's favor, post-judgment discovery and collection of the judgment awarded, and to satisfy the judgment by writ of execution. And if any Defendant should file a Motion for New Trial, the Plaintiff shall be awarded an additional $3,750.00 to prepare and respond to such motion.

10.     If Defendant makes an unsuccessful appeal from this judgment, I am of the opinion that $8,500.00 would be a reasonable fee for services performed in this cause on appeal to the court of appeals.

11.     If Plaintiff's Judgment is upheld by the court of appeals and Defendant make an unsuccessful appeal from the judgment and the judgment of the court of appeals, I am of the opinion that $12,000.00 would be a reasonable fee for making or responding to an application for petition of review to the Supreme Court of Texas.

12.     If Plaintiff's Judgment is upheld by the court of appeals and Defendant make an unsuccessful appeal from the judgment and the judgment of the court of appeals, I am of the opinion that $8,000.00 would be a reasonable fee for services performed for an appeal to the Supreme Court of Texas in the event application for petition for review is granted.

13.     It is my opinion that these fees are reasonable attorney's fees based upon the factors set forth in Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, the case law interpreting this Rule, and,

    a.     The time and labor required, the novelty and difficulty of the issue involved, the skill required to provide the legal services properly, and the experience, reputation, and expertise of the lawyer or lawyers performing the services;

    b.     The likelihood that the acceptance of the particular employment will preclude other employment by me;

    c.     The fee customarily charged in the community for similar legal services.

    d.     The amount involved and the result obtained;

    e.     The time limitations imposed by my clients or by the circumstances;

    f.     The nature and length of professional relationship with my clients;

    g.     My experience, reputation, and my ability as an attorney performing the services;

    h.     Whether or not the fee is fixed or contingent on the results obtained – that is the uncertainty of collection before legal services have been rendered; and

    i.     Based on common knowledge of the attorney's involved and this Court.

14.     I, and any subsequent attorneys retained on this matter, reserve the right to supplement this amount as additional work and cost are performed and incurred.

15.     Plaintiff request his cost for the County Court and the original appeal to the Court of Appeals for this matter.

16.     Further, affiant saith not."

**THIS PORTION INTENTIONALLY LEFT BLANK**

Tom Murphy

STATE OF TEXAS                §
                              §
COUNTY OF TRAVIS              §

    BEFORE ME, the undersigned, a Notary Public in and for the State of Texas, on this day personally appeared Tom Murphy, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed it for the purposes and consideration expressed in it.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 29th day of January, 2015.

Marion Church
Notary Public – State of Texas

NOTARY PUBLIC
STATE OF TEXAS
Marion Church
Commission Expires
09-25-2017

# APPENDIX #4

| JOHN BRYAN LANGDON | § | IN THE COUNTY COURT |
| Plaintiff, | § | |
| | § | |
| VS. | § | AT LAW #2 OF |
| | § | |
| LESLIE MATHISON GILBERT, | § | |
| Defendant | § | TRAVIS COUNTY, TEXAS |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR TRADITIONAL SUMMARY JUDGMENT FOR BILL OF REVIEW AND NO EVIDENCE MOTION SOR SUMMARY JUDGMENT

LESLIE MATHISON GILBERT, Defendant herein, files her response to Plaintiff's Motion for Traditional Summary Judgment for Bill of Review and No Evidence Motion for Summary Judgment.

**SUMMARY:**

To bring the appellate matters and bill of review case to a close and conserve resources, Defendant concedes that the Court should grant Plaintiff Langdon's bill of review and set aside the underlying judgment, but objects to any award of attorney's fees or other relief to Plaintiff Langdon since there is no legal support for it. Alternatively, there is a question of material fact regarding whether the attorney's fees sought are reasonable or necessary or properly proven; thus, summary judgment is improper.

**RESPONSE:**

1. **Defendant Gilbert concedes that the Court should grant Plaintiff Langdon's bill of review and set aside the underlying judgment.**

Solely to conserve resources, Defendant Gilbert concedes that the Court should grant Plaintiff's bill of review (based on the omission of the word "Front" on the citation in the underlying lawsuit) solely to set aside the underlying March 19, 2014 default judgment and return the parties to the pre-default judgment status in the underlying lawsuit. This will conclude the bill of review lawsuit. Thereafter, the Court should re-set the underlying lawsuit for trial at a

1

later date. See Tex. R. Civ. P. 174(b) and 245; *Caldwell v. Barnes* 154 S.W. 2d 93, 97 (Tex. 2004); *Baker v. Goldsmith*, 582 S.W. 2d 404, 408 (Tex. 1979).

**2. Defendant Gilbert objects to any award of attorney's fees to Plaintiff Langdon since there is no legal support for it; thus the Court should deny summary judgment.**

Plaintiff Langdon cites no authority in his motion or live pleading which would permit a Court to award attorney's fees to an equitable bill of review plaintiff.

The Court does not have discretion to award a bill of review plaintiff attorney's fees under the Uniform Declaratory Judgment Act. *Mungia v VIA Metro Transit*, 441 S.W. 3d 542 (Tex. App.—San Antonio 2014, no pet.).

The general rule in Texas is that each litigant must pay its own attorney's fees. *MBM Fin. Corp. v. Woodland Oper. Co.*, 292 S.W.3d 660, 663 (Tex. 2009). Recovery of attorney's fees from the adverse party is allowed only when the recovery is permitted by statute, by contract, between the litigants, or under equity. *Akin, Gump, Strauss, Hauer & Feld, LLP v. National Dev. & Research Corp.*, 299 S.W.3d 106, 120 (Tex. 2009).

**3. Alternatively, there is a question of material fact regarding whether the attorney's fees sought are reasonable or necessary, and the Court should deny summary judgment.**

Assuming the Court determines that Plaintiff Langdon can recover attorney's fees for prosecuting a bill of review lawsuit, the Court should deny the motion for summary judgment as to attorney's fees since the affidavit of counsel for Defendant, marked and attached as Exhibit A, regarding reasonable and necessary attorney's fees, creates a material issue of fact. Additionally, Plaintiff's affidavit fails to state Plaintiff's counsel's hourly rate or provide any level of detailed billing as required by the Texas Supreme Court in *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763-765 (Tex. 2012). Further, Plaintiff Langdon's summary judgment evidence fails to provide any evidence that his claim for attorney's fees was timely presented to Defendant Gilbert. Tex. Civ. Prac. & Rem. Code 38.002.

THEREFORE, Defendant requests that the underlying judgment be set aside and Plaintiff's request for attorney's fees be denied, and for such other and further relief to which Defendant may be justly entitled.

Respectfully submitted,

**EVANS KOSUT DAVIDSON, PLLC**

*/s/ John M. Davidson*

By: _____
John M. Davidson
State Bar No. 05434980
16000 Stuebner Airline Rd., Suite 200
Spring, Texas 77379
281-251-7900 – Telephone
281-251-7909 – Fax
jdavidson@ekklaw.com

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above document has this 27th day of March, 2015, been served to counsel of record as follows:

***Via eFiling and/or eMail: tom@tommurphyslaw.com***
Tom Murphy
Law Office of Tom Murphy
9600 Great Hills Trail, Ste. 150W
Austin, TX  78759

*/s/ John M. Davidson*

By: _____
John M. Davidson

3

| | | |
|---|---|---|
| **JOHN BRYAN LANGDON** | § | **IN THE COUNTY COURT** |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **AT LAW #2 OF** |
| | § | |
| **LESLIE MATHISON GILBERT,** | § | |
| **Defendant** | § | **TRAVIS COUNTY, TEXAS** |

## AFFIDAVIT OF JOHN M. DAVIDSON

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, personally appeared John M. Davidson who, upon his oath, deposed and said:

1.      "My name is John M. Davidson. I am over 21 years of age and fully competent to execute this affidavit. I am an attorney with the law firm of Evans Kosut Davidson, PLLC in Spring, Texas, and the attorney for LESLIE MATHISON GILBERT, Defendant in the above-captioned action. I have personal knowledge of the facts in this affidavit, and those facts are true and correct.

2.      I am an attorney in good standing licensed in the State of Texas and have been a practicing attorney in Houston, Texas and nearby counties for 25 years. I am generally familiar with the attorney's fees charged by litigation counsel in Travis County, Texas.

3.      I am of the opinion that $18,500.00 in attorney's fees, and related appellate fee requests, would **not** be a reasonable fee for the services summarily described in Plaintiff's attorney's affidavit marked as Plaintiff's Exhibit B. Further, Plaintiff's affidavit fails to state Plaintiff's counsel's hourly rate or provide any level of detailed billing as required by the Texas Supreme Court in *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763-765 (Tex. 2012).

4.      It is my opinion that these fees are **not** reasonable or necessary attorney's fees based upon the factors set forth in Rule 1.4 of the Texas Disciplinary Rules of Professional Conduct, and the case law interpreting this Rule:

   a.      The time and labor required, the novelty and difficulty of the issue involved, the skill required to provide the legal services properly, and the experience, reputation, and expertise of the lawyer or lawyers performing the services;

   b.      The likelihood that the acceptance of the particular employment will preclude other employment by the attorney;

1

c.      The fee customarily charged .in the community for similar legal services.

d.      The amount involved and the result obtained;

e.      The time limitations imposed by the clients or by the circumstances;

f.      The nature and length of professional relationship with the clients;

g.      The experience, reputation, and the ability of the attorney performing the services;

h.      Whether or not the fee is fixed or contingent on the results obtained - that is the uncertainty of collection before legal services have been rendered; and

i.      Based on common knowledge of the attorney involved and this Court.

5.      In my opinion, the reasonable and necessary attorney's fees, if any, for this Plaintiff in a simple default judgment based upon incorrect service type of case, would be significantly lower than the amount being requested by Plaintiff in this bill of review proceeding. Further, it would be inequitable to award the fees requested by Plaintiff since Plaintiff's counsel could have timely filed a motion for new trial and avoided the need for any bill of review proceeding.

Further Affiant sayeth not."

By: _____
John M. Davidson

SUBSCRIBED AND SWORN TO before me on the 27th day of March, 2015.

By: _____
Notary Public, State of Texas

LESLIE M. KESLER
MY COMMISSION EXPIRES
December 17, 2015

2

# APPENDIX
# #5

Cause No. C-1-CV-13-009444

| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
| | § | |
| VS. | § | AT LAW NUMBER 2 |
| | § | |
| JOHN BRYAN LANGDON | § | TRAVIS COUNTY, TEXAS |

### PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, LESLIE MATHISON GILBERT, ("GILBERT"), an individual, hereinafter called Plaintiff, complaining of JOHN BRYAN LANGDON an individual, and in support thereof would respectfully show the Court as follows:

### DISCOVERY CONTROL PLAN

1. Discovery in this case is intended to be conducted under level 1 as set forth in Rule 190, TCRP.

### PARTIES

2. Plaintiff is a an individual residing in Travis County, Texas.

3. Defendant, JOHN BRYAN LANGDON, is an individual, and can be served at by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 as his agent for service because Defendant has not designated or maintained a resident agent for service of process in Texas. The Defendant has engaged in business in Texas. The Defendant does not maintain a regular place of business in Texas. The lawsuit arises from Defendant's business in Texas. The Secretary of State is the agent for service on the nonresident Defendant.

### VENUE

4. Plaintiff's cause of action arose in Travis County, Texas.

### BACKGROUND



000824511

5.    On or about August 1, 2011, JOHN BRYAN LANGDON (hereinafter referred to as "LANGDON") and GILBERT executed a Residential Lease for the lease of 4109 Michael Neill, Austin, Texas 78730. (the "Lease").   A true and correct copy of the Lease is attached as Exhibit A.    GILBERT gave LANGDON a security deposit in the amount of $4,000.00.  A true and correct copy of the check is attached as Exhibit B.  LANGDON has not returned the security deposit or a written description and itemization of deductions.

## CAUSES OF ACTION

6.    LANGDON is liable to GILBERT for failing to return the security deposit. Pursuant to Section 92.109 of the Texas Property Code, Plaintiff is entitled to $100.00 plus three times the amount of the security deposit wrongfully withheld; court costs and attorney fees.

7.    GILBERT is owed $1,500.00 for an overpayment in rent for the month of July 2013.  To accommodate Defendant, GILBERT moved out on July 15, 2013 although she paid the entire $3,000.00 rent for the month of July.

## UNJUST ENRICHMENT

8.    In the alternative and without waiving the above, Plaintiff is entitled to recover the amounts due from Defendant based upon promises implied by law under the theory of unjust enrichment.  Specifically, GILBERT provided valuable goods and services to Defendant, which goods and services were accepted, used, and enjoyed by Defendant, and under such circumstances as reasonably notified Defendant, that in providing the goods and services, Plaintiff was expecting to be paid by Defendant.

9.    Defendant's actions in the above facts constitute unjust enrichment, all to Defendant's benefit in actual damage in the amount referenced above.

## ATTORNEY FEES

10.    Pursuant to 92.109(a) of the Texas Property Code, Plaintiff is entitled to recover reasonable attorneys' fees.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays the Court that Defendant LESLIE MATHISON GILBERT and be cited to appear and file answer herein, and on final hearing hereof, that Plaintiff, LESLIE MATHISON GILBERT does have and recover of and from Defendant JOHN BRYAN LANGDON as follows:

a)    $100.00 civil penalty;

b)    Three time the amount of the security deposit wrongfully withheld;

c)    $1,500.00 in rental overpayment;

d)    pre-judgment and post-judgment interest as allowed by law;

e)    reasonable attorney fees,

f)    post judgment interest as provided by law;

g)    all costs of court; and

h)    and for such other and further relief to which Plaintiff may show itself to be justly entitled.

Respectfully submitted,

Troup & Bruce LLP

/s/ Blair A. Bruce
Blair A. Bruce,
State Bar No: 00792376
Tracy Ray Troup
State Bar No: 00791820
211 Florence
Tomball, Texas 77375
Telephone (281) 516-1100
Telecopier (281) 516-1180



EXHIBIT A



1. **PARTIES:** The parties to this lease are:

   the owner of the Property, Landlord,: _____ John Bryan Langdon _____ ; and

   Tenant(s): **Leslie Mathison Gilbert** _____ ,

2. **PROPERTY:** Landlord leases to Tenant the following real property:

   Address: **4109 Michael Neill, Austin, TX 78730**
   legally described as: **Lot 9; Block B; Section 13; River Place**

   In _____ **Travis** _____ County, Texas, together with the following non-real-property
   Items: **Outdoor patio, grill, all draperies**

   The real property and the non-real-property are collectively called the "Property".

3. **TERM:**

   A. <u>Primary Term</u>: The primary term of this lease begins and ends as follows:

   Commencement Date: ___ August 1, 2011 July 6, 2011 ___   Expiration Date: ___ July 31, 2012 ___ ,

   B. <u>Delay of Occupancy</u>: Tenant must occupy the Property within 6 days after the Commencement Date. If Tenant is unable to occupy the Property by the 5th day after the Commencement Date because of construction on the Property or a prior tenant's holding over of the Property, Tenant may terminate this lease by giving written notice to Landlord before the Property becomes available to be occupied by Tenant, and Landlord will refund to Tenant the security deposit and any rent paid. Landlord will abate rent on a daily basis for a delay caused by construction or a prior tenant's holding over. This paragraph does not apply to any delay in occupancy caused by cleaning, repairs, or make-ready items.

4. **AUTOMATIC RENEWAL AND NOTICE OF TERMINATION:**

   A. This lease automatically renews on a month-to-month basis unless Landlord or Tenant provides the other party written notice of termination not less than: *(Check only one box.)*
   - [x] (1) 30 days before the Expiration Date.
   - [ ] (2) _____ days before the Expiration Date.

   B. If this lease automatically renews on a month-to-month basis, it will continue to renew on a month-to-month basis until either party provides written notice of termination to the other party and the notice of termination will be effective: *(Check only one box.)*
   - [ ] (1) on the last day of the month following the month in which the notice is given. Landlord is not obligated to prorate rent even if Tenant surrenders the Property before the termination date.
   - [x] (2) on the date designated in the notice but not sooner than 30 days after the notice is given and, if necessary, rent will be prorated on a daily basis.

   (TAR-2001) 6-1-10    Tenant: _____ , _____ & Landlord or Landlord's Representative: _____    Page 1 of 14

Residential Lease concerning:

C. Oral notice of termination is not sufficient under any circumstances. Time is of the essence for providing notice of termination (strict compliance with dates by which notice must be provided is required). The date on which rent is due does not apply to the requirement for providing written notice of termination. If a box is not checked under Paragraph 4A, Paragraph 4A(1) will apply. If a box is not checked under Paragraph 4B, Paragraph 4B(1) will apply.

5. RENT:

A. Monthly Rent: Tenant will pay Landlord monthly rent in the amount of $ 3,000.00 for each full month during this lease. The first full month's rent is due and payable not later than August 1, 2011. Thereafter, Tenant will pay the monthly rent so that Landlord receives the monthly rent on or before:
[x] (1) the first day of each month during this lease.
[ ] (2) _____
Weekends, holidays, and mail delays do not excuse Tenant's obligation to timely pay rent.

B. Prorated Rent: On or before _____ Tenant will pay Landlord $, _____ as prorated rent from the Commencement Date through the last day of the month in which this lease begins.

C. Place of Payment: Unless this lease provides otherwise, Tenant will remit all amounts due to Landlord under this lease to the following person or entity at the place stated and make all payments payable to the named person or entity. Landlord may later designate, in writing, another person or place to which Tenant must remit amounts due under this lease.
Name: Bryan Langdon
Address: _____

Notice: Place the Property address and Tenant's name on all payments.

D. Method of Payment:
(1) Tenant must pay all rent timely and without demand, deduction, or offset, except as permitted by law or this lease.
(2) Time is of the essence for the payment of rent (strict compliance with rental due dates is required).
(3) Unless the parties agree otherwise, Tenant may not pay rent in cash and will pay all rent by check, cashier's check, money order, or other means acceptable to Landlord.
(4) Landlord [x] requires [ ] does not require Tenant(s) to pay monthly rents by one payment.
(5) If Tenant fails to timely pay any amounts due under this lease or if any check of Tenant is not honored by the institution on which it was drawn, Landlord may require Tenant to pay such amount and any subsequent amounts under this lease in certified funds. This paragraph does not limit Landlord from seeking other remedies under this lease for Tenant's failure to make timely payments with good funds.

E. Rent Increases: There will be no rent increases through the primary term. Landlord may increase the rent that will be paid during any month-to-month renewal period by providing at least 30 days written notice to Tenant.

6. LATE CHARGES:

A. If Landlord does not actually receive a rent payment in the full amount at the designated place of payment by the ___5___ day of each month at 11:59pm, Tenant will pay Landlord for each late payment:
(1) an initial late charge equal to (check one box only): [x] (a) $100.00 ; or [ ] (b) _____ % of one month's rent; and
(2) additional late charges of $ 25.00 per day thereafter until rent and late charges are paid in full. Additional late charges for any one payment may not exceed more than 30 days.
Notice: §92.019, Property Code prohibits assessing a late fee until rent has remained unpaid for at least one full day after the date on which the rent is due.

Tenants: _____ & Landlord or Landlord's Representative: _____ Page 2 of 14

B. For the purposes of paying rent and any late charges, the mailbox is not the agent for receipt for Landlord (the postmark date is not the date Landlord receives the payment). The parties agree that the late charge is based on a reasonable estimate of uncertain damages to the Landlord that are incapable of precise calculation and result from late payment of rent. Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 27.

7. **RETURNED PAYMENT:** Tenant will pay Landlord $ 25.00 _____ for each payment Tenant tenders to Landlord which is returned or not honored by the institution on which it is drawn for any reason, plus any late charges until Landlord receives payment. Tenant must make any returned payment good by paying such amount(s) plus any associated charges in certified funds.

8. **APPLICATION OF FUNDS:** Regardless of any notation on a payment, Landlord may apply funds received from Tenant first to any non-rent obligations of Tenant, including but not limited to, late charges, returned payment charges, repairs, brokerage fees, periodic utilities, pet charges, and then to rent.

9. **PETS:**

   A. Unless the parties agree otherwise in writing, Tenant may not permit, even temporarily, any pet on the Property (including but not limited to any mammal, reptile, bird, fish, rodent, or insect).

   B. If Tenant violates this Paragraph 9 or any agreement to keep a pet on the Property, Landlord may take all or any of the following action:
      (1) declare Tenant to be in default of this lease and exercise Landlord's remedies under Paragraph 27;
      (2) charge Tenant, as additional rent, an initial amount of $ _____ and $ _____ per day thereafter per pet for each day Tenant violates the pet restrictions;
      (3) remove or cause to be removed any unauthorized pet and deliver it to appropriate local authorities by providing at least 24-hour written notice to Tenant of Landlord's intention to remove the unauthorized pet; and
      (4) charge to Tenant the Landlord's cost to:
         (a) remove any unauthorized pet;
         (b) exterminate the Property for fleas and other insects;
         (c) clean and deodorize the Property's carpets and drapes; and
         (d) repair any damage to the Property caused by the unauthorized pet.

   C. When taking any action under Paragraph 9B Landlord will not be liable for any harm, injury, death, or sickness to any pet.

10. **SECURITY DEPOSIT:**

    A. Security Deposit: On or before execution of this lease, Tenant will pay a security deposit to Landlord in the amount of $ 3,000.00 _____ . "Security deposit" has the meaning assigned to that term in §92.102, Property Code.

    B. Interest: No interest or income will be paid to Tenant on the security deposit. Landlord may place the security deposit in an interest-bearing or income-producing account and any interest or income earned will be paid to Landlord or Landlord's representative.

    C. Refund: Tenant must give Landlord at least thirty (30) days written notice of surrender before Landlord is obligated to refund or account for the security deposit.

    Notices about Security Deposits:
    (1) §92.108, Property Code provides that a tenant may not withhold payment of any portion of the last month's rent on grounds that the security deposit is security for unpaid rent.

(TAR-2001) 6-1-10   Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____   Page 3 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          Lease Listing

(2) Bad faith violations of §92.108 may subject a tenant to liability up to 3 times the rent wrongfully withheld and the landlord's reasonable attorney's fees.

(3) The Property Code does not obligate a landlord to return or account for the security deposit until the tenant surrenders the Property and gives the landlord a written statement of the tenant's forwarding address, after which the landlord has 30 days in which to account.

(4) "Surrender" is defined in Paragraph 16 of this lease.

(5) One may view the Texas Property Code at the Texas Legislature's website which, as of the date shown in the lower left-hand corner of this form, is http://www.statutes.legis.state.tx.us/.

D. **Deductions**:

(1) Landlord may deduct reasonable charges from the security deposit for:

(a) damages to the Property, excluding normal wear and tear, and all reasonable costs associated to repair the Property;

(b) costs for which Tenant is responsible to clean, deodorize, exterminate, and maintain the Property;

(c) unpaid or accelerated rent;

(d) unpaid late charges;

(e) unpaid utilities and utility expenses Landlord incurs to maintain utilities to the Property as required by this Lease;

(f) unpaid pet charges;

(g) replacing unreturned keys, garage door openers, security devices, or other components;

(h) the removal of unauthorized locks or fixtures installed by Tenant;

(i) Landlord's cost to access the Property if made inaccessible by Tenant;

(j) missing or burned-out light bulbs and fluorescent tubes (at the same location and of the same type and quality that are in the Property on the Commencement Date);

(k) packing, removing, and storing abandoned property;

(l) removing abandoned or illegally parked vehicles;

(m) costs of reletting (as defined in Paragraph 27), if Tenant is in default;

(n) attorney's fees, costs of court, costs of service, and other reasonable costs incurred in any legal proceeding against Tenant;

(o) mailing costs associated with sending notices to Tenant for any violations of this lease;

(p) any other unpaid charges or fees or other items for which Tenant is responsible under this lease; and

(q) cost to restore walls, flooring, landscaping or any alteration to the Property not approved in writing by Landlord.

(2) If deductions exceed the security deposit, Tenant will pay to Landlord the excess within 10 days after Landlord makes written demand.

## 11. UTILITIES:

A. Tenant will pay all connection fees, service fees, usage fees, and all other costs and fees for all utilities to the Property (for example, electricity, gas, water, wastewater, garbage, telephone, alarm monitoring systems, cable, and Internet connections) except the following which Landlord will pay: HOA dues _____

_____

Unless otherwise agreed, amounts under this paragraph are payable directly to the service providers.

B. Unless provided by Landlord, Tenant must, at a minimum, keep the following utilities on, if available, at all times this lease is in effect: gas; electricity; water; wastewater; and garbage services.

Notice: Before signing this lease, Tenant should determine if all necessary utilities are available to the Property and are adequate for Tenant's use.

(TAR-2001) 6-1-10      Tenants: _____,_____,_____ & Landlord or Landlord's Representative: _____,_____      Page 4 of 14

## 12. USE AND OCCUPANCY:

A. **Occupants:** Tenant may use the Property as a private residence only. The only persons Tenant may permit to reside on the Property during the term of this lease are (*Include names and ages of all occupants*): Leslie Gilbert 39

~~REDACTED PER TRAP 9.9~~

B. **Phone Numbers and E-mail:** Tenant must promptly inform Landlord of any changes in Tenant's phone numbers (home, work, and mobile) and e-mail not later than 5 days after a change.

C. **HOA Rules:** Tenant must comply with any owners' association rules or restrictive covenants affecting the Property. Tenant will reimburse Landlord for any fines or other charges assessed against Landlord for violations by Tenant of any owners' association rule or restrictive covenant.

D. **Prohibitions:** Unless otherwise authorized by this lease, Tenant may not install or permit any of the following on the Property, even temporarily: a spa, hot tub, above-ground pool, trampoline, or any item which causes a suspension or cancellation of insurance coverage or an increase in insurance premiums. Tenant may not permit any part of the Property to be used for: (1) any activity which is a nuisance, offensive, noisy, or dangerous; (2) the repair of any vehicle; (3) any business of any type, including but not limited to child care; (4) any activity which violates any zoning ordinance, owners' association rule, or restrictive covenant; (5) any illegal or unlawful activity; or (6) activity that obstructs, interferes with, or infringes on the rights of other persons near the Property.

E. **Guests:** Tenant may not permit any guest to stay on the Property longer than the amount of time permitted by any owners' association rule or restrictive covenant or _____20_____ days without Landlord's written permission, whichever is less.

F. **Common Areas:** Landlord is not obligated to pay any non-mandatory or user fees for Tenant's use of any common areas or facilities (for example, pool or tennis courts).

## 13. PARKING RULES:
Tenant may not permit more than ____3____ vehicles, including but not limited to automobiles, trucks, recreational vehicles, trailers, motorcycles, all-terrain vehicles, jet skis, and boats, on the Property unless authorized by Landlord in writing. Tenant may not park or permit any person to park any vehicles in the yard. Tenant may permit vehicles to be parked only in drives, garages, designated common parking areas, or in the street if not prohibited by law or an owners' association. Tenant may not store or permit any person to store any vehicles on or adjacent to the Property or on the street in front of the Property. In accordance with applicable state and local laws, Landlord may have towed, at Tenant's expense: (a) any inoperative vehicle on or adjacent to the Property; (b) any vehicle parked in violation of this paragraph or any additional parking rules made part of this lease; or (c) any vehicle parked in violation of any law, local ordinance, or owners' association rule.

## 14. ACCESS BY LANDLORD:

A. **Advertising:** Landlord may prominently display a "For Sale" or "For Lease" or similarly worded sign on the Property during the term of this lease or any renewal period. Landlord or Landlord's contractor may take interior or exterior photographs or images of the Property and use the photographs or images in any advertisements to lease or sell the Property.

B. **Access:** Before accessing the Property, Landlord or anyone authorized by Landlord will attempt to first contact Tenant, but may enter the Property at reasonable times without notice to make repairs or to show the Property to prospective tenants or buyers, inspectors, fire marshals, lenders, appraisers, or insurance agents. Additionally, Landlord or anyone authorized by Landlord may peacefully enter the Property at reasonable times without first attempting to contact Tenant and without notice to: (1) survey or review the Property's condition and take photographs to document the condition; (2) make emergency repairs; (3) exercise a contractual or statutory lien; (4) leave written notices; or (5) seize nonexempt property if Tenant is in default.

(TAR-2001) 6-1-10   Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative _____, _____   Page 5 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   Lease Listing

Residential Lease concerning: _____

4109 Michael Neill
Austin, TX 78730

C. Trip Charges: If Landlord or Landlord's agents have made prior arrangements with Tenant to access the Property and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible, Landlord may charge Tenant a trip charge of $ _____ .

D. Keybox: A keybox is a locked container placed on the Property holding a key to the Property. The keybox is opened by a special combination, key, or programmed access device so that persons with the access device may enter the Property, even in Tenant's absence. The keybox is a convenience but involves risk (such as unauthorized entry, theft, property damage, or personal injury). Neither the Association of REALTORS® nor MLS requires the use of a keybox.

(1) Tenant authorizes Landlord, Landlord's property manager, and Landlord's broker to place on the Property a keybox containing a key to the Property:
(a) during the last _____30_____ days of this lease or any renewal or extension; and
(b) at any time Landlord lists the Property for sale with a Texas licensed broker.

(2) Tenant may withdraw Tenant's authorization to place a keybox on the Property by providing written notice to Landlord and paying Landlord a fee of $ 3,000.00 as consideration for the withdrawal. Landlord will remove the keybox within a reasonable time after receipt of the notice of withdrawal and payment of the required fee. Removal of the keybox does not alleviate Tenant's obligation to make the Property available for showings as indicated in Paragraph 14B.

(3) If Landlord or Landlord's agents have notified Tenant of their intent to access the Property to show it to prospects and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible, Landlord may charge Tenant a trip charge of $ 100.00 .

(4) Landlord, the property manager, and Landlord's broker are not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses arising from use of the keybox unless caused by Landlord, the property manager, or Landlord's broker.

## 15. MOVE-IN CONDITION:

A. Landlord makes no express or implied warranties as to the Property's condition. Tenant has inspected the Property and accepts it AS-IS provided that Landlord: _____
_____
_____

B. Tenant will complete an Inventory and Condition Form, noting any damages to the Property, and deliver it to Landlord within _____10_____ days after the Commencement Date. If Tenant fails to timely deliver the Inventory and Condition Form, the Property will be deemed to be free of damages, unless otherwise expressed in this lease. The Inventory and Condition Form is not a request for repairs. Tenant must direct all requests for repairs in compliance with Paragraph 18.

## 16. MOVE-OUT:

A. Move-Out Condition: When this lease ends, Tenant will surrender the Property in the same condition as when received, normal wear and tear excepted. Tenant will leave the Property in a clean condition free of all trash, debris, and any personal property. Tenant may not abandon the Property.

(TAR-2001) 6-1-10    Tenant: _____ & Landlord or Landlord's Representative _____    Page 6 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    Lease Listing

B. Definitions:

(1) "Normal wear and tear" means deterioration that occurs without negligence, carelessness, accident, or abuse.

(2) "Surrender" occurs when all occupants have vacated the Property, in Landlord's reasonable judgment, and one of the following events occurs:
(a) the date Tenant specifies as the move-out or termination date in a written notice to Landlord has passed; or
(b) Tenant returns keys and access devices that Landlord provided to Tenant under this lease.

(3) "Abandonment" occurs when all of the following occur:
(a) all occupants have vacated the Property, in Landlord's reasonable judgment;
(b) Tenant is in breach of this lease by not timely paying rent; and
(c) Landlord has delivered written notice to Tenant, by affixing it to the inside of the main entry door or if the Landlord is prevented from entering the Property by affixing it to the outside of the main entry door, stating that Landlord considers the Property abandoned, and Tenant fails to respond to the affixed notice by the time required in the notice, which will not be less than 2 days from the date the notice is affixed to the main entry door.

C. Personal Property Left After Move-Out:

(1) If Tenant leaves any personal property in the Property after surrendering or abandoning the Property Landlord may:
(a) dispose of such personal property in the trash or a landfill;
(b) give such personal property to a charitable organization; or
(c) store and sell such personal property by following procedures in §54.046(b)-(e), Property Code.
(2) Tenant must reimburse Landlord all Landlord's reasonable costs under Paragraph 16C(1) for packing, removing, storing, and selling the personal property left in the Property after surrender or abandonment.

## 17. PROPERTY MAINTENANCE:

A. Tenant's General Responsibilities: Tenant, at Tenant's expense, must:
(1) keep the Property clean and sanitary;
(2) promptly dispose of all garbage in appropriate receptacles;
(3) supply and change heating and air conditioning filters at least once a month;
(4) supply and replace all light bulbs, fluorescent tubes, and batteries for smoke detectors, carbon monoxide detectors, garage door openers, ceiling fan remotes, and other devices (of the same type and quality that are in the Property on the Commencement Date);
(5) maintain appropriate levels of necessary chemicals or matter in any water softener;
(6) take action to promptly eliminate any dangerous condition on the Property;
(7) take all necessary precautions to prevent broken water pipes due to freezing or other causes;
(8) replace any lost or misplaced keys;
(9) pay any periodic, preventive, or additional extermination costs desired by Tenant;
(10) remove any standing water;
(11) know the location and operation of the main water cut-off valve and all electric breakers and how to switch the valve or breakers off at appropriate times to mitigate any potential damage;
(12) water the foundation of the Property at reasonable and appropriate times; and
(13) promptly notify Landlord, in writing, of all needed repairs.

Residential Lease concerning:

B. <u>Yard Maintenance</u>:

(1) *"Yard"* means all lawns, shrubbery, bushes, flowers, gardens, trees, rock or other landscaping, and other foliage on or encroaching on the Property or on any easement appurtenant to the Property, and does not include common areas maintained by an owners' association.

(2) *"Maintain the yard"* means to perform activities such as, but not limited to: (a) mowing, fertilizing, and trimming the yard; (b) controlling pests in the yard; and (c) removing debris from the yard.

(3) Unless prohibited by ordinance or other law, Tenant will water the yard at reasonable and appropriate times including but not limited to the following times: _____

_____ , Other than watering, the yard will be maintained as follows:

_____

☐ (a) Landlord, at Landlord's expense, will maintain the yard. Tenant will permit Landlord and Landlord's contractors reasonable access to the yard and will remove any pet from the yard at appropriate times.

☒ (b) Tenant, at Tenant's expense, will maintain the yard.

☐ (c) Tenant will maintain in effect a scheduled yard maintenance contract with: ☐ a contractor who regularly provides such service; ☐ _____ .

C. <u>Pool/Spa Maintenance</u>: Any pool or spa on the Property will be maintained according to a Pool/Spa Maintenance Addendum.

D. <u>Prohibitions</u>: If Tenant installs any fixtures on the Property, authorized or unauthorized, such as additional smoke detectors, locks, alarm systems, cables, satellite dishes, or other fixtures, such fixtures will become the property of the Landlord. Except as otherwise permitted by law, this lease, or in writing by Landlord, Tenant may not:
(1) remove any part of the Property or any of Landlord's personal property from the Property;
(2) remove, change, add, or rekey any lock;
(3) make holes in the woodwork, floors, or walls, except that a reasonable number of small nails may be used to hang pictures in sheetrock and grooves in paneling;
(4) permit any water furniture on the Property;
(5) install additional phone or video cables, outlets, antennas, satellite receivers, or alarm systems;
(6) alter, replace or remove flooring material, paint, or wallpaper;
(7) install, change, or remove any: fixture, appliance, or non-real-property item listed in Paragraph 2;
(8) keep or permit any hazardous material on the Property such as flammable or explosive materials;
(9) keep or permit any material or item which causes any liability or fire and extended insurance coverage to be suspended or canceled or any premiums to be increased;
(10) dispose of any environmentally detrimental substance (for example, motor oil or radiator fluid) on the Property; or
(11) cause or allow any lien to be filed against any portion of the Property.

E. <u>Failure to Maintain</u>: If Tenant fails to comply with this Paragraph 17 or any Pool/Spa Maintenance Addendum, Landlord may, in addition to exercising Landlord's remedies under Paragraph 27, perform whatever action Tenant is obligated to perform and Tenant must immediately reimburse Landlord the reasonable expenses that Landlord incurs.

18. REPAIRS: (Notice: Subchapter B, Chapter 92, Property Code governs repair obligations).

A. <u>Repair Requests</u>: All requests for repairs must be in writing and delivered to Landlord. If Tenant is delinquent in rent at the time a repair notice is given, Landlord is not obligated to make the repair. In the event of an emergency related to the condition of the Property that materially affects the physical health or safety of an ordinary tenant, call: (512) 773-1534 _____ . is not an emergency. Ordinarily, a repair to the heating and air conditioning system is not an emergency.

(TAR-2001) 6-1-10     Tenants: _____ , _____ & Landlord or Landlord's Representative: _____ , _____     Page 8 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com     Lease Listing

B. <u>NOTICE</u>: If Landlord fails to repair a condition that materially affects the physical health or safety of an ordinary tenant as required by this lease or the Property Code, Tenant may be entitled to exercise remedies under §92.056 and §92.0561 of the Property Code. If Tenant follows the procedures under those sections, the following remedies may be available to Tenant: (1) terminate the lease and obtain an appropriate refund under §92.056(f); (2) have the condition repaired or remedied according to §92.0561; (3) deduct from the rent the cost of the repair or remedy according to §92.0561; and (4) obtain judicial remedies according to §92.0563. Do not exercise these remedies without consulting an attorney or carefully reviewing the procedures under the applicable sections. The Property Code presumes that 7 days is a reasonable period of time for the Landlord to make a diligent effort to repair a condition unless there are circumstances which establish that a different period of time is appropriate (such as the severity and nature of the condition and the availability of materials, labor, and utilities). Failure to strictly follow the procedures in the applicable sections may cause Tenant to be in default of the lease.

C. <u>Completion of Repairs</u>:

   (1) Tenant may not repair or cause to be repaired any condition, regardless of the cause, without Landlord's permission. All decisions regarding repairs, including the completion of any repair, whether to repair or replace the item, and the selection of contractors, will be at Landlord's sole discretion.

   (2) Landlord is not obligated to complete a repair on a day other than a business day unless required to do so by the Property Code.

D. <u>Payment of Repair Costs</u>: Except as otherwise specified in this lease, Landlord will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures for requesting repairs as described in this Paragraph 18.

   (1) Landlord will pay the entire cost to repair the following items not caused by Tenant or Tenant's negligence:
     (a) heating and air conditioning systems;
     (b) water heaters; or
     (c) water penetration from structural defects.

   (2) Landlord will NOT pay to repair the following items unless caused by Landlord's negligence:
     (a) conditions caused by Tenant, an Occupant, or any guest or invitee of Tenant;
     (b) damage to doors, windows, and screens;
     (c) damage from windows or doors left open;
     (d) damage from wastewater stoppages caused by foreign or improper objects in lines that exclusively serve the Property;
     (e) items that are cosmetic in nature with no impact on the functionality or use of the item; and
     (f) the following specific items or appliances: _____
_____
_____

E. <u>Trip Charges</u>: If a repair person is unable to access the Property after making arrangements with Tenant to complete the repair, Tenant will pay any trip charge the repair person may charge, which amount may be different from the amount stated in Paragraph 14C.

F. <u>Advance Payments and Reimbursements</u>: Landlord may require advance payment of repairs or payments under this Paragraph 18 for which Tenant is responsible. Tenant must promptly reimburse Landlord the amounts under this Paragraph 18 for which Tenant is responsible.

(TAR-2001) 6-1-10     Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____     Page 9 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com     Lease Listing

**19. SECURITY DEVICES AND EXTERIOR DOOR LOCKS:**

A. Subchapter D, Chapter 92, Property Code requires the Property to be equipped with certain types of locks and security devices. Landlord has rekeyed the security devices since the last occupant vacated the Property or will rekey the security devices within 7 days after Tenant moves in. "Security device" has the meaning assigned to that term in §92.151, Property Code.

B. All notices or requests by Tenant for rekeying, changing, installing, repairing, or replacing security devices must be in writing. Installation of additional security devices or additional rekeying or replacement of security devices desired by Tenant will be paid by Tenant in advance and may be installed only by contractors authorized by Landlord.

**20. SMOKE DETECTORS:** Subchapter F, Chapter 92, Property Code requires the Property to be equipped with smoke detectors in certain locations. Requests for additional installation, inspection, or repair of smoke detectors must be in writing. Disconnecting or intentionally damaging a smoke detector or removing a battery without immediately replacing it with a working battery may subject Tenant to civil penalties and liability for damages and attorney fees under §92.2611, Property Code.

**21. LIABILITY:** Unless caused by Landlord, Landlord is not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses to person or property caused by fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, condition of the Property, environmental contaminants (for example, carbon monoxide, asbestos, radon, lead-based paint, mold, fungus, etc.), or other occurrences or casualty losses. Tenant will promptly reimburse Landlord for any loss, property damage, or cost of repairs or service to the Property caused by Tenant, Tenant's guests, any occupants, or any pets.

**22. HOLDOVER:** If Tenant fails to vacate the Property at the time this lease ends Tenant will pay Landlord rent for the holdover period and indemnify Landlord and prospective tenants for damages, including but not limited to lost rent, lodging expenses, costs of eviction, and attorneys' fees. Rent for any holdover period will be three (3) times the monthly rent, calculated on a daily basis, and will be immediately due and payable daily without notice or demand.

**23. RESIDENTIAL LANDLORD'S LIEN:** Landlord will have a lien for unpaid rent against all of Tenant's nonexempt personal property that is in the Property and may seize such nonexempt property if Tenant fails to pay rent. Subchapter C, Chapter 54, Property Code governs the rights and obligations of the parties regarding Landlord's lien. Landlord may collect a charge for packing, removing, or storing property seized in addition to any other amounts Landlord is entitled to receive. Landlord may sell or dispose of any seized property in accordance with the provisions of §54.045, Property Code.

**24. SUBORDINATION:** This lease and Tenant's leasehold interest are and will be subject, subordinate, and inferior to: (i) any lien or encumbrance now or later placed on the Property by Landlord; (ii) all advances made under any such lien or encumbrance; (iii) the interest payable on any such lien or encumbrance; (iv) any and all renewals and extensions of any such lien or encumbrance; (v) any restrictive covenant; and (vi) the rights of any owners' association affecting the Property.

**25. CASUALTY LOSS OR CONDEMNATION:** Section 92.054, Property Code governs the rights and obligations of the parties regarding a casualty loss to the Property. Any proceeds, payment for damages, settlements, awards, or other sums paid because of a casualty loss to the Property will be Landlord's sole property. For the purpose of this lease, any condemnation of all or a part of the Property is a casualty loss.

(TAR-2001) 6-1-10     Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____ Page 10 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com     Lease Listing

26. **SPECIAL PROVISIONS:** *(Do not insert a lease-option or lease-purchase clause without the assistance of legal counsel. Special obligations and liabilities under statute apply to such transactions.)*
Tenant and Landlord to set up direct bank payment transfers for rent payment prior to July 1, 2011 for rent payments; Deposit is not the last month's rent and last month's rent to be paid in full.

DEPOSIT & FIRST MONTH'S RENT FOR AUGUST DUE
JULY 1ST, 2011

27. **DEFAULT:**

A. If Landlord fails to comply with this lease, Tenant may seek any relief provided by law.

B. If Tenant fails to timely pay all amounts due under this lease or otherwise fails to comply with this lease, Tenant will be in default and:
   (1) Landlord may terminate Tenant's right to occupy the Property by providing Tenant with at least one day written notice to vacate;
   (2) all unpaid rents which are payable during the remainder of this lease or any renewal period will be accelerated without notice or demand;
   (3) Landlord may exercise Landlord's lien under Paragraph 23 and any other rights under this lease or the Property Code; and
   (4) Tenant will be liable for:
      (a) any lost rent;
      (b) Landlord's cost of reletting the Property including but not limited to leasing fees, advertising fees, utility charges, and other fees reasonably necessary to relet the Property;
      (c) repairs to the Property for use beyond normal wear and tear;
      (d) all Landlord's costs associated with eviction of Tenant, including but not limited to attorney's fees, court costs, costs of service, witness fees, and prejudgment interest;
      (e) all Landlord's costs associated with collection of amounts due under this lease, including but not limited to collection fees, late charges, and returned check charges; and
      (f) any other recovery to which Landlord may be entitled by law.

C. Notice to vacate under Paragraph 27B(1) may be by any means permitted by §24.005, Property Code.

D. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by attempting to relet the Property to acceptable tenants and reducing Tenant's liability accordingly.

28. **EARLY TERMINATION:** This lease begins on the Commencement Date and ends on the Expiration date unless: (i) renewed under Paragraph 4; (ii) extended by written agreement of the parties; or (iii) terminated earlier under Paragraph 27, by agreement of the parties, applicable law, or this Paragraph 28.

A. *Special Statutory Rights* Tenants may have special statutory rights to terminate the lease early in certain situations involving family violence, military deployment or transfer, or certain sex offenses.

   (1) *Military:* If Tenant is or becomes a servicemember or a dependent of a servicemember, Tenant may terminate this lease by delivering to Landlord a written notice of termination and a copy of an appropriate government document providing evidence of: (a) entrance into military service; (b) military orders for a permanent change of station (PCS); or (c) military orders to deploy with a military unit for not less than 90 days. Termination is effective on the 30th day after the first date on which the next rental payment is due after the date on which the notice is delivered. Section 92.017, Property Code governs the rights and obligations of the parties under this paragraph.

Residential Lease concerning: 

**4109 Michael Neill**
**Austin, TX  78730**

(2) <u>Family Violence</u>: Tenant may terminate this lease if Tenant provides Landlord with a copy of a court order described under §92.016, Property Code protecting Tenant or an occupant from family violence committed by a cotenant or occupant of the Property. Section 92.016, Property Code governs the rights and obligations of the parties under this paragraph. If the family violence is committed by someone other than a cotenant or co-occupant of the Property, Tenant must give written notice of termination 30 days prior to the effective date of the notice.

(3) <u>Sex Offenses</u>: Tenant may have special statutory rights to terminate this lease in certain situations involving sexual assault or sexual abuse. For more information about the types of abuse and assault covered by this provision, Tenant is advised to review §92.0161, Property Code.

B. Assignment, Subletting and Replacement Tenants:

(1) Tenant may not assign this lease or sublet the Property without Landlord's written consent.

(2) If Tenant requests an early termination of this lease under this Paragraph 28B, Tenant may attempt to find a replacement tenant and may request Landlord to do the same. Landlord may, but is not obligated to, attempt to find a replacement tenant under this paragraph.

(3) Any assignee, subtenant, or replacement tenant must, in Landlord's discretion, be acceptable as a tenant and must sign: (a) a new lease with terms not less favorable to Landlord than this lease or otherwise acceptable to Landlord; (b) a sublease with terms approved by Landlord; or (c) an assignment of this lease in a form approved by Landlord.

(4) At the time Landlord agrees to permit an assignee, subtenant, or replacement tenant to occupy the Property, Tenant will pay Landlord:

(a) If Tenant procures the assignee, subtenant, or replacement tenant:
☐ (i) $ _____.
☐ (ii) _____ % of one's month rent that the assignee, subtenant, or replacement tenant is to pay.

(b) If Landlord procures the assignee, subtenant, or replacement tenant:
☐ (i) $ _____.
☐ (ii) _____ % of one's month rent that the assignee, subtenant, or replacement tenant is to pay.

(5) Unless expressly stated otherwise in an assignment or sublease, Tenant will not be released from Tenant's obligations under this lease because of an assignment or sublease. An assignment of this lease or a sublease of this lease without Landlord's written consent is voidable by Landlord.

29. **ATTORNEY'S FEES:** Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, attorney's fees, costs of service, and all other costs of the legal proceeding from the non-prevailing party.

30. **REPRESENTATIONS:** Tenant's statements in this lease and any application for rental are material representations. Each party to this lease represents that he or she is of legal age to enter into a contract. If Tenant makes a misrepresentation in this lease or in an application for rental, Tenant is in default.

31. **ADDENDA:** Incorporated into this lease are the following addenda, exhibits and other information. If Landlord's Rules and Regulations are made part of this lease, Tenant agrees to comply with the Rules and Regulations as Landlord may, at Landlord's discretion, amend from time to time.

☐ Addendum Regarding Lead-Based Paint
☐ Inventory & Condition Form
☐ Landlord's Additional Parking Rules
☒ Pet Agreement
☐ Protecting Your Home from Mold
☐ Agreement for Application Deposit & Hold
☐ _____
☐ _____

☒ Agreement Between Brokers
☐ Landlord's Rules & Regulations
☐ Owners' Association Rules
☐ Pool/Spa Maintenance Addendum
☒ Residential Lease Application
☐ Residential Lease Guaranty
☐ _____

(TAR-2001) 6-1-10    Tenants: _____, _____, _____, _____  & Landlord or Landlord's Representative _____, _____    Page 12 of 14
Lease Listing
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

**32. NOTICES:** All notices under this lease must be in writing and are effective when hand-delivered, sent by mail, or sent by electronic transmission to *(Do not insert an e-mail address or a fax number unless the party consents to receive notices under this lease at the e-mail address or fax number specified.):*

Tenant at the Property and a copy to:

Landlord c/o:

E-mail:

E-mail:

Fax:

Fax:

**33. AGREEMENT OF PARTIES:**

A. **Entire Agreement:** There are no oral agreements between Landlord and Tenant. This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

B. **Binding Effect:** This lease is binding upon and inures to the benefit of the parties to this lease and their respective heirs, executors, administrators, successors, and permitted assigns.

C. **Joint and Several:** All Tenants are jointly and severally liable for all provisions of this lease. Any act or notice to, refund to, or signature of, any one or more of the Tenants regarding any term of this lease, its extension, its renewal, or its termination is binding on all Tenants executing this lease.

D. **Waiver:** Landlord's past delay, waiver, or non-enforcement of a rental due date or any other right will not be deemed to be a waiver of any other breach by Tenant or any other right in this lease.

E. **Severable Clauses:** Should a court find any clause in this lease unenforceable, the remainder of this lease will not be affected and all other provisions in this lease will remain enforceable.

F. **Controlling Law:** The laws of the State of Texas govern the interpretation, validity, performance, and enforcement of this lease.

G. **Copyright:** If an active REALTOR® member of the Texas Association of REALTORS® or an active member of the State Bar of Texas does not negotiate this lease as a party or for one of the parties, either as a party's broker or attorney, this lease is voidable at will by Tenant.

**34. INFORMATION:**

A. Future inquiries about this lease, rental payments, and security deposits should be directed to the person listed for receipt of notices for Landlord under Paragraph 32.

B. It is Tenant's responsibility to determine, before signing this lease, if: (i) all services (e.g., utilities, connections, schools, and transportation) are accessible to or from the Property; (ii) such services are sufficient for Tenant's needs and wishes; and (iii) Tenant is satisfied with the Property's condition.

C. The brokers to this lease have no knowledge of whether Landlord is delinquent in the payment of any lien against the Property.

(TAR-2001) 6-1-10    Tenant _____, _____, _____ & Landlord or Landlord's Representative _____, _____    Page 13 of 14

Lease Listing

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Residential Lease concerning: 4109 Michael Neill
Austin, TX 78730

D. Unpaid rent and any unpaid amount under this lease are reportable to credit reporting agencies.

E. Landlord is not obligated to respond to any requests for Tenant's rental and payment history from a mortgage company or other prospective landlord until Tenant has given notice of termination of this lease and Tenant is not in breach of this lease. (*Notice: Landlord or Landlord's agent may charge a reasonable fee for processing such information.*)

F. If all occupants over 18 years of age die during this lease, Landlord may: (i) permit the person named below to access the Property at reasonable times in Landlord's or Landlord's agent's presence; (ii) permit the named person to remove Tenant's personal property; and (iii) refund the security deposit, less deductions, to the named person. Section 92.014, Property Code governs procedures to follow in the event of a tenant's death.

    Name: _____ Phone: _____
    Address: _____
    E-mail: _____

G. The Texas Department of Public Safety maintains a database that the public may search, at no cost, to determine if registered sex offenders are located in certain areas (see www.txdps.state.tx.us under on-line services). For information concerning past criminal activity in certain areas, contact the local police department.

H. Landlord's insurance does not cover Tenant from loss of personal property. Landlord recommends that Tenant obtain insurance for casualties such as fire, flood, water damage, and theft. Tenant represents that Tenant [X] intends [ ] does not intend to purchase such insurance.

I. Landlord's broker, Keller Williams Realty
   [ ] will [X] will not act as the property manager for landlord.

J. This lease is negotiable between the parties. This lease is binding upon final acceptance. READ IT CAREFULLY. If you do not understand the effect of this lease, consult your attorney BEFORE signing.

K. This lease should not be used in conjunction with executory contracts of any type, such as contracts for deed, leases with options to purchase, or lease options, without the advice of an attorney.

_____ 6/30/11      _____ 6/27/11
Landlord                          Date            Tenant                            Date
John Bryan Langdon                                Leslie Mathison Gilbert

_____ Date          _____ Date
Landlord                                          Tenant

Or signed for Landlord under written property management agreement or power of attorney:

By: _____ Date          _____ Date
                                                  Tenant

Printed Name: _____

Firm Name: _____                _____ Date
                                                  Tenant
Broker's License No.: _____

(TAR-2001) 6-1-10
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com



## TEXAS ASSOCIATION OF REALTORS®
## PET AGREEMENT

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc., 2003

ADDENDUM TO RESIDENTIAL LEASE CONCERNING THE PROPERTY AT <u>4109 Michael Neill, Austin,</u>
<u>TX 78730</u>

**A. PET AUTHORIZATION AND PET DESCRIPTION:**

(1) Tenant may not keep any pet on the Property unless specifically authorized by this agreement. "Pet" includes any animal, whether mammal, reptile, bird, fish, rodent, or insect.

(2) Tenant may keep the following pet(s) on the Property until the above-referenced lease ends.

Type: <u>Mini Poodle</u>   Breed: <u>Poodle</u>   Name: <u>Zsa Zsa</u>
Color: <u>White</u>   Weight: <u>11 pounds</u>   Age: <u>10</u>   Gender: <u>Female</u>
Neutered? [X] yes [ ] no   Declawed? [ ] yes [X] no   Rabies Shots Current? [X] yes [ ] no

Type: _____   Breed: _____   Name: _____
Color: _____   Weight: _____   Age: ____   Gender: _____
Neutered? [ ] yes [ ] no   Declawed? [ ] yes [ ] no   Rabies Shots Current? [ ] yes [ ] no

**B. CONSIDERATION:** In consideration for Landlord's authorization for Tenant to keep the pet(s) described in Paragraph A on the Property, the parties agree to the following. *(Check any one or any combination of the following.)*

[X] (1) On or before the date Tenant moves into the Property, Tenant will pay Landlord a pet deposit of $ <u>1,000.00</u>. The pet deposit is an increase in the security deposit in the lease and is made part of the security deposit for all purposes. This increase in the security deposit is not refundable before the lease ends, even if the pet is removed. Any refund of the security deposit, including this increase, is governed by the terms of the lease.

[ ] (2) The monthly rent in the lease is increased to $ _____.

[ ] (3) Tenant will, upon execution of this agreement, pay Landlord $ _____ as a one-time, non-refundable payment.

**C. PET RULES:** Tenant must:
(1) take all reasonable action to insure that any pet does not violate the rights of other persons;
(2) comply with all applicable statutes, ordinances, restrictions, owners' association rules, and other enforceable regulations regarding any pet;
(3) keep the rabies shots of any pet current;
(4) confine any pet that is a dog or cat, when outside, by fences or on leashes under Tenant's control;
(5) confine any pet other than a dog or cat in appropriate cages at all times;
(6) promptly remove any pet waste from the Property, including all living areas, garages, storage areas, yards, porches, patios, courtyards, and decks; and
(7) promptly remove from the Property any offspring of any pet.

**D. ACCESS:** Tenant must remove or confine any pet at any time that the pet is likely to limit or prohibit Landlord or other persons access to Property as permitted by the lease.

(TAR-2004) 10-14-03   Initialed for Identification by Tenants: ____, ____, and Landlord ____   Page 1 of 2

Keller Williams Realty 4010 River Place Blvd Austin, TX 78730   Lease Listing
Phone: 512.576.7344   Fax: 512-623-6123   Tim Moncrief
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Pet Agreement concerning _____ 4109 Michael Neill
Austin, TX 78730 _____

E. DISCLOSURE CONCERNING PETS:
(1) Is Tenant aware of whether any of the pets described under this addendum has ever bitten or injured another person?   ☐ Yes ☒ No
    If yes, explain: _____
    _____.

(2) Is Tenant aware of whether any of the pets described under this addendum has any propensity or predisposition to bite or injure someone?   ☐ Yes ☒ No
    If yes, explain: _____
    _____.

F. TENANT'S LIABILITY:
(1) Tenant is responsible and liable for:
    (a) any damage to the Property or any item in the Property caused by any pet;
    (b) any personal injuries to any person caused by any pet; and
    (c) any damage to any person's property caused by any pet.
(2) Tenant will pay all reasonable costs that are necessary to clean, deodorize, deflea, or repair any part of the Property, including but not limited to the carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, sod, yard, fences, or landscaping.

G. INDEMNIFICATION: Tenant will protect, defend, indemnify, and hold Landlord, Landlord's property manager, and Landlord's agents harmless from any damages, costs, attorney's fees, and expenses that are caused by the act of any pet or Tenant.

H. DEFAULT: If Tenant breaches any provision in this pet agreement, Landlord may exercise all or any of the remedies described under Paragraph 9B of the lease.

I. SPECIAL PROVISIONS:

Landlord John Bryan Langdon    6/26/11   Date        Tenant Leslie Mathison-Gilbert   7/27/11   Date

Landlord    Date        Tenant    Date

Or signed for Landlord under written property management agreement or power of attorney:        Tenant    Date

By: _____        Tenant    Date
Printed Name: _____
Firm Name: _____

Page 2 of 2

(TAR-2004) 10-14-03        Lease Listing
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com



EXHIBIT B

VOID VOID VOID VOID

**CASHIER'S CHECK**

0074704661

0000747     11-24
Office AU #     1210(8)

Operator I.D.: tx004573

June 29, 2011

PAY TO THE ORDER OF    ***BRYAN LANGDON***
***RE: PROPERTY DEPOSIT LESLIE GILBERT***

*\*\*\*Four thousand dollars and no cents\*\*\**      **\*\*$4,000.00\*\***

WELLS FARGO BANK, N.A.
6911 RANCH ROAD 620 N
AUSTIN, TX 78732
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $   4,000.00

*Richard Levy*

CONTROLLER

⑆0074704661⑆

Security Features Included. — Details on Back.

UNOFFICIAL

# APPENDIX
# #6

Cause No. C-1-CV-13-009444

| | | |
|---|---|---|
| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
| | § | |
| VS. | § | AT LAW  NUMBER 2 |
| | § | |
| JOHN BRYAN LANGDON | § | TRAVIS COUNTY, TEXAS |

## MOTION FOR DEFAULT JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff **LESLIE MATHISON GILBERT** moves that the Court enter default under

Rule 239 of the Texas Rules of Civil Procedure as Defendant, **JOHN BRYAN LANGDON** has

failed to appear and answer the Original Petition as required by Rule 99 of the Texas Rules of

Civil Procedure.

The Whitney Certificate from the Texas Secretary of State has been on file more than ten

(10) days, exclusive of this date and the day of service as required by Rule 107 of the Texas

Rules of Civil Procedure.

Plaintiff moves that the Court enter a Default Judgment in favor of Plaintiff against

Defendant, **JOHN BRYAN LANGDON,** in the amount of:

a)      $100.00 civil penalty;

b)      Three time the amount of the security deposit wrongfully withheld or $12,000.00;

c)      $1,500.00 in rental overpayment;

d)      Pre-judgment interest has been accruing at the rate of five percent (5.00%) per annum since October 14, 2013, for total accrued interest of $218.22 as of February 8, 2014 and will continue to accrue at the rate of $1.85 per day until entry of judgment;

e)      reasonable attorney fees,

f)      post judgment interest as provided by law;

- 1 -



000842666

g)      all costs of court; and

h)      and for such other and further relief to which Plaintiff may show itself to be justly

        entitled.


Dated this 18 day of Februay 2014.

                                    Respectfully submitted,

                                    Troup & Bruce LLP


                                    /s/ Blair Bruce
                                    Blair A. Bruce,
                                    State Bar No: 00792376
                                    blair@troupbruce.com
                                    211 Florence
                                    Tomball, Texas 77375
                                    Telephone (281) 516-1100
                                    Telecopier (281) 516-1180

Cause No. C-1-CV-13-009444

| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
| | § | |
| VS. | § | AT LAW NUMBER 2 |
| | § | |
| JOHN BRYAN LANGDON | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF DAMAGES

**BEFORE ME,** the undersigned notary public, on this day **LESLIE MATHISON GILBERT**, who upon her oath did depose and testify as follows:

1. My name is **LESLIE MATHISON GILBERT** ("GILBERT"), I am above the age of 18 years, am competent to make this affidavit, and do so from my own personal knowledge.

2. I am personally familiar with the files records with respect to the Defendant.

3. On or about August 1, 2011, JOHN BRYAN LANGDON (hereinafter referred to as "LANGDON") and GILBERT executed a Residential Lease for the lease of 4109 Michael Neill, Austin, Texas 78730. (the "Lease"). A true and correct copy of the Lease is attached as Exhibit A. GILBERT gave LANGDON a security deposit in the amount of $4,000.00. A true and correct copy of the check is attached as Exhibit B. On or about July 1, 2013, I gave a notice of intent to move out of the house. As an accommodation to LANGDON I moved out early on July 15, 2013. On or about September 4, 2013 I sent LANGDON a letter demanding the prorated amount of $1,500.00 as well as the security deposit in the amount of $4,000.00. There was no response.

4. Pursuant to Section 92.109 of the Texas Property Code, I am entitled to $100.00 plus three times the amount of the security deposit wrongfully withheld; court costs and attorney

-1-

fees or $13,600.00 plus cost and attorney's fees. That amount is just and true, it is due and all just and lawful offsets, payments and credits have been allowed.

5.      As shown by the Whitney certificate on file with the Court, on December 12, 2013, LANGDON was served by serving the Texas Secretary of State.

6.      The balance due and owing by Defendant, to GILBERT as of October 14, 2013 was $13,500.00. Pre-judgment interest has been accruing at the contractual rate of five percent (5%) per annum since October 14, 2013, for total accrued interest of $218.22 as of February 8, 2014, and will continue to accrue at the rate of $1.85 per day until entry of judgment. Pursuant to 92.109 of the Texas Property Code, a fine of $100.00 is also due.

*FURTHER AFFIANT SAYETH NOT.*

LESLIE MATHISON GILBERT

***SUBSCRIBED AND SWORN*** to before me this ____14____ day of ___Feb___, 2014.



JEFFREY G CRAIG
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 1/7/17

Notary Public in and for the State of Texas

My Commission Expires 01/07/2017

- 2 -



EXHIBIT A



# TEXAS ASSOCIATION OF REALTORS®
## RESIDENTIAL LEASE

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS, Inc. 2010

1. **PARTIES:** The parties to this lease are:

   the owner of the Property, Landlord,: _____ John Bryan Langdon _____ ; and

   Tenant(s): **Leslie Mathison Gilbert** _____ .

2. **PROPERTY:** Landlord leases to Tenant the following real property:

   Address: 4109 Michael Neill, Austin, TX 78730
   legally described as: Lot 9; Block B; Section 13; River Place

   In _____ Travis _____ County, Texas, together with the following non-real-property
   items: Outdoor patio, grill, all draperies

   The real property and the non-real-property are collectively called the "Property".

3. **TERM:**

   A. **Primary Term:** The primary term of this lease begins and ends as follows:
      August 1, 2011
      Commencement Date: _____ July 8, 2011 _____   Expiration Date: _____ July 31, 2012 _____ .

   B. **Delay of Occupancy:** Tenant must occupy the Property within 5 days after the Commencement Date. If Tenant is unable to occupy the Property by the 5th day after the Commencement Date because of construction on the Property or a prior tenant's holding over of the Property, Tenant may terminate this lease by giving written notice to Landlord before the Property becomes available to be occupied by Tenant, and Landlord will refund to Tenant the security deposit and any rent paid. Landlord will abate rent on a daily basis for a delay caused by construction or a prior tenant's holding over. This paragraph does not apply to any delay in occupancy caused by cleaning, repairs, or make-ready items.

4. **AUTOMATIC RENEWAL AND NOTICE OF TERMINATION:**

   A. This lease automatically renews on a month-to-month basis unless Landlord or Tenant provides the other party written notice of termination not less than: *(Check only one box.)*
   ☒ (1) 30 days before the Expiration Date.
   ☐ (2) _____ days before the Expiration Date.

   B. If this lease automatically renews on a month-to-month basis, it will continue to renew on a month-to-month basis until either party provides written notice of termination to the other party and the notice of termination will be effective: *(Check only one box.)*
   ☐ (1) on the last day of the month following the month in which the notice is given. Landlord is not obligated to prorate rent even if Tenant surrenders the Property before the termination date.
   ☒ (2) on the date designated in the notice but not sooner than 30 days after the notice is given and, if necessary, rent will be prorated on a daily basis.

(TAR-2001) 6-1-10    Tenant:_____,_____,_____ & Landlord or Landlord's Representative:_____,_____    Page 1 of 14

C.  Oral notice of termination is not sufficient under any circumstances. Time is of the essence for providing notice of termination (strict compliance with dates by which notice must be provided is required). The date on which rent is due does not apply to the requirement for providing written notice of termination. If a box is not checked under Paragraph 4A, Paragraph 4A(1) will apply. If a box is not checked under Paragraph 4B, Paragraph 4B(1) will apply.

5.  **RENT:**

A.  Monthly Rent: Tenant will pay Landlord monthly rent in the amount of $ 3,000.00 _____ for each full month during this lease. The first full month's rent is due and payable not later than _____ August 1, 2011 _____.
    Thereafter, Tenant will pay the monthly rent so that Landlord receives the monthly rent on or before:

    ☒ (1) the first day of each month during this lease.
    ☐ (2) _____.
    Weekends, holidays, and mail delays do not excuse Tenant's obligation to timely pay rent.

B.  Prorated Rent: On or before _____ Tenant will pay Landlord $_____ as prorated rent from the Commencement Date through the last day of the month in which this lease begins.

C.  Place of Payment: Unless this lease provides otherwise, Tenant will remit all amounts due to Landlord under this lease to the following person or entity at the place stated and make all payments payable to the named person or entity. Landlord may later designate, in writing, another person or place to which Tenant must remit amounts due under this lease.

    Name:   Bryan Langdon _____
    Address: _____

    Notice: Place the Property address and Tenant's name on all payments.

D.  Method of Payment:
    (1) Tenant must pay all rent timely and without demand, deduction, or offset, except as permitted by law or this lease.
    (2) Time is of the essence for the payment of rent (strict compliance with rental due dates is required).
    (3) Unless the parties agree otherwise, Tenant may not pay rent in cash and will pay all rent by check, cashier's check, money order, or other means acceptable to Landlord.
    (4) Landlord ☒ requires ☐ does not require   Tenant(s) to pay monthly rents by one payment.
    (5) If Tenant fails to timely pay any amounts due under this lease or if any check of Tenant is not honored by the institution on which it was drawn, Landlord may require Tenant to pay such amount and any subsequent amounts under this lease in certified funds. This paragraph does not limit Landlord from seeking other remedies under this lease for Tenant's failure to make timely payments with good funds.

E.  Rent Increases: There will be no rent increases through the primary term. Landlord may increase the rent that will be paid during any month-to-month renewal period by providing at least 30 days written notice to Tenant.

6.  **LATE CHARGES:**

A.  If Landlord does not actually receive a rent payment in the full amount at the designated place of payment by the ___5___ day of each month at 11:59pm, Tenant will pay Landlord for each late payment:
    (1) an initial late charge equal to (check one box only): ☒ (a) $100.00 _____ ; or ☐ (b)_____ % of one month's rent; and
    (2) additional late charges of $ 25.00 _____ per day thereafter until rent and late charges are paid in full. Additional late charges for any one payment may not exceed more than 30 days.
    Notice: §92.019, Property Code prohibits assessing a late fee until rent has remained unpaid for at least one full day after the date on which the rent is due.

(TAR-2001) 6-1-10    Tenant: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____    Page 2 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com    Lease Listing

6. For the purposes of paying rent and any late charges, the mailbox is not the agent for receipt for Landlord (the postmark date is not the date Landlord receives the payment). The parties agree that the late charge is based on a reasonable estimate of uncertain damages to the Landlord that are incapable of precise calculation and result from late payment of rent. Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 27.

7. **RETURNED PAYMENT:** Tenant will pay Landlord $ 25.00 _____ for each payment Tenant tenders to Landlord which is returned or not honored by the institution on which it is drawn for any reason, plus any late charges until Landlord receives payment. Tenant must make any returned payment good by paying such amount(s) plus any associated charges in certified funds.

8. **APPLICATION OF FUNDS:** Regardless of any notation on a payment, Landlord may apply funds received from Tenant first to any non-rent obligations of Tenant, including but not limited to, late charges, returned payment charges, repairs, brokerage fees, periodic utilities, pet charges, and then to rent.

9. **PETS:**

   A. Unless the parties agree otherwise in writing, Tenant may not permit, even temporarily, any pet on the Property (including but not limited to any mammal, reptile, bird, fish, rodent, or insect).

   B. If Tenant violates this Paragraph 9 or any agreement to keep a pet on the Property, Landlord may take all or any of the following action:
   (1) declare Tenant to be in default of this lease and exercise Landlord's remedies under Paragraph 27;
   (2) charge Tenant, as additional rent, an initial amount of $ _____ and $ _____ per day thereafter per pet for each day Tenant violates the pet restrictions;
   (3) remove or cause to be removed any unauthorized pet and deliver it to appropriate local authorities by providing at least 24-hour written notice to Tenant of Landlord's intention to remove the unauthorized pet; and
   (4) charge to Tenant the Landlord's cost to:
       (a) remove any unauthorized pet;
       (b) exterminate the Property for fleas and other insects;
       (c) clean and deodorize the Property's carpets and drapes; and
       (d) repair any damage to the Property caused by the unauthorized pet.

   C. When taking any action under Paragraph 9B Landlord will not be liable for any harm, injury, death, or sickness to any pet.

10. **SECURITY DEPOSIT:**

   A. Security Deposit: On or before execution of this lease, Tenant will pay a security deposit to Landlord in the amount of $ 3,000.00 _____ . "Security deposit" has the meaning assigned to that term in §92.102, Property Code.

   B. Interest: No interest or income will be paid to Tenant on the security deposit. Landlord may place the security deposit in an interest-bearing or income-producing account and any interest or income earned will be paid to Landlord or Landlord's representative.

   C. Refund: Tenant must give Landlord at least thirty (30) days written notice of surrender before Landlord is obligated to refund or account for the security deposit.

   Notices about Security Deposits:
   (1) §92.108, Property Code provides that a tenant may not withhold payment of any portion of the last month's rent on grounds that the security deposit is security for unpaid rent.

(TAR-2001) 6-1-10    Tenants: _____ , _____ , _____ , _____ & Landlord or Landlord's Representative: _____ , _____ Page 3 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          Lease Listing

(2) Bad faith violations of §92.108 may subject a tenant to liability up to 3 times the rent wrongfully withheld and the landlord's reasonable attorney's fees.

(3) The Property Code does not obligate a landlord to return or account for the security deposit until the tenant surrenders the Property and gives the landlord a written statement of the tenant's forwarding address, after which the landlord has 30 days in which to account.

(4) "Surrender" is defined in Paragraph 16 of this lease.

(5) One may view the Texas Property Code at the Texas Legislature's website which, as of the date shown in the lower left-hand corner of this form, is http://www.statutes.legis.state.tx.us/.

D. Deductions:

(1) Landlord may deduct reasonable charges from the security deposit for:
  (a) damages to the Property, excluding normal wear and tear, and all reasonable costs associated to repair the Property;
  (b) costs for which Tenant is responsible to clean, deodorize, exterminate, and maintain the Property;
  (c) unpaid or accelerated rent;
  (d) unpaid late charges;
  (e) unpaid utilities and utility expenses Landlord incurs to maintain utilities to the Property as required by this Lease;
  (f) unpaid pet charges;
  (g) replacing unreturned keys, garage door openers, security devices, or other components;
  (h) the removal of unauthorized locks or fixtures installed by Tenant;
  (i) Landlord's cost to access the Property if made inaccessible by Tenant;
  (j) missing or burned-out light bulbs and fluorescent tubes (at the same location and of the same type and quality that are in the Property on the Commencement Date);
  (k) packing, removing, and storing abandoned property;
  (l) removing abandoned or illegally parked vehicles;
  (m) costs of reletting (as defined in Paragraph 27), if Tenant is in default;
  (n) attorney's fees, costs of court, costs of service, and other reasonable costs incurred in any legal proceeding against Tenant;
  (o) mailing costs associated with sending notices to Tenant for any violations of this lease;
  (p) any other unpaid charges or fees or other items for which Tenant is responsible under this lease; and
  (q) cost to restore walls, flooring, landscaping or any alteration to the Property not approved in writing by Landlord.

(2) If deductions exceed the security deposit, Tenant will pay to Landlord the excess within 10 days after Landlord makes written demand.

11. UTILITIES:

A. Tenant will pay all connection fees, service fees, usage fees, and all other costs and fees for all utilities to the Property (for example, electricity, gas, water, wastewater, garbage, telephone, alarm monitoring systems, cable, and internet connections) except the following which Landlord will pay: HOA dues _____

_____

Unless otherwise agreed, amounts under this paragraph are payable directly to the service providers.

B. Unless provided by Landlord, Tenant must, at a minimum, keep the following utilities on, if available, at all times this lease is in effect: gas; electricity; water; wastewater; and garbage services.

Notice: Before signing this lease, Tenant should determine if all necessary utilities are available to the Property and are adequate for Tenant's use.

(TAR-2001) 6-1-10     Tenants: _____, _____, _____, _____   & Landlord or Landlord's Representative: _____, _____   Page 4 of 14

## 12. USE AND OCCUPANCY:

A. **Occupants:** Tenant may use the Property as a private residence only. The only persons Tenant may permit to reside on the Property during the term of this lease are *(Include names and ages of all occupants):* ~~REDACTED PER TRAP 9.9~~ Leslie Gilbert 39

B. **Phone Numbers and E-mail:** Tenant must promptly inform Landlord of any changes in Tenant's phone numbers (home, work, and mobile) and e-mail not later than 5 days after a change.

C. **HOA Rules:** Tenant must comply with any owners' association rules or restrictive covenants affecting the Property. Tenant will reimburse Landlord for any fines or other charges assessed against Landlord for violations by Tenant of any owners' association rule or restrictive covenant.

D. **Prohibitions:** Unless otherwise authorized by this lease, Tenant may not install or permit any of the following on the Property, even temporarily: a spa, hot tub, above-ground pool, trampoline, or any item which causes a suspension or cancellation of insurance coverage or an increase in insurance premiums. Tenant may not permit any part of the Property to be used for: (1) any activity which is a nuisance, offensive, noisy, or dangerous; (2) the repair of any vehicle; (3) any business of any type, including but not limited to child care; (4) any activity which violates any zoning ordinance, owners' association rule, or restrictive covenant; (5) any illegal or unlawful activity; or (6) activity that obstructs, interferes with, or infringes on the rights of other persons near the Property.

E. **Guests:** Tenant may not permit any guest to stay on the Property longer than the amount of time permitted by any owners' association rule or restrictive covenant or _____20_____ days without Landlord's written permission, whichever is less.

F. **Common Areas:** Landlord is not obligated to pay any non-mandatory or user fees for Tenant's use of any common areas or facilities (for example, pool or tennis courts).

## 13. PARKING RULES:
Tenant may not permit more than ____3____ vehicles, including but not limited to automobiles, trucks, recreational vehicles, trailers, motorcycles, all-terrain vehicles, jet skis, and boats, on the Property unless authorized by Landlord in writing. Tenant may not park or permit any person to park any vehicles in the yard. Tenant may permit vehicles to be parked only in drives, garages, designated common parking areas, or in the street if not prohibited by law or an owners' association. Tenant may not store or permit any person to store any vehicles on or adjacent to the Property or on the street in front of the Property. In accordance with applicable state and local laws, Landlord may have towed, at Tenant's expense: (a) any inoperative vehicle on or adjacent to the Property; (b) any vehicle parked in violation of this paragraph or any additional parking rules made part of this lease; or (c) any vehicle parked in violation of any law, local ordinance, or owners' association rule.

## 14. ACCESS BY LANDLORD:

A. **Advertising:** Landlord may prominently display a "For Sale" or "For Lease" or similarly worded sign on the Property during the term of this lease or any renewal period. Landlord or Landlord's contractor may take interior or exterior photographs or images of the Property and use the photographs or images in any advertisements to lease or sell the Property.

B. **Access:** Before accessing the Property, Landlord or anyone authorized by Landlord will attempt to first contact Tenant, but may enter the Property at reasonable times without notice to make repairs or to show the Property to prospective tenants or buyers, inspectors, fire marshals, lenders, appraisers, or insurance agents. Additionally, Landlord or anyone authorized by Landlord may peacefully enter the Property at reasonable times without first attempting to contact Tenant and without notice to: (1) survey or review the Property's condition and take photographs to document the condition; (2) make emergency repairs; (3) exercise a contractual or statutory lien; (4) leave written notices; or (5) seize nonexempt property if Tenant is in default.

(TAR-2001) 6-1-10    Tenant: _____,_____,_____,_____ & Landlord or Landlord's Representative _____,_____    Page 5 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com    Lease Listing

Residential Lease concerning: _____ **4109 Michael Neill** / **Austin, TX 78730**

C. **Trip Charges:** If Landlord or Landlord's agents have made prior arrangements with Tenant to access the Property and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible, Landlord may charge Tenant a trip charge of $ _____ .

D. **Keybox:** A keybox is a locked container placed on the Property holding a key to the Property. The keybox is opened by a special combination, key, or programmed access device so that persons with the access device may enter the Property, even in Tenant's absence. The keybox is a convenience but involves risk (such as unauthorized entry, theft, property damage, or personal injury). Neither the Association of REALTORS® nor MLS requires the use of a keybox.

(1) Tenant authorizes Landlord, Landlord's property manager, and Landlord's broker to place on the Property a keybox containing a key to the Property:
(a) during the last _____30_____ days of this lease or any renewal or extension; and
(b) at any time Landlord lists the Property for sale with a Texas licensed broker.

(2) Tenant may withdraw Tenant's authorization to place a keybox on the Property by providing written notice to Landlord and paying Landlord a fee of $ 3,000.00 as consideration for the withdrawal. Landlord will remove the keybox within a reasonable time after receipt of the notice of withdrawal and payment of the required fee. Removal of the keybox does not alleviate Tenant's obligation to make the Property available for showings as indicated in Paragraph 14B.

(3) If Landlord or Landlord's agents have notified Tenant of their intent to access the Property to show it to prospects and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible, Landlord may charge Tenant a trip charge of $ 100.00 .

(4) Landlord, the property manager, and Landlord's broker are not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses arising from use of the keybox unless caused by Landlord, the property manager, or Landlord's broker.

15. **MOVE-IN CONDITION:**

A. Landlord makes no express or implied warranties as to the Property's condition. Tenant has inspected the Property and accepts it AS-IS provided that Landlord: _____

B. Tenant will complete an Inventory and Condition Form, noting any damages to the Property, and deliver it to Landlord within _____10_____ days after the Commencement Date. If Tenant fails to timely deliver the Inventory and Condition Form, the Property will be deemed to be free of damages, unless otherwise expressed in this lease. The Inventory and Condition Form is not a request for repairs. Tenant must direct all requests for repairs in compliance with Paragraph 18.

16. **MOVE-OUT:**

A. **Move-Out Condition:** When this lease ends, Tenant will surrender the Property in the same condition as when received, normal wear and tear excepted. Tenant will leave the Property in a clean condition free of all trash, debris, and any personal property. Tenant may not abandon the Property.

(TAR-2001) 6-1-10    Tenants: _____ , _____ , _____ , _____ & Landlord or Landlord's Representative _____ , _____    Page 6 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    Lease Listing

B. Definitions:

(1) "Normal wear and tear" means deterioration that occurs without negligence, carelessness, accident, or abuse.

(2) "Surrender" occurs when all occupants have vacated the Property, in Landlord's reasonable judgment, and one of the following events occurs:
(a) the date Tenant specifies as the move-out or termination date in a written notice to Landlord has passed; or
(b) Tenant returns keys and access devices that Landlord provided to Tenant under this lease.

(3) "Abandonment" occurs when all of the following occur:
(a) all occupants have vacated the Property, in Landlord's reasonable judgment;
(b) Tenant is in breach of this lease by not timely paying rent; and
(c) Landlord has delivered written notice to Tenant, by affixing it to the inside of the main entry door or if the Landlord is prevented from entering the Property by affixing it to the outside of the main entry door, stating that Landlord considers the Property abandoned, and Tenant fails to respond to the affixed notice by the time required in the notice, which will not be less than 2 days from the date the notice is affixed to the main entry door.

C. Personal Property Left After Move-Out:

(1) If Tenant leaves any personal property in the Property after surrendering or abandoning the Property Landlord may:
(a) dispose of such personal property in the trash or a landfill;
(b) give such personal property to a charitable organization; or
(c) store and sell such personal property by following procedures in §54.045(b)-(e), Property Code.
(2) Tenant must reimburse Landlord all Landlord's reasonable costs under Paragraph 16C(1) for packing, removing, storing, and selling the personal property left in the Property after surrender or abandonment.

## 17. PROPERTY MAINTENANCE:

A. Tenant's General Responsibilities: Tenant, at Tenant's expense, must:
(1) keep the Property clean and sanitary;
(2) promptly dispose of all garbage in appropriate receptacles;
(3) supply and change heating and air conditioning filters at least once a month;
(4) supply and replace all light bulbs, fluorescent tubes, and batteries for smoke detectors, carbon monoxide detectors, garage door openers, ceiling fan remotes, and other devices (of the same type and quality that are in the Property on the Commencement Date);
(5) maintain appropriate levels of necessary chemicals or matter in any water softener;
(6) take action to promptly eliminate any dangerous condition on the Property;
(7) take all necessary precautions to prevent broken water pipes due to freezing or other causes;
(8) replace any lost or misplaced keys;
(9) pay any periodic, preventive, or additional extermination costs desired by Tenant;
(10) remove any standing water;
(11) know the location and operation of the main water cut-off valve and all electric breakers and how to switch the valve or breakers off at appropriate times to mitigate any potential damage;
(12) water the foundation of the Property at reasonable and appropriate times; and
(13) promptly notify Landlord, in writing, of all needed repairs.

(TAR-2001) 6-1-10    Tenants _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____    Page 7 of 14

4109 Michael Neill
Austin, TX 78730

B. Yard Maintenance:

(1) "*Yard*" means all lawns, shrubbery, bushes, flowers, gardens, trees, rock or other landscaping, and other foliage on or encroaching on the Property or on any easement appurtenant to the Property, and does not include common areas maintained by an owners' association.

(2) "*Maintain the yard*" means to perform activities such as, but not limited to: (a) mowing, fertilizing, and trimming the yard; (b) controlling pests in the yard; and (c) removing debris from the yard.

(3) Unless prohibited by ordinance or other law, Tenant will water the yard at reasonable and appropriate times including but not limited to the following times:_____
_____
_____ , Other than watering, the yard will be maintained as follows:

☐ (a) Landlord, at Landlord's expense, will maintain the yard. Tenant will permit Landlord and Landlord's contractors reasonable access to the yard and will remove any pet from the yard at appropriate times.

☒ (b) Tenant, at Tenant's expense, will maintain the yard.

☐ (c) Tenant will maintain in effect a scheduled yard maintenance contract with: ☐ a contractor who regularly provides such service; ☐ _____ .

C. Pool/Spa Maintenance: Any pool or spa on the Property will be maintained according to a Pool/Spa Maintenance Addendum.

D. Prohibitions: If Tenant installs any fixtures on the Property, authorized or unauthorized, such as additional smoke detectors, locks, alarm systems, cables, satellite dishes, or other fixtures, such fixtures will become the property of the Landlord. Except as otherwise permitted by law, this lease, or in writing by Landlord, Tenant may not:
   (1) remove any part of the Property or any of Landlord's personal property from the Property;
   (2) remove, change, add, or rekey any lock;
   (3) make holes in the woodwork, floors, or walls, except that a reasonable number of small nails may be used to hang pictures in sheetrock and grooves in paneling;
   (4) permit any water furniture on the Property;
   (5) install additional phone or video cables, outlets, antennas, satellite receivers, or alarm systems;
   (6) alter, replace or remove flooring material, paint, or wallpaper;
   (7) install, change, or remove any: fixture, appliance, or non-real-property item listed in Paragraph 2;
   (8) keep or permit any hazardous material on the Property such as flammable or explosive materials;
   (9) keep or permit any material or item which causes any liability or fire and extended insurance coverage to be suspended or canceled or any premiums to be increased;
   (10) dispose of any environmentally detrimental substance (for example, motor oil or radiator fluid) on the Property; or
   (11) cause or allow any lien to be filed against any portion of the Property.

E. Failure to Maintain: If Tenant fails to comply with this Paragraph 17 or any Pool/Spa Maintenance Addendum, Landlord may, in addition to exercising Landlord's remedies under Paragraph 27, perform whatever action Tenant is obligated to perform and Tenant must immediately reimburse Landlord the reasonable expenses that Landlord incurs.

18. REPAIRS: (Notice: Subchapter B, Chapter 92, Property Code governs repair obligations).

A. Repair Requests: All requests for repairs must be in writing and delivered to Landlord. If Tenant is delinquent in rent at the time a repair notice is given, Landlord is not obligated to make the repair. In the event of an emergency related to the condition of the Property that materially affects the physical health or safety of an ordinary tenant, call: (512) 773-1534_____ .
Ordinarily, a repair to the heating and air conditioning system is not an emergency.

(TAR-2001) 6-1-10      Tenant: _____, _____, _____ & Landlord or Landlord's Representative _____, _____      Page 8 of 14

B. **NOTICE:** If Landlord fails to repair a condition that materially affects the physical health or safety of an ordinary tenant as required by this lease or the Property Code, Tenant may be entitled to exercise remedies under §92.056 and §92.0561 of the Property Code. If Tenant follows the procedures under those sections, the following remedies may be available to Tenant: (1) terminate the lease and obtain an appropriate refund under §92.056(f); (2) have the condition repaired or remedied according to §92.0561; (3) deduct from the rent the cost of the repair or remedy according to §92.0561; and (4) obtain judicial remedies according to §92.0563. Do not exercise these remedies without consulting an attorney or carefully reviewing the procedures under the applicable sections. The Property Code presumes that 7 days is a reasonable period of time for the Landlord to make a diligent effort to repair a condition unless there are circumstances which establish that a different period of time is appropriate (such as the severity and nature of the condition and the availability of materials, labor, and utilities). Failure to strictly follow the procedures in the applicable sections may cause Tenant to be in default of the lease.

C. **Completion of Repairs:**

(1) Tenant may not repair or cause to be repaired any condition, regardless of the cause, without Landlord's permission. All decisions regarding repairs, including the completion of any repair, whether to repair or replace the item, and the selection of contractors, will be at Landlord's sole discretion.

(2) Landlord is not obligated to complete a repair on a day other than a business day unless required to do so by the Property Code.

D. **Payment of Repair Costs:** Except as otherwise specified in this lease, Landlord will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures for requesting repairs as described in this Paragraph 18.

(1) Landlord will pay the entire cost to repair the following items not caused by Tenant or Tenant's negligence:
   (a) heating and air conditioning systems;
   (b) water heaters; or
   (c) water penetration from structural defects.

(2) Landlord will NOT pay to repair the following items unless caused by Landlord's negligence:
   (a) conditions caused by Tenant, an Occupant, or any guest or invitee of Tenant;
   (b) damage to doors, windows, and screens;
   (c) damage from windows or doors left open;
   (d) damage from wastewater stoppages caused by foreign or improper objects in lines that exclusively serve the Property;
   (e) items that are cosmetic in nature with no impact on the functionality or use of the item; and
   (f) the following specific items or appliances: _____
   _____
   _____

E. **Trip Charges:** If a repair person is unable to access the Property after making arrangements with Tenant to complete the repair, Tenant will pay any trip charge the repair person may charge, which amount may be different from the amount stated in Paragraph 14C.

F. **Advance Payments and Reimbursements:** Landlord may require advance payment of repairs or payments under this Paragraph 18 for which Tenant is responsible. Tenant must promptly reimburse Landlord the amounts under this Paragraph 18 for which Tenant is responsible.

(TAR-2001) 8-1-10    Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____, _____    Page 9 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com    Lease Listing

**19. SECURITY DEVICES AND EXTERIOR DOOR LOCKS:**

    A. Subchapter D, Chapter 92, Property Code requires the Property to be equipped with certain types of locks and security devices. Landlord has rekeyed the security devices since the last occupant vacated the Property or will rekey the security devices within 7 days after Tenant moves in. "Security device" has the meaning assigned to that term in §92.151, Property Code.

    B. All notices or requests by Tenant for rekeying, changing, installing, repairing, or replacing security devices must be in writing. Installation of additional security devices or additional rekeying or replacement of security devices desired by Tenant will be paid by Tenant in advance and may be installed only by contractors authorized by Landlord.

**20. SMOKE DETECTORS:** Subchapter F, Chapter 92, Property Code requires the Property to be equipped with smoke detectors in certain locations. Requests for additional installation, inspection, or repair of smoke detectors must be in writing. Disconnecting or intentionally damaging a smoke detector or removing a battery without immediately replacing it with a working battery may subject Tenant to civil penalties and liability for damages and attorney fees under §92.2611, Property Code.

**21. LIABILITY:** Unless caused by Landlord, Landlord is not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses to person or property caused by fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, condition of the Property, environmental contaminants (for example, carbon monoxide, asbestos, radon, lead-based paint, mold, fungus, etc.), or other occurrences or casualty losses. Tenant will promptly reimburse Landlord for any loss, property damage, or cost of repairs or service to the Property caused by Tenant, Tenant's guests, any occupants, or any pets.

**22. HOLDOVER:** If Tenant fails to vacate the Property at the time this lease ends Tenant will pay Landlord rent for the holdover period and indemnify Landlord and prospective tenants for damages, including but not limited to lost rent, lodging expenses, costs of eviction, and attorneys' fees. Rent for any holdover period will be three (3) times the monthly rent, calculated on a daily basis, and will be immediately due and payable daily without notice or demand.

**23. RESIDENTIAL LANDLORD'S LIEN:** Landlord will have a lien for unpaid rent against all of Tenant's nonexempt personal property that is in the Property and may seize such nonexempt property if Tenant fails to pay rent. Subchapter C, Chapter 54, Property Code governs the rights and obligations of the parties regarding Landlord's lien. Landlord may collect a charge for packing, removing, or storing property seized in addition to any other amounts Landlord is entitled to receive. Landlord may sell or dispose of any seized property in accordance with the provisions of §54.045, Property Code.

**24. SUBORDINATION:** This lease and Tenant's leasehold interest are and will be subject, subordinate, and inferior to: (i) any lien or encumbrance now or later placed on the Property by Landlord; (ii) all advances made under any such lien or encumbrance; (iii) the interest payable on any such lien or encumbrance; (iv) any and all renewals and extensions of any such lien or encumbrance; (v) any restrictive covenant; and (vi) the rights of any owners' association affecting the Property.

**25. CASUALTY LOSS OR CONDEMNATION:** Section 92.054, Property Code governs the rights and obligations of the parties regarding a casualty loss to the Property. Any proceeds, payment for damages, settlements, awards, or other sums paid because of a casualty loss to the Property will be Landlord's sole property. For the purpose of this lease, any condemnation of all or a part of the Property is a casualty loss.

(TAR-2001) 6-1-10    Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative _____, _____ Page 10 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com    Leave Listing

UNOFFICIAL

Residential Lease concerning: _____ 
**4109 Michael Neill**
**Austin, TX 78730**
_____

**26. SPECIAL PROVISIONS:** *(Do not insert a lease-option or lease-purchase clause without the assistance of legal counsel. Special obligations and liabilities under statute apply to such transactions.)*
Tenant and Landlord to set up direct bank payment transfers for rent payment prior to July 1, 2011 for rent payments; Deposit is not the last month's rent and last month's rent to be paid in full.

Deposit & First Month's Rent For August Due July 1st, 2011

**27. DEFAULT:**

A. If Landlord fails to comply with this lease, Tenant may seek any relief provided by law.

B. If Tenant fails to timely pay all amounts due under this lease or otherwise fails to comply with this lease, Tenant will be in default and:
(1) Landlord may terminate Tenant's right to occupy the Property by providing Tenant with at least one day written notice to vacate;
(2) all unpaid rents which are payable during the remainder of this lease or any renewal period will be accelerated without notice or demand;
(3) Landlord may exercise Landlord's lien under Paragraph 23 and any other rights under this lease or the Property Code; and
(4) Tenant will be liable for:
  (a) any lost rent;
  (b) Landlord's cost of reletting the Property including but not limited to leasing fees, advertising fees, utility charges, and other fees reasonably necessary to relet the Property;
  (c) repairs to the Property for use beyond normal wear and tear;
  (d) all Landlord's costs associated with eviction of Tenant, including but not limited to attorney's fees, court costs, costs of service, witness fees, and prejudgment interest;
  (e) all Landlord's costs associated with collection of amounts due under this lease, including but not limited to collection fees, late charges, and returned check charges; and
  (f) any other recovery to which Landlord may be entitled by law.

C. Notice to vacate under Paragraph 27B(1) may be by any means permitted by §24.005, Property Code.

D. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by attempting to relet the Property to acceptable tenants and reducing Tenant's liability accordingly.

**28. EARLY TERMINATION:** This lease begins on the Commencement Date and ends on the Expiration date unless: (i) renewed under Paragraph 4; (ii) extended by written agreement of the parties; or (iii) terminated earlier under Paragraph 27, by agreement of the parties, applicable law, or this Paragraph 28.

A. Special Statutory Rights Tenants may have special statutory rights to terminate the lease early in certain situations involving family violence, military deployment or transfer, or certain sex offenses.

(1) Military: If Tenant is or becomes a servicemember or a dependent of a servicemember, Tenant may terminate this lease by delivering to Landlord a written notice of termination and a copy of an appropriate government document providing evidence of: (a) entrance into military service; (b) military orders for a permanent change of station (PCS): or (c) military orders to deploy with a military unit for not less than 90 days. Termination is effective on the 30th day after the first date on which the next rental payment is due after the date on which the notice is delivered. Section 92.017, Property Code governs the rights and obligations of the parties under this paragraph.

(TAR-2001) 6-1-10    Tenants: _____, _____, _____, _____ & Landlord or Landlord's Representative: _____ Page 11 of 14

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com    Lease Listing

Residential Lease concerning:    **4109 Michael Neill**
**Austin, TX   78730**

(2) Family Violence: Tenant may terminate this lease if Tenant provides Landlord with a copy of a court order described under §92.016, Property Code protecting Tenant or an occupant from family violence committed by a cotenant or occupant of the Property. Section 92.016, Property Code governs the rights and obligations of the parties under this paragraph. If the family violence is committed by someone other than a cotenant or co-occupant of the Property, Tenant must give written notice of termination 30 days prior to the effective date of the notice.

(3) Sex Offenses: Tenant may have special statutory rights to terminate this lease in certain situations involving sexual assault or sexual abuse. For more information about the types of abuse and assault covered by this provision, Tenant is advised to review §92.0161, Property Code.

B. Assignment, Subletting and Replacement Tenants:

(1) Tenant may not assign this lease or sublet the Property without Landlord's written consent.

(2) If Tenant requests an early termination of this lease under this Paragraph 28B, Tenant may attempt to find a replacement tenant and may request Landlord to do the same. Landlord may, but is not obligated to, attempt to find a replacement tenant under this paragraph.

(3) Any assignee, subtenant, or replacement tenant must, in Landlord's discretion, be acceptable as a tenant and must sign: (a) a new lease with terms not less favorable to Landlord than this lease or otherwise acceptable to Landlord; (b) a sublease with terms approved by Landlord; or (c) an assignment of this lease in a form approved by Landlord.

(4) At the time Landlord agrees to permit an assignee, subtenant, or replacement tenant to occupy the Property, Tenant will pay Landlord:

(a) If Tenant procures the assignee, subtenant, or replacement tenant:
☐ (i) $ _____.
☐ (ii) _____ % of one's month rent that the assignee, subtenant, or replacement tenant is to pay.

(b) If Landlord procures the assignee, subtenant, or replacement tenant:
☐ (i) $ _____.
☐ (ii) _____ % of one's month rent that the assignee, subtenant, or replacement tenant is to pay.

(5) Unless expressly stated otherwise in an assignment or sublease, Tenant will not be released from Tenant's obligations under this lease because of an assignment or sublease. An assignment of this lease or a sublease of this lease without Landlord's written consent is voidable by Landlord.

29. ATTORNEY'S FEES: Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, attorney's fees, costs of service, and all other costs of the legal proceeding from the non-prevailing party.

30. REPRESENTATIONS: Tenant's statements in this lease and any application for rental are material representations. Each party to this lease represents that he or she is of legal age to enter into a contract. If Tenant makes a misrepresentation in this lease or in an application for rental, Tenant is in default.

31. ADDENDA: Incorporated into this lease are the following addenda, exhibits and other information. If Landlord's Rules and Regulations are made part of this lease, Tenant agrees to comply with the Rules and Regulations as Landlord may, at Landlord's discretion, amend from time to time.

☐ Addendum Regarding Lead-Based Paint          ☒ Agreement Between Brokers
☐ Inventory & Condition Form                   ☐ Landlord's Rules & Regulations
☐ Landlord's Additional Parking Rules          ☐ Owners' Association Rules
☒ Pet Agreement                                ☐ Pool/Spa Maintenance Addendum
☐ Protecting Your Home from Mold               ☒ Residential Lease Application
☐ Agreement for Application Deposit & Hold      ☐ Residential Lease Guaranty
☐ _____              ☐ _____
☐ _____              ☐ _____

(TAR-2001) 6-1-10    Tenants: _____ , _____ , _____ & Landlord or Landlord's Representative _____ , _____ Page 12 of 14

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          Lease Listing

**32. NOTICES:** All notices under this lease must be in writing and are effective when hand-delivered, sent by mail, or sent by electronic transmission to *(Do not insert an e-mail address or a fax number unless the party consents to receive notices under this lease at the e-mail address or fax number specified.)*:

Tenant at the Property and a copy to:             Landlord c/o:

_____             _____
_____             _____
_____             _____
E-mail:_____             E-mail:_____
Fax:_____             Fax:_____

**33. AGREEMENT OF PARTIES:**

A. Entire Agreement: There are no oral agreements between Landlord and Tenant. This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

B. Binding Effect: This lease is binding upon and inures to the benefit of the parties to this lease and their respective heirs, executors, administrators, successors, and permitted assigns.

C. Joint and Several: All Tenants are jointly and severally liable for all provisions of this lease. Any act or notice to, refund to, or signature of, any one or more of the Tenants regarding any term of this lease, its extension, its renewal, or its termination is binding on all Tenants executing this lease.

D. Waiver: Landlord's past delay, waiver, or non-enforcement of a rental due date or any other right will not be deemed to be a waiver of any other breach by Tenant or any other right in this lease.

E. Severable Clauses: Should a court find any clause in this lease unenforceable, the remainder of this lease will not be affected and all other provisions in this lease will remain enforceable.

F. Controlling Law: The laws of the State of Texas govern the interpretation, validity, performance, and enforcement of this lease.

G. Copyright: If an active REALTOR® member of the Texas Association of REALTORS® or an active member of the State Bar of Texas does not negotiate this lease as a party or for one of the parties, either as a party's broker or attorney, this lease is voidable at will by Tenant.

**34. INFORMATION:**

A. Future inquiries about this lease, rental payments, and security deposits should be directed to the person listed for receipt of notices for Landlord under Paragraph 32.

B. It is Tenant's responsibility to determine, before signing this lease, if: (i) all services (e.g., utilities, connections, schools, and transportation) are accessible to or from the Property; (ii) such services are sufficient for Tenant's needs and wishes; and (iii) Tenant is satisfied with the Property's condition.

C. The brokers to this lease have no knowledge of whether Landlord is delinquent in the payment of any lien against the Property.

(TAR-2001) 6-1-10      Tenants____,____,____,____ & Landlord or Landlord's Representative____,____      Page 13 of 14

Residential Lease concerning: _____ 4109 Michael Neill
_____ Austin, TX 78730 _____

D. Unpaid rent and any unpaid amount under this lease are reportable to credit reporting agencies.

E. Landlord is not obligated to respond to any requests for Tenant's rental and payment history from a mortgage company or other prospective landlord until Tenant has given notice of termination of this lease and Tenant is not in breach of this lease. (*Notice: Landlord or Landlord's agent may charge a reasonable fee for processing such information.*)

F. If all occupants over 18 years of age die during this lease, Landlord may: (i) permit the person named below to access the Property at reasonable times in Landlord's or Landlord's agent's presence; (ii) permit the named person to remove Tenant's personal property; and (iii) refund the security deposit, less deductions, to the named person. Section 92.014, Property Code governs procedures to follow in the event of a tenant's death.

   Name: _____ Phone: _____
   Address: _____
   E-mail: _____

G. The Texas Department of Public Safety maintains a database that the public may search, at no cost, to determine if registered sex offenders are located in certain areas (see www.txdps.state.tx.us under on-line services). For information concerning past criminal activity in certain areas, contact the local police department.

H. Landlord's insurance does not cover Tenant from loss of personal property. Landlord recommends that Tenant obtain insurance for casualties such as fire, flood, water damage, and theft. Tenant represents that Tenant ☒ intends ☐ does not intend to purchase such insurance.

I. Landlord's broker, Keller Williams Realty
   ☐ will ☒ will not act as the property manager for landlord.

J. This lease is negotiable between the parties. This lease is binding upon final acceptance. READ IT CAREFULLY. If you do not understand the effect of this lease, consult your attorney BEFORE signing.

K. This lease should not be used in conjunction with executory contracts of any type, such as contracts for deed, leases with options to purchase, or lease options, without the advice of an attorney.

| | |
|---|---|
| _Landlord_ 6/28/11 Date | _Tenant_ 6/27/11 Date |
| John Bryan Langdon | Leslie Mathison Gilbert |
| | |
| Landlord _____ Date | Tenant _____ Date |

Or signed for Landlord under written property management
agreement or power of attorney:

By: _____
                              Date

Printed Name: _____

Firm Name: _____

Broker's License No.: _____

Tenant _____ Date

Tenant _____ Date

UNOFFICIAL



ADDENDUM TO RESIDENTIAL LEASE CONCERNING THE PROPERTY AT <u>4109 Michael Neill, Austin,</u>
<u>TX 78730</u>

A. **PET AUTHORIZATION AND PET DESCRIPTION:**

(1) Tenant may not keep any pet on the Property unless specifically authorized by this agreement. "Pet" includes any animal, whether mammal, reptile, bird, fish, rodent, or insect.

(2) Tenant may keep the following pet(s) on the Property until the above-referenced lease ends.

Type: <u>Mini Poodle</u>　Breed: <u>Poodle</u>　Name: <u>Zaa Zaa</u>
Color: <u>White</u>　Weight: <u>11 pounds</u>　Age: <u>10</u>　Gender: <u>Female</u>
Neutered? ☒ yes ☐ no　Declawed? ☐ yes ☒ no　Rabies Shots Current? ☒ yes ☐ no

Type: ___　Breed: ___　Name: ___
Color: ___　Weight: ___　Age: ___　Gender: ___
Neutered? ☐ yes ☐ no　Declawed? ☐ yes ☐ no　Rabies Shots Current? ☐ yes ☐ no

B. **CONSIDERATION:** In consideration for Landlord's authorization for Tenant to keep the pet(s) described in Paragraph A on the Property, the parties agree to the following. *(Check any one or any combination of the following.)*

☒ (1) On or before the date Tenant moves into the Property, Tenant will pay Landlord a pet deposit of $ <u>1,000.00</u>　. The pet deposit is an increase in the security deposit in the lease and is made part of the security deposit for all purposes. This increase in the security deposit is not refundable before the lease ends, even if the pet is removed. Any refund of the security deposit, including this increase, is governed by the terms of the lease.

☐ (2) The monthly rent in the lease is increased to $ ___ .

☐ (3) Tenant will, upon execution of this agreement, pay Landlord $ ___ as a one-time, non-refundable payment.

C. **PET RULES:** Tenant must:
(1) take all reasonable action to insure that any pet does not violate the rights of other persons;
(2) comply with all applicable statutes, ordinances, restrictions, owners' association rules, and other enforceable regulations regarding any pet;
(3) keep the rabies shots of any pet current;
(4) confine any pet that is a dog or cat, when outside, by fences or on leashes under Tenant's control;
(5) confine any pet other than a dog or cat in appropriate cages at all times;
(6) promptly remove any pet waste from the Property, including all living areas, garages, storage areas, yards, porches, patios, courtyards, and decks; and
(7) promptly remove from the Property any offspring of any pet.

D. **ACCESS:** Tenant must remove or confine any pet at any time that the pet is likely to limit or prohibit Landlord or other persons access to Property as permitted by the lease.

(TAR-2004) 10-14-03　Initialed for Identification by Tenants: ___ , ___ , and Landlord ___　Page 1 of 2

Keller Williams Realty 4010 River Place Blvd Austin, TX 78730
Phone: 512.576.7344　Fax: .512-623-6123　Tim Moncrief　Lease Listing
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026　www.zipLogix.com

Pet Agreement concerning _____ 4109 Michael Neill
Austin, TX  78730

E.  **DISCLOSURE CONCERNING PETS:**
(1)  Is Tenant aware of whether any of the pets described under this addendum has ever bitten or injured another person?  ☐ Yes ☒ No
If yes, explain: _____

(2)  Is Tenant aware of whether any of the pets described under this addendum has any propensity or predisposition to bite or injure someone?  ☐ Yes ☒ No
If yes, explain: _____

F.  **TENANT'S LIABILITY:**
(1)  Tenant is responsible and liable for:
(a)  any damage to the Property or any item in the Property caused by any pet;
(b)  any personal injuries to any person caused by any pet; and
(c)  any damage to any person's property caused by any pet.
(2)  Tenant will pay all reasonable costs that are necessary to clean, deodorize, deflea, or repair any part of the Property, including but not limited to the carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, sod, yard, fences, or landscaping.

G.  **INDEMNIFICATION:** Tenant will protect, defend, indemnify, and hold Landlord, Landlord's property manager, and Landlord's agents harmless from any damages, costs, attorney's fees, and expenses that are caused by the act of any pet or Tenant.

H.  **DEFAULT:** If Tenant breaches any provision in this pet agreement, Landlord may exercise all or any of the remedies described under Paragraph 9B of the lease.

I.  **SPECIAL PROVISIONS:**

Landlord John Bryan Langdon      6/26/11      Tenant Leslie Mathison-Gilbert      7/27/11
_____ Date    _____ Date

Landlord      Date                Tenant      Date

Or signed for Landlord under written property management agreement or power of attorney:    Tenant      Date

By: _____
Printed Name: _____    Tenant      Date
Firm Name: _____

(TAR-2004) 10-14-03

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com



EXHIBIT B

VOID VOID VOID VOID

CASHIER'S CHECK

0074704661

Details on Back.

0000747    11-24
Office AU #    1210(8)

Operator I.D.: b004573

June 29, 2011

PAY TO THE ORDER OF    ***BRYAN LANGDON***
***RE: PROPERTY DEPOSIT LESLIE GILBERT***

***Four thousand dollars and no cents***

**$4,000.00**

WELLS FARGO BANK, N.A.
6911 RANCH ROAD 620 N
AUSTIN, TX 78732
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $   4,000.00

*Richard Levy*

CONTROLLER

Security Features Included.

⑈0074704661⑈

UNOFFICIAL

| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
|---|---|---|
| | § | |
| VS. | § | AT LAW NUMBER 2 |
| | § | |
| JOHN BRYAN LANGDON | § | TRAVIS COUNTY, TEXAS |

| STATE OF TEXAS | § |
|---|---|
| | § |
| | § |
| COUNTY OF HARRIS | § |

## AFFIDAVIT OF ATTORNEY FEES

**BEFORE ME,** the undersigned notary public, on this day BLAIR A. BRUCE, who upon his oath did depose and testify as follows:

1. My name is BLAIR A. BRUCE. I am above the age of 18 years, of sound mind, am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am an attorney licensed to practice in the State of Texas.

3. LESLIE MATHISON GILBERT retained me to represent it in this suit on open account.

4. LESLIE MATHISON GILBERT's retention of me on this case precluded me from accepting other employment.

5. The novelty and difficulty of the questions involved in this case required me to spend approximately 10 hours prosecuting this cause of action.

6. APF agreed to compensate me for my work based on an hourly fee.

- 1 -

7.    Based on our fee arrangement, APF incurred attorney's fees and cost in the amount of $2,500.00.

8.    The attorney fees charged in this case were necessary, were reasonable, and were incurred in the prosecution of this suit.  Fees were incurred in sending demand letters, preparing Plaintiff's Original Petition, obtaining service, review of documents, drafting and filing the motion for default and related documents.

9.    The fees I charged in this case are customarily charged in this area for the same or similar services for an attorney with my experience, reputation, and ability, considering the type of controversy, the time limitations imposed, the results obtained, and the nature and length of my relationship with APF.

*FURTHER AFFIANT SAYETH NOT.*

_____
Blair Bruce


*SUBSCRIBED AND SWORN* to before me this ___19th___ day of _Feb_____,
2014.

_____
Notary Public in and for the State of Texas

My Commission Expires



ERIN N KERSHAW
My Commission Expires
August 6, 2016

-2-

Cause No. C-1-CV-13-009444

| | | |
|---|---|---|
| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
| | § | |
| VS. | § | AT LAW NUMBER 2 |
| | § | |
| JOHN BRYAN LANGDON | § | TRAVIS COUNTY, TEXAS |

## FINAL JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

BE IT REMEMBERED that on this day, the Court being regularly in session at the place where the above entitled and numbered cause was commenced, in which case the Plaintiff is LESLIE MATHISON GILBERT and the Defendant is JOHN BRYAN LANGDON. The Judge in open Court regularly called the cause in its order on the docket and Plaintiff was present in court;

WHEREFORE, the Plaintiff, LESLIE MATHISON GILBERT, ought to recover of and from the Defendant, JOHN BRYAN LANGDON the sum of $13,600.00, plus interest with costs of suit to be taxed against the Defendant JOHN BRYAN LANGDON and such other and further relief at law or in equity to which Plaintiff may show itself to be justly entitled.

It is therefore, ORDERED, ADJUDGED AND DECREED by this Court that Plaintiff, LESLIE MATHISON GILBERT, should have and recover of the Defendant, JOHN BRYAN LANGDON:

1. $100.00 civil penalty;

2. Three time the amount of the security deposit wrongfully withheld or $12,000.00;

3. $1,500.00 in rental overpayment;

- 1 -

4. Pre-judgment interest has been accruing at the rate of five percent (5.00%) per annum since October 14, 2013, for total accrued interest of $218.22 as of February 8, 2014 and will continue to accrue at the rate of $1.85 per day until entry of judgment;

5. attorney fees in the amount of $2,500.00,

6. post judgment interest as provided by law;

7. all costs of court; and

8. and for such other and further relief to which Plaintiff may show itself to be justly entitled.

9.

Signed this _____ day of _____, 2014.


_____
The Honorable Judge,



APPROVED AS TO SUBSTANCE AND FORM:

TROUP & BRUCE LLP

/s/ Blair Bruce
Blair A. Bruce,
State Bar No: 00792376
blair@troupbruce.com
211 Florence
Tomball, Texas 77375
Telephone (281) 516-1100
Telecopier (281) 516-1180
Attorneys for Plaintiff

**Cause No. C-1-CV-13-009444**

| | | |
|---|---|---|
| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
| | § | |
| VS. | § | AT LAW  NUMBER 2 |
| | § | |
| JOHN BRYAN LANGDON | § | TRAVIS COUNTY, TEXAS |

### CERTIFICATE OF LAST KNOWN MAILING ADDRESS

I, the attorney for Plaintiff, hereby certify that based upon a review of Plaintiff's records and records of the public domain, the last known mailing address of JOHN BRYAN LANGDON Defendant in the above-entitled cause, is 275 2nd Avenue, Long Branch, NJ 07740

.

Respectfully submitted,

Troup & Bruce LLP

/s/ Blair Bruce
Blair A. Bruce,
State Bar No: 00792376
blair@troupbruce.com
211 Florence
Tomball, Texas 77375
Telephone (281) 516-1100
Telecopier (281) 516-1180

UNOFFICIAL

Page 1 of 1

Cause No. C-1-CV-13-009444

| LESLIE MATHISON GILBERT | § IN THE COUNTY CIVIL COURT |
| | § |
| VS. | § AT LAW NUMBER 2 |
| | § |
| JOHN BRYAN LANGDON | § TRAVIS COUNTY, TEXAS |

## SERVICEMEMBERS CIVIL RELIEF ACT AFFIDAVIT

| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, personally appeared the below-named affiant, who upon oath deposed and stated:

I am over the age of eighteen (18) years and am competent to make this affidavit. I am the
     Plaintiff
✓ Plaintiff's agent
in the above-entitled and numbered matter.

I have
✓ made a personal investigation
✓ personally reviewed the business records of the Plaintiff

As a result of the investigation or review, it is my belief that John Bryan Langdon
✓ is not in the military service on active duty, and is not a dependent of a servicemember on active duty
     is in the military service on active duty
     I have been unable to determine whether or not the defendant is in the military service on active duty

Attached is a printout from the Department of Defense Manpower Data Center which confirms my findings.

I understand that any false statements in this document are made under penalty of perjury, and that making a false statement is a violation of Federal Law and is subject to both fine and imprisonment.

DATED this _13_ day of _February_, 2014.

_____
Affiant

SUBSCRIBED AND SWORN TO before me this 18th day of _Feb_, 2014.

_____
Notary Public

ERIN N KERSHAW
My Commission Expires
August 6, 2016



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>LANGDON</u>
First Name: <u>JOHN</u>
Middle Name: <u>BRYAN</u>
Active Duty Status As Of: <u>Feb-09-2014</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the Individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the Individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the Individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty. HOWEVER, WITHOUT A SOCIAL SECURITY NUMBER, THE DEPARTMENT OF DEFENSE MANPOWER DATA CENTER CANNOT AUTHORITATIVELY ASSERT THAT THIS IS THE SAME INDIVIDUAL THAT YOUR QUERY REFERS TO. NAME AND DATE OF BIRTH ALONE DO NOT UNIQUELY IDENTIFY AN INDIVIDUAL.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via the "defenselink.mil" URL: http://www.defenselink.mil/faq/pis/PC09SLDR.html. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

## Certificate ID: 67C2S845C029K80

ACCEPTED
03-15-00305-CV
5651777
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/12/2015 10:17:57 AM
JEFFREY D. KYLE
CLERK

APPELLATE CASE NO. 03-15-00305-CV

JOHN BRYAN LANGDON
Appellant

v.

LESLIE MATHISON GILBERT
Appellee

On Appeal from the
County Court at Law Number Two of Travis County, Texas

**APPELLANT'S APPENDIX**

Identity of Parties and Counsel

| | |
|---|---|
| Leslie Mathison Gilbert | John Bryan Langdon |
| Defendant at the Trial Court Level | Plaintiff at the Trial Court Level |
| | |
| Evans Kosut Davidson, PLLC | Law Office of Tom Murphy |
| Attn: John M. Davidson | Attn: Tom Murphy |
| 16000 Stuebner Airline Rd., Ste. 200 | 9600 Great Hills Trail, Ste. 150W |
| Spring, Texas 77379 | Austin, Texas 78759 |
| (281) 251-7900 | (512) 477-5680 |
| (281) 251-7909 Fax | (512) 493-0691 Fax |
| Email: jdavidson@ekklaw.com | Email: tom@tommurphyslaw.com |
| Trial Attorney and | Trial Attorney and |
| Presumed Appellee Counsel for Gilbert | Appellate Counsel for Langdon |

Respectfully submitted,

LAW OFFICE OF TOM MURPHY

By: _____
    Tom Murphy
    TSB # 24013217
    9600 Great Hills Trail, Ste. 150W
    Austin, Texas 78759
    (512) 477-5680
    (512) 493-0691 Fax
    Email: tom@tommurphyslaw.com
    Attorney for Appellant Langdon

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above was delivered to the following parties or their attorneys of record pursuant to the TRCP on June 11, 2015.

Evans Kosut Davidson, PLLC
Attn: John M. Davidson
16000 Stuebner Airline Rd., Ste. 200
Spring, Texas 77379
(281) 251-7900
(281) 251-7909 Fax
Email: jdavidson@ekklaw.com
Trial Attorney and Presumed
Appellate Counsel for Gilbert

Court of Appeals
Third District of Texas
Attn: Jeffrey D. Kyle, Clerk of the Court
PO Box 12547
Austin, Texas 78711-2547

_____
Tom Murphy

# APPENDIX

Appendix #1.     Copy of the Lease Agreement

Appendix #2.     Copy of the Second Amended Petition for Bill of Review

Appendix #3.     Copy of Exhibit B (Attorneys' Fees) of Motion for Summary Judgment

Appendix #4.     Appellee's Response to Appellant's Motion for Summary Judgment

Appendix #5.     Appellee's First Amended Petition

Appendix #6.     Motion for Default Judgment

Appendix #7.     Final Judgment in the Underlying Suit

Appendix #8.     Order Granting Appellee's Notice of Non-Suit without Prejudice

Appendix #9.     TEX. R. CIV. P. 54

Appendix #10.     TEX. R. CIV. P. 329b(d)

Appendix #11.     TEX. R. CIV. P. 329b(f)

Appendix #12.     1A TexJur Actions §49 and §62

Appendix #13.     34 TexJur Equity §2

Appendix #14.     *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App. – Dallas 209, no pet.)

Appendix #15.     *Bakali v. Bakali*, 830 S.W.2d 251, 257 (Tex. App. - Dallas 1992, no writ)

Appendix #16.     Black's Law Dictionary, 10th ed. (2014)

Appendix #17.    *CenterPlace Props., Ltd. v. Columbia Med. Ctr.*, 406 S.W.3d 674, 688 (Tex. App. – Fort Worth 2013, pet. granted, judgm't vacated w.r.m.)

Appendix #18.    *Fitzgerald v. Schoeder Ventures II, LLC*, 345 S.W.3d 624, 627 (Tex. App. – San Antonio 2011, no pet.)

Appendix #19.    *Franzetti v. Franzetti*, 120 S.W.2d 123, 125-26 (Tex. App. – Austin 1938, no writ)

Appendix #20.    *G. Richard Goins Constr. Co. v. S.B. McLaughlin Assocs.*, 930 S.W.2d 124, 130 (Tex. App. – Tyler 1996, writ denied)

Appendix #21.    *Greathouse v. Charter Nat'l Bank-Sw.*, 851 S.W.2d 173, 174 (Tex. 1992)

Appendix #22.    *Hill v. Thompson & Knight*, 756 S.W.2d 824, 826 (Tex. App. – Dallas 1988, no writ)

Appendix #23.    *In Re Smith*, 2007 Tex. App. LEXIS 1153 *4 (Tex. App. – Houston [1st Dist.] 2007, no pet.)

Appendix #24.    *Intercontintental Grp. v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 655 (Tex. 2009)

Appendix #25.    *Kessler v. Kessler*, 693 S.W.2d 522, 525 (Tex. App. - Corpus Christi 1985, writ ref'd n.r.e.)

Appendix #26.    *Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 799 (Tex. 1974)

Appendix #27.    *Lowe v. Farm Credit Bank of Texas*, 2 S.W.3d 293, 299 (Tex. App. —San Antonio 1999, pet. denied)

Appendix #28.    *Martin v. Tex. Dept. of Family & Protective Servs.*, 176 S.W.3d 390, 392 (Tex. App.-Houston [1st Dist.] 2004, no pet.)

Appendix #29.    *MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 663 (Tex. 2009)

Appendix #30.    *Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 58 (Tex. 2008)

Appendix #31.    *Meece v. Moerbe*, 631 S.W.2d 729, 730 (Tex. 1982)

Appendix #32.    *Mitchell v. LaFlamme*, 60 S.W.3d 123, 130 (Tex. App. – Houston [14th Dist.] 2000, no pet.)

Appendix #33.    *Moore Landrey, L.L.P. v. Hirsch & Westheimer, P.C.*, 126 S.W.3d 536, 538-39 (Tex. App.-Houston [1st Dist.] 2003, no pet.)

Appendix #34.    *Rodriguez v. Holmstrom*, 627 S.W.2d 198, 202-03 (Tex. App. - Austin 1981, no writ)

Appendix #35.    *Shahbaz v. Feizy Imp. & Exp. Co.*, 827 S.W.2d 63, 64 (Tex. App.-Houston [1st Dist.] 1992, no writ)

Appendix #36.    *Solar Applications Eng'g v. T.A. Oper. Corp.*, 327 S.W.3d 104, 108 (Tex. 2010)

Appendix #37.    *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996)

Appendix #38.    *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 866 (Tex. 2010)

# APPENDIX
## #7

# EXHIBIT B-1

Cause No. C-1-CV-13-009444

FOR RECORD

2014 MAR 19 AM 11:44

| | |
|---|---|
| LESLIE MATHISON GILBERT | § IN THE COUNTY CIVIL COURT |
| | § |
| VS. | § AT LAW NUMBER 2 |
| | § |
| JOHN BRYAN LANGDON | § |
| | § TRAVIS COUNTY, TEXAS |

## FINAL JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

BE IT REMEMBERED that on this day, the Court being regularly in session at the place where the above entitled and numbered cause was commenced, in which case the Plaintiff is LESLIE MATHISON GILBERT and the Defendant is JOHN BRYAN LANGDON. The Judge in open Court regularly called the cause in its order on the docket and Plaintiff was present in court;

WHEREFORE, the Plaintiff, LESLIE MATHISON GILBERT, ought to recover of and from the Defendant, JOHN BRYAN LANGDON the sum of $13,600.00, plus interest with costs of suit to be taxed against the Defendant JOHN BRYAN LANGDON and such other and further relief at law or in equity to which Plaintiff may show itself to be justly entitled.

It is therefore, ORDERED, ADJUDGED AND DECREED by this Court that Plaintiff, LESLIE MATHISON GILBERT, should have and recover of the Defendant, JOHN BRYAN LANGDON:

1. $100.00 civil penalty;

2. Three time the amount of the security deposit wrongfully withheld or $12,000.00;

3. $1,500.00 in rental overpayment;

# EXHIBIT B-1

- 1 -

4. Pre-judgment interest has been accruing at the rate of five percent (5.00%) per annum since October 14, 2013, for total accrued interest of $218.22 as of February 8, 2014 and will continue to accrue at the rate of $1.85 per day until entry of judgment;

5. attorney fees in the amount of $2,500.00,

6. post judgment interest as provided by law;

7. all costs of court; and

8. ~~and for such other and further relief to which Plaintiff may show itself to be justly entitled.~~

9.

Signed this ___19___ day of ___March___ 2014.

_____
The Honorable Judge,
ERIC M. SHEPPERD

APPROVED AS TO SUBSTANCE AND FORM:

TROUP & BRUCE LLP

/s/ Blair Bruce
Blair A. Bruce,
State Bar No: 00792376
blair@troupbruce.com
211 Florence
Tomball, Texas 77375
Telephone (281) 516-1100
Telecopier (281) 516-1180
Attorneys for Plaintiff

# EXHIBIT B-2

UNOFFICIAL

# APPENDIX
# #8

| | | |
|---|---|---|
| LESLIE MATHISON GILBERT | § | IN THE COUNTY CIVIL COURT |
| **Plaintiff** | § | |
| | § | |
| VS. | § | AT LAW NUMBER TWO (2) |
| | § | |
| JOHN BRYAN LANGDON | § | |
| **Defendant** | § | TRAVIS COUNTY, TEXAS |

## ORDER GRANTING NON-SUIT WITHOUT PREJUDICE

On this day came on to be considered Plaintiff LESLIE MATHISON GILBERT's Notice of Non-Suit Without Prejudice. After reviewing the notice, the Court is of the opinion that the non-suit should be GRANTED. It is therefore

ORDERED that Plaintiff's Non-Suit Without Prejudice is hereby GRANTED as to all claims against Defendant JOHN BRYAN LANGDON

SIGNED this 7th day of April, 2015.

_____
JUDGE PRESIDING
ERIC M. SHEPPERD

Case # C-1-CV-13-009444

# APPENDIX
# #9

# RULE 54

## CONDITIONS PRECEDENT

In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred. When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.

# APPENDIX
# #10

# RULE 329b(d)

## TIME FOR FILING MOTIONS

The following rules shall be applicable to motions for new trial and motions to modify, correct, or reform judgments (other than motions to correct the record under Rule 316) in all district and county courts:

(d)    The trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed.

# APPENDIX
# #11

## RULE 329b(f)

## TIME FOR FILING MOTIONS

The following rules shall be applicable to motions for new trial and motions to modify, correct, or reform judgments (other than motions to correct the record under Rule 316) in all district and county courts:

(f)     On expiration of the time within which the trial court has plenary power, a judgment cannot be set aside by the trial court except by bill of review for sufficient cause, filed within the time allowed by law; provided that the court may at any time correct a clerical error in the record of a judgment and render judgment nunc pro tunc under Rule 316, and may also sign an order declaring a previous judgment or order to be void because signed after the court's plenary power had expired.

# APPENDIX
# #12

Mandamus,[1] child-support actions,[2] and actions seeking expungement of criminal records[3] are civil, not criminal, proceedings. However, an action on a forfeited bail bond or recognizance, being incidental to criminal proceedings, is regarded as criminal for purposes of appeal though subject in other respects to the rules that govern civil cases.[4] Also, official oppression is a criminal offense rather than an intentional tort.[5] Disputes that arise over the enforcement of statutes governed by the Code of Criminal Procedure and that arise as a result of or incident to criminal prosecution are criminal law matters.[6] Although a proceeding for forfeiture of an appearance bond is a criminal proceeding, costs on appeal by the surety on appeal, provided for by statute, are both by directive of statute and by rules themselves a part of the civil procedural rules, and thus, there is no error in the assessment of costs as authorized by civil cases.[7]

The legislature established that an action under a statute for a hearing to dispose of seized property in the absence of a pending criminal action[8] is a criminal case by establishing jurisdiction with the criminal magistrate and not with the civil court.[9] A proceeding to restore stolen property to its owner,[10] however, is a civil matter for purposes of appellate

[Section 48]

[1] Hogan v. Turland, 428 S.W.2d 316 (Tex. 1968).

[2] Foster v. Smith, 424 S.W.2d 689 (Tex. Civ. App. Waco 1968).

[3] Matter of Wilson, 932 S.W.2d 263 (Tex. App. El Paso 1996); Jones v. Texas Dept. of Public Safety, 803 S.W.2d 760 (Tex. App. Houston 14th Dist. 1991).

[4] Scott v. State, 6 Tex. Civ. App. 343, 25 S.W. 337 (1894), writ refused, 86 Tex. 321, 24 S.W. 789 (1894).

[5] Bras, Ltd., 205 F. Supp. 2d 629 (E.D. Tex. 2002).

[6] Curry v. Wilson, 853 S.W.2d 40 (Tex. Crim. App. 1993) (holding that the court of criminal appeals had power to issue writs of prohibition in criminal law matters).

[7] Price v. State, 856 S.W.2d 226 (Tex. App. Fort Worth 1993), petition for discretionary review refused, (Jan. 26, 1994).

[8] Tex. Code Crim. Proc. Ann. art. 47.01a.

[9] White v. State, 930 S.W.2d 673 (Tex. App. Waco 1996).

[10] Tex. Code Crim. Proc. Ann. art. 47.02.

[11] Hutchison v. Brookshire art. 47.02.

---

jurisdiction of the court of appeals.[11]

Contempt proceedings may be either criminal or civil, depending on whether the purpose of the action is to punish the perpetrator or to persuade the contemner to obey some order of the court where such obedience will benefit the opposing litigant.[12] Whether habeas corpus to remove an unlawful restraint is criminal or civil depends on the cause of the restraint.[13]

## § 49 Legal and equitable actions

### Research References

West's Key Number Digest, Action ⊜ 21 to 25

Typically, an action "at law" is one brought for a money judgment while an action "in equity" is one brought for other types of relief, such as an injunction, specific performance, rescission, or cancellation.[1] Where a party seeks monetary damages, he or she seeks a legal remedy, not an equitable one.[2]

A claim for breach of contract is based upon a purely legal right.[3] In other words, a claim for money due and owing under a contract is quintessentially an action at law[4] unless a significant public interest is involved, parties to a contract are left to their remedies at law.[5]

Texas practice is a blend of the systems that once prevailed at law and in equity in other jurisdictions so that, strictly

[11] Four B's Inc. v. State, 902 S.W.2d 683 (Tex. App. Austin 1995, writ denied (Nov. 16, 1995).

[12] Tex. Jur. 3d Contempt § 3.

[13] Tex. Jur. 3d Extraordinary Writs § 40.

[Section 49]

[1] Cooley v. Bass, 291 S.W. 576 (Tex. Comm'n App. 1927), O'Bryant v. City of Midland, 949 S.W.2d 406 (Tex. App. Austin 1997), aff'd in part, rev'd in part on other grounds, 18 S.W.3d 209 (Tex. 2000).

[2] Patel v. City of Everman,

[3] 179 S.W.3d 1 (Tex. App. Tyler 2004).

[4] Three H Enterprises, L.L.C. v. Advanced Environmental Recycling Technologies, Inc. 256 F. Supp. 2d 568 (W.D. Tex. 2002).

[5] Great West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002).

[6] Samson Lone Star, Ltd. Partnership v. Hooks, 2011 WL 3918093 (Tex. App. Houston 1st Dist 2011).

speaking, there is neither an action at law nor one in equity. In the ordinary action, any right may be asserted, legal or equitable, and the court will administer whatever relief the facts may authorize, whether legal or equitable or both. In other words, legal and equitable rights are blended, and a choice of remedies for either equitable or legal relief is not required. Nevertheless, the distinction between legal and equitable relief, although largely if not wholly disregarded, is still recognized, and the courts frequently speak of an action as one "at law" or "in equity," depending on the nature of principles invoked and the relief sought, rather than on the character of the pleadings or the court in which the action is brought; however, equitable relief will not be afforded to a party who, having had the opportunity, has failed to pursue redress at law.

## § 50 Actions in personam

**Research References**

West's Key Number Digest, Action ⚖16

Actions are either "in personam" or "in rem," depending on whether the suit is directed against a person or against a thing. Generally speaking, an action to determine personal rights and obligations is an action in personam. The object of an in personam action is a judgment against the person rather than a judgment against property to determine its status. It is brought against a person, and its object is a judgment against the person, as distinguished from a judg-

---

⁶Goldman v. Blum, 58 Tex. 630, 1883 WL 9084 (1883); Kelly v. Egan, 143 S.W. 1183 (Tex. Civ. App. Galveston 1911).

⁷Long v. Cude, 75 Tex. 225, 12 S.W. 827 (1889); Goldman v. Blum, 58 Tex. 630, 1883 WL 9084 (1883).

⁸More v. Snowball, 98 Tex. 16, 81 S.W. 5 (1904).

⁹Marin Real Estate Partners, L.P. v. Vogt, 2011 WL 5869520 (Tex. App. San Antonio 2011), Rule 53.7(f) motion granted, (Jan. 27, 2012).

**[Section 50]**

¹American Ins. Co. v. Fret Sav. & Loan Assn, 454 S.W.2d 170 (Tex. Civ. App. Fort Worth 1969, writ refused n.r.e., (Feb. 12, 1969).

²Tex. Jur. 3d, Equity § 15.

³Green Oaks Apts., Ltd. v. Cannan, 696 S.W.2d 415 (Tex. App. San Antonio 1985); Shappard, Stevens & Co., 2 Willson 229, 1884 WL 8302 (Tex. Ct. App 1884).

⁴Greenpeace, Inc. v. Exxon Mobil Corp., 133 S.W.3d 804 (Tex. App. Dallas 2004; Bodine v. Webb.

---

ment against property, to determine its status. The fact that an equitable decree will indirectly affect title to or an interest in land does not preclude the characterization of the action as one in personam where the remedy will be enforced against the person.

◆ **Observation:** Such definitions have been described as being of little or no value, and it has been said that as much guidance could be furnished by defining an action in personam as one that is neither in rem nor quasi in rem.

Actions for damages are in personam. The same is generally true of actions seeking equitable remedies, such as injunction.

## § 51 Actions in rem

**Research References**

West's Key Number Digest, Action ⚖16

An "in rem action" is a proceeding or action instituted directly against a thing, an action taken directly against property, or an action that is brought to enforce a right in the thing itself. An action is "in rem" when it is taken directly against a thing and affects the interests that all persons in the world may have in that thing. Such actions often bear an intriguing caption, such as "State v. One 1963 Pontiac Automobile," and are binding on the interests of all

---

992 S.W.2d 672 (Tex App Austin 1999).

²Green Oaks Apts., Ltd. v. Cannan, 696 S.W.2d 415 (Tex App San Antonio 1985); American Institute of Real Estate Appraisers v Hawk, 436 S.W.2d 359 (Tex. Civ. App. Houston 14th Dist. 1968).

³Greenpeace, Inc v Exxon Mobil Corp., 133 S.W.3d 804 (Tex App. Dallas 2004).

⁴Green Oaks Apts., Ltd v Cannan, 696 S.W.2d 415 (Tex. App San Antonio 1985).

⁵As to actions in rem, see § 51; as to actions quasi in rem, see § 52.

⁶Aldridge v. Universal C.I.T

Credit Corp., 290 S.W.2d 398 (Tex. Civ App El Paso 1956), writ refused n.r.e.

⁷City of Dallas v Wright, 120 Tex. 190, 36 S.W.2d 973, 77 A.L.R. 709 (1931); Greenpeace, Inc. v. Exxon Mobil Corp., 133 S.W.3d 804 (Tex. App. Dallas 2004; Green Oaks Apts., Ltd. v. Cannan, 696 S.W.2d 415 (Tex App San Antonio 1985).

⁸Green Oaks Apts., Ltd v Cannan, 696 S.W.2d 415 (Tex App San Antonio 1985.

**[Section 51]**

¹Bodine v. Webb, 992 S.W.2d 672 (Tex. App. Austin 1999).

tory one.[6]

## § 62 Distinction between law and equity

**Research References**

West's Key Number Digest, Action 25(1), 30, 32

The distinction between law and equity, which once prevailed in many jurisdictions, has never existed in Texas,[1] and it is largely, if not wholly, disregarded both by the Texas Constitution and by Texas legislation.[2] The courts recognize that rules of equity differ from those of law, but the two systems are so blended as to remove the distinctions between courts of law and courts of equity.[3] Actions are instituted and prosecuted without regard to whether they are in equity or at law, and the courts apply such principles of either law or equity as may control the questions involved.[4]

To be entitled to equitable relief, however, the plaintiff must show a proper case for a court to exercise its equitable jurisdiction.[5]

### D. COMMENCEMENT AND TERMINATION OF ACTIONS

**Research References**

*West's Key Number Digest*

Action 62 to 64, 66, 71; Sunday 30(2), 30(3)

*A.L.R. Library*

A.L.R. Index, Accrual of Cause of Action; Action or Suit

West's A.L.R. Digest, Action 62 to 64, 66, 71; Sunday 30(2), 30(3)

[Section 62]

[1]Smith v. Clopton, 4 Tex. 109, 1849 WL 3976 (1849); Dittmar v. Alamo Nat. Co., 91 S.W.2d 781 (Tex. Civ. App. El Paso 1936), writ granted and judgment aff'd, 132 Tex. 44, 118 S.W.2d 298 (Comm'n App. 1938).

[2]Smith v. Clopton, 4 Tex. 109, 1849 WL 3976 (1849).

[3]Apollo Enterprises, Inc. v. ScripNet, Inc.,301 S.W.3d 848 (Tex. App. Austin 2009).

[4]Towner v. Sayre, 4 Tex. 28, 1849 WL 3962 (1849); Jackson v. Missouri, K. & T. Ry. Co. of Texas, 78 S.W. 724 (Tex. Civ. App. 1904).

[5]City of Dallas v. McElroy, 264 S.W. 599 (Tex. Civ. App. Dallas 1923), writ dismissed w.o.j., (Nov. 21, 1923).

[6]Rogers v. Daniel Oil & Royalty Co., 130 Tex. 386, 110 S.W.2d 891 (1937).

*Legal Encyclopedias*

Am. Jur. 2d, Actions §§ 63 to 67

C.J.S., Actions §§ 305 to 317, 341 to 345

## § 63 When action is commenced

**Research References**

West's Key Number Digest, Action 63, 64; Sunday 30(2), 30(3)

A civil suit in the district or county court is commenced by a petition filed in the office of the clerk.[1]

● **Illustration:** The Attorney General failed to properly intervene to seek delinquent child-support payments in the workers'-compensation case of a father where the father received judgment because the Attorney General never filed a petition with the office of the clerk as required by the Rules of Civil Procedure, thereby providing the father with no opportunity to prepare a proper response[2]

The ordinary civil suit in the district and county courts is commenced by the filing of a petition[3] stating a cause of action[4] in the office of the clerk[5] of the proper court[6] with the bona fide intention[7] of prosecuting it to a conclusion[8] and with an express or implied request that process issue forthwith.[9] To commence a civil action, the plaintiff must not only file the petition but must also exercise reasonable

[Section 63]

[1]Tex. R. Civ. P. 22.
As to the jurisdiction of justice courts, see Tex. Jur. 3d Courts §§ 89 to 92.

[2]Diaz v. Attorney General of State of Tex., 827 S.W.2d 19 (Tex. App. Corpus Christi 1992) holding further that the Attorney General waived whatever rights to intervene he possessed by failing to timely file the petition in intervention and to follow the proper procedural requirements.

[3]Hughes v. Atlantic Refining Co., 424 S.W.2d 622 (Tex. 1968); Texas Alcoholic Beverage Commission v. Wilson, 573 S.W.2d 832 (Tex. Civ. App. Beaumont 1978),

writ refused n.r.e., Feb 14 1979.

[4]Jones v. Andrews, 72 Tex. 5, 9 S.W. 170 (1888)

[5]Trilby v. Wolke, 74 Tex. 142, 11 S.W. 1089 (1889); A.H. Belo & Co. v. Lacy, 111 S.W. 215 (Tex. Civ. App. 1908) writ refused.

[6]Southwestern Life Ins. Co. v. Sanqunet, 231 S.W.2d 727 (Tex. Civ. App. Fort Worth 1950).

[7]Russell v. Taylor, 121 Tex. 450, 49 S.W.2d 733 (Comm'n App 1932).

[8]Southwestern Life Ins. Co. v. Sanqunet, 231 S.W.2d 727 (Tex. Civ. App. Fort Worth 1950).

[9]Maddox v. Humphries, 30 Tex. 494, 1867 WL 4640 (1867).

# APPENDIX #13

TARLTON
LAW
LIBRARY

# THIRD EDITION
# TEXAS JUR

## 34

Employment Agencies
to
Estoppel

2010

WEST.

A Thomson Reuters business

For Customer Assistance Call 1-800-328-4880

Mat #40805639

American Jurisprudence 2d (AMJUR)
American Jurisprudence Legal Forms 2d (AMJUR-LF)
American Jurisprudence Proof of Facts (AMJUR-POF)
American Jurisprudence Pleading and Practice Forms Annotated (AMJUR-PP)
American Jurisprudence Trials (AMJUR-TRIALS)
Corpus Juris Secundum (CJS)
Texas Jur. Pleading and Practice Forms 2d (TX-PP)

KeyCite®: Cases and other legal materials listed in KeyCite Scope can be researched through the KeyCite service on Westlaw®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

## I. IN GENERAL

**Research References**

*West's Key Number Digest*

Equity ⊜1

*A.L.R. Library*
A.L.R. Index, Equity
West's A.L.R. Digest, Equity ⊜1

*Legal Encyclopedias*
Am. Jur. 2d, Equity §§ 1 to 3
C.J.S., Equity §§ 1 to 8

## § 1 Generally; definitions

**Research References**
West's Key Number Digest, Equity ⊜1

"Equity" is the name given to a mitigating principle or set of principles of a system of jurisprudence by the application of which substantial justice may be attained in particular cases wherein the prescribed or customary forms of ordinary law seem to be inadequate.¹ Equitable principles are designed to alleviate the harsh results caused by a rigid ap-

[Section 1]
¹Securities and Exchange Comm'n v. U.S. Realty & Imp. Co., 310 U.S. 434, 60 S. Ct. 1044, 84 L. Ed. 1293 (1940); Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S. Ct. 777, 83 L. Ed. 1184 (1939).

---

plication of legal principles.² In the broadest sense, the word "equity" describes a system of jurisprudence and is employed to designate the principles or standards of that system;³ it is in this sense that equity is spoken of in terms of abstract personification as in the expression that "equity" regards as done that which ought to be done.⁴ In this connection, a court of equity is sometimes referred to as a court of "conscience."⁵

◆ **Observation:** Equity is a court of conscience, which assumes jurisdiction when the legal remedy is not as complete as, is less effective than, or is less satisfactory than the equitable remedy. Equity acts in accordance with conscience and good faith and promotes fair dealing.

"Equity" is also used to describe the standing of a party to claim relief where the merit of his or her claim is dependent upon the showing of an ability to have prevented the prejudicial situation in which the litigants find themselves; this use appears in the maxim "where there is equal equity, the law must prevail."⁶

The terms "equitable" and "inequitable" signify just and unjust, in addition, "equitable" with reference to ownership connotes the right to property where title is held for that person's benefit by another person.⁸

## § 2 Distinction between law and equity

**Research References**
West's Key Number Digest, Equity ⊜1

Equitable principles are a part of the law of the State of

²Slaughter v. Qualls, 162 S.W.2d 671 (Tex. App. Amarillo 1960).

³Am. Jur. 2d, Equity § 1.

⁴§ 21.

⁵Frost National Bank v. Burge, 29 S.W.3d 580 (Tex. App. Houston 14th Dist. 2000); First Heights Bank, FSB v. Gutierrez, 852 S.W.2d 596 (Tex. App. Corpus Christi 1993, writ denied (Dec. 8, 1993)); Davis v.

⁶Carothers, 335 S.W.2d 631 (Tex. Civ. App. Waco 1960), writ dismissed by agreement, (Oct. 5, 1960); Bush v. Gaffney, 84 S.W.2d 759 (Tex. Civ. App. San Antonio 1935).

⁷Flores v. Flores, 116 S.W.3d 870 (Tex. App. Corpus Christi 2003).

⁸§ 38.

⁹Am. Jur. 2d, Equity § 1.

Texas.[1] Before the adoption of the common law, the distinction between law and equity was unknown in Texas.[2] In fact, the distinction between law and equity, has never existed in Texas, and it is largely, if not wholly, disregarded by both the Texas Constitution and Texas legislation. The courts recognize that rules of equity differ from those of law, but the two systems are so blended as to remove the distinctions between courts of law and courts of equity. Actions are instituted and prosecuted without regard to whether they are in equity or at law, and the courts apply such principles of either law or equity as may control the questions involved.[3]

◆ **Observation:** The distinctions drawn by Anglo-American jurisprudence between courts of law and courts of chancery or equity, and the judicial systems administered by such courts were unknown to the Spanish civil law which prevailed in the State of Texas during its formative years, and under which a single system of courts accorded by a homogeneous procedure all appropriate relief whether legal or equitable according to common-law concepts. Those distinctions therefore do not have, under the judicial system that has developed in the State of Texas, the same significance that is given them in other Anglo-American jurisdictions.[4]

Texas practice is thus a blend of the systems that once prevailed at law and in equity in other jurisdictions so that, strictly speaking, there is neither an action at law nor one in equity. In the ordinary action, any right may be asserted, whether legal or equitable, and the court will administer whatever relief the facts may authorize, whether legal or equitable or both. Nevertheless, the courts still speak of an action as one "at law" or "in equity," depending on the nature of the principles involved or the relief sought rather than on the character of the pleadings or the court in which the action is brought.[5]

[Section 2]

[1] Lyon-Gray Lumber Co. v. Gibraltar Life Ins. Co., 269 S.W. 80 (Tex. Comm'n App. 1925).

[2] Southern Ornamental Iron Works v. Morrow, 101 S.W.2d 336 (Tex. Civ. App. Fort Worth 1937); City of Dallas v. McElroy, 254 S.W. 1938).

599 (Tex. Civ. App. Dallas 1923), writ dismissed w.o.j. (Nov. 21, 1923).

[3] Tex. Jur. 3d, Actions § 55.

[4] Franzetti v. Franzetti, 120 S.W.2d 123 (Tex. Civ. App. Austin 1938).

tion is brought.[5]

## II. JURISDICTION

### A. IN GENERAL

**Research References**

*West's Key Number Digest*

Equity �köe 1 to 3, 15 to 17, 31 to 36, 39 to 39(4)

*A.L.R. Library*

A.L.R. Index, Equity; Jurisdiction

West's A.L.R. Digest, Equity ⊏ 1 to 3, 15 to 17, 31 to 36, 39 to 39(4)

*Legal Encyclopedias*

Am. Jur. 2d, Equity §§ 37 to 82

C.J.S., Equity §§ 9 to 16, 53 to 95

*Trial Strategy*

Equitable Relief from Execution—Circumstances of Sale, 10 Am. Jur. Proof of Facts 2d 285

Actions for Unfair Competition—Trade Secrets, 14 Am. Jur. Trials 1

### § 3 Generally; ancillary jurisdiction

**Research References**

West's Key Number Digest, Equity ⊏ 1 to 3, 32 to 35

The legislature has the general power of altering the "boundaries" of equitable jurisdiction and procedure short of the invasion of constitutional guarantees.[1] With respect to the attachment of jurisdiction in a particular case, the filing of a cross-action demanding equitable relief has the effect of bringing a dispute into equity regardless of the nature of the original action.[2]

Under the system of blended law and equity prevailing in

[Section 3]

[1] Johnson v. State, 267 S.W. 1057 (Tex. Civ. App. Dallas 1924),

writ refused (Mar. 11, 1925).

[5] Tex. Jur. 3d, Actions § 42.

[2] Mulholland v. Jolly, 17 S.W.2d 1109 (Tex. Civ. App. San Antonio 1929), writ refused. (Oct. 30, 1929).

# APPENDIX
# #14

# EXCERPTED

Page 877

287 S.W.3d 877 (Tex.App.-Dallas 2009)

**ALAN REUBER CHEVROLET, INC., Appellant**

v.

**GRADY CHEVROLET, LTD., Formerly Grady Chevrolet Company, Appellee.**

**No. 05-08-00107-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

June 9, 2009

Page 878

[Copyrighted Material Omitted]

Page 879

[Copyrighted Material Omitted]

Page 880

Jay Edward Ray, Glast, Phillips & Murray, PC, Dallas, for Appellant.

Joe E. Weis, Pemberton, Green, Newcomb and Weis, Greenville, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG-MIERS.

## OPINION

MOSELEY, Justice.

In this appeal, we decide whether: (1) Alan Reuber Chevrolet, Inc. (ARCI) is entitled to recover attorney's fees as the successful party to Grady Chevrolet, Ltd.'s breach of contract claim, despite pleading and procedure issues; and (2) the evidence supports the findings on the damages awarded to Grady Chevrolet on its conversion claim. Because we answer both of those questions in the affirmative, we reverse the trial court's revised final judgment to the extent it denies ARCI's claim for attorney's fees and remand this case to the trial court for further proceedings on that claim. In all other respects, we affirm the revised final judgment.

### I. FACTUAL BACKGROUND

Jerry Grady was the president of Grady Chevrolet Company, which operated a Chevrolet dealership in Greenville, Texas. Alan Reuber was the president of ARCI and AMTJ, Inc. In September 2001, Grady and Reuber, as corporate officers, signed a Dealership Asset Sale and Purchase Agreement whereby AMTJ, Inc. agreed to buy Grady Chevrolet's assets under the terms and conditions in the agreement.

Four provisions of the agreement are relevant to the issues presented on appeal. First, AMTJ, Inc. agreed to buy fixed assets at a price calculated on their fair market value as appraised. Second, AMTJ, Inc. also agreed to buy all the " non-obsolete current, unused, new and returnable Chevrolet factory parts and accessories" on hand when the sale closed. These parts were to be inventoried and valued at the net cost to Grady Chevrolet as set forth in the most recent Chevrolet price book, less any discounts or rebates reflected on the parts invoices. Third, AMTJ, Inc. agreed to purchase " all non-Chevrolet factory parts and accessories" on hand at the time of closing at fair market value, but if the parties could not agree on their fair market value, they would not be subject to the agreement.

Page 881

Fourth, the agreement provided (in section 17) the following regarding attorney's fees and costs:

In the event of any litigation between the Parties hereto to enforce any provisions or rights hereunder, the unsuccessful Party to such litigation shall pay to the successful Party therein all costs and expenses expressly including, but not limited to, reasonable attorney's fees ..., which ... attorney's fees shall be included in and as part of any judgment rendered in such litigation.

The fixed assets were appraised by Travis R. Fralicks, who submitted an appraisal to both parties. The parts were inventoried and valued by Leighton Railsback; he referred to a nonreturnable part as a " nonconforming" part. [1] As relevant here, he valued the nonreturnable parts at just under $60,000. Before the closing, AMTJ, Inc. assigned its rights and obligations under the agreement to ARCI. The sale closed November 13, 2001, with the sale price based on the appraisals and inventories.

Four days after the closing, Grady mistakenly opened an envelope from Fralicks to Reuber; the envelope contained another appraisal-at higher values-of the fixed assets involved in the sale. Attached to the second appraisal was a handwritten note from Fralicks to Reuber: " Alan: This info for your use only." Grady believed the second appraisal was evidence that he received less at the closing than he should have received. Additionally, Grady was unsuccessful in obtaining the nonreturnable parts, which had been excepted from the sale, from ARCI.

### II. PROCEDURAL BACKGROUND

......

**Page 883**

### III. ATTORNEY'S FEES

Pertinent to the issues on appeal as to ARCI's request for attorney's fees, trial court found that: (1) ARCI's live pleading contained a general prayer for recovery of attorney's fees without specifying any statute or other basis on which ARCI could recover attorney's fees; and (2) although Grady Chevrolet failed to meet its burden of proof on its breach of contract claim against ARCI, Grady Chevrolet abandoned its breach of contract claim against ARCI before the judgment was signed.

In its first and third issues, ARCI attacks the trial court's failure to award it attorney's fees as the successful party on Grady Chevrolet's breach of contract claim. Specifically, ARCI argues the trial court erred in denying its attorney's fees claim as the " successful party" under the agreement on the grounds that: (1) it had not sufficiently pleaded that claim; and (2) Grady Chevrolet abandoned its breach of contract claim after the trial court had already found that ARCI had not breached the contract.

#### A. Standard of Review

A trial court's conclusions of law are always reviewable. *Spiller v. Spiller,* 901 S.W.2d 553, 556 (Tex.App.-San Antonio 1995, writ denied). We uphold conclusions of law on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Id.* We do not reverse a conclusion of law unless it is erroneous as a matter of law. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.-Austin 1992, no writ). We review a trial court's conclusions of law de novo as legal questions, affording no deference to the lower court's decision. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 227 (Tex.2002). Under de novo review, we exercise our own judgment and redetermine each legal issue. *Id.* at 222. We do not reverse a judgment for incorrect conclusions of law if the controlling findings of fact support the judgment under a correct legal theory. *Westech Eng'g, Inc.,* 835 S.W.2d at 196.

#### B. Sufficient Pleading for Attorney's Fees

In its first issue, ARCI argues it properly pleaded for the recovery of its attorney's fees in its first amended original answer and its general request for attorney's fees therein provided sufficient and fair notice to Grady Chevrolet that it was seeking attorney's fees pursuant to section 17.

ARCI's briefing is directed primarily to the trial court's statement in the September 10, 2007 letter that ARCI's request for attorney's fees " in the prayer alone, and not in the body of its answer, is insufficient, and too

unspecific, to be the basis of an award of attorneys' fees under the [agreement]." Prejudgment letters of this sort do not constitute findings of fact and conclusions of law and are not competent evidence of a trial court's basis for judgment. *See Cherokee Water Co. v. Gregg County Appraisal Dist.,* 801 S.W.2d 872, 878 (Tex.1990) (discussing letter to parties characterized as findings of fact, trial court " could have disregarded the evidence at the time judgment was actually signed" and such letter " is not a finding of fact" as contemplated by rules of civil procedure 296 through 299); *Mondragon v. Austin,* 954 S.W.2d 191, 193 (Tex.App.-Austin 1997, pet. denied) (prejudgment letter " cannot constitute findings of fact and conclusions of law" ; citing *Cherokee Water Co.,* 801 S.W.2d at 878). However, in its findings of fact, the trial court stated:

20. Said First Amended Original Answer filed by ARCI, within its prayer, contained a general prayer for recovery of attorney's fees without

**Page 884**

specifying any statute or other basis on which attorney's fees could be recovered by ARCI.

While this conclusion of law, stated as a finding of fact, does not exactly express the same opinion in the letter, we conclude that ARCI's arguments encompass and attack this conclusion.

#### 1. Applicable Law and Standard of Review

Attorney's fees may not be recovered unless provided for by statute or by contract between the parties. *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.,* 835 S.W.2d 75, 77 (Tex.1992). Absent a mandatory statute, a trial court's jurisdiction to render a judgment for attorney's fees must be invoked by pleadings, and a judgment not supported by pleadings requesting an award of attorney's fees is a nullity. *State v. Estate of Brown,* 802 S.W.2d 898, 900 (Tex.App.-San Antonio 1991, no pet.) (citing *Wolters v. White,* 659 S.W.2d 885, 888 (Tex.App.-San Antonio 1983, writ dism'd), and *Ex parte Fleming,* 532 S.W.2d 122, 123 (Tex.Civ.App.-Dallas 1975, orig. proceeding)). *See In re Pecht,* 874 S.W.2d 797, 803 (Tex.App.-Texarkana 1994, no writ) (" In order to be entitled to a discretionary award of attorney's fees, however, the movant must affirmatively plead for them unless the issue is waived or tried by consent." ).

" The office of pleadings is to define the issues at trial, and to give the opposing party information sufficient to enable him to prepare a defense." *Estate of Brown,* 802 S.W.2d at 900 (quoting *Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 636 (Tex.1982), and *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982)). " Texas follows a ' fair notice' standard for pleading, in which courts assess the sufficiency of pleadings by determining whether an opposing party can ascertain from the pleading the nature, basic issues, and the type of

evidence that might be relevant to the controversy." *Low v. Henry,* 221 S.W.3d 609, 612 (Tex.2007) (citing *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896-97 (Tex.2000)). *See* TEX.R. CIV. P. 47(a).

A general prayer for relief will not support an award of attorney's fees because it is a request for affirmative relief that must be supported by the pleadings. *Varner v. Howe,* 860 S.W.2d 458, 466 (Tex.App.-El Paso 1993, no writ). *See Kissman v. Bendix Home Sys., Inc.,* 587 S.W.2d 675, 677 (Tex.1979) (" The prayer for general relief is of no assistance [in giving fair notice of a claim] because a prayer must be consistent with the facts stated as a basis for relief." ). However, in passing on the sufficiency of a pleading, all allegations in the adversary's pleading may be considered, and any omission in the pleading is cured when the omission is supplied by the opponent's pleading. *S. Ins. Co. v. Fed. Serv. Fin. Corp.,* 370 S.W.2d 24, 28 (Tex.Civ.App.-Austin 1963, writ dism'd). *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980) (" In determining whether issues are supported by pleadings, the trial court will supply omissions in the pleadings of one party by referring to the allegations contained in the pleadings of another." ); *Lacy v. First Nat'l Bank,* 809 S.W.2d 362, 365 (Tex.App.-Beaumont 1991, no writ) (same); *Whittington v. Glazier,* 81 S.W.2d 543, 545 (Tex.Civ.App.-Texarkana 1935, writ ref'd) (same). An opposing party should use special exceptions to identify defects in a pleading so that they may be cured, if possible, by amendment. *Auld,* 34 S.W.3d at 897. When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. *Id.*

Whether a party is entitled to recover attorney's fees is a question of law

**Page 885**

that we review de novo. *Holland v. Wal-Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999).

# APPENDIX
# #15

# EXCERPTED

**Page 251**

**830 S.W.2d 251 (Tex.App. □Dallas 1992)**

**Saleha BAKALI, Appellant,**

**v.**

**Gulam Ishaq BAKALI, Appellee.**

**No. 05-91-00756-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**April 21, 1992**

**Page 252**

[Copyrighted Material Omitted]

**Page 253**

Mark H. How, Marcia F. Pennell, Dallas, for appellant.

Khalid Y. Hamideh, Prema A. Velu, Dallas, for appellee.

Before STEWART, CHAPMAN and KAPLAN, JJ.

OPINION

KAPLAN, Justice.

Saleha Bakali appeals from a summary judgment denying her petition for bill of review and awarding her former husband attorney's fees. In four points of error, wife contends that (1) the underlying divorce decree is void and subject to collateral attack, (2) the trial court erred in granting summary judgment, and (3) the trial court erred in awarding attorney's fees to husband. We overrule all points of error and affirm the trial court's judgment.

## FACTUAL BACKGROUND

Gulam Ishaq Bakali sued his wife for divorce. The case was specially set for trial on July 20, 1989. After one full day of testimony and hours of negotiation, the parties announced to the court that they had reached a settlement. A settlement agreement was dictated into the record. The agreement provided that (1) each party would receive all personal property in his or her possession; (2) wife would receive sixty percent of the community property interest in husband's retirement plan at Lockwood Green Engineering; (3) wife would receive $450 a month for eighteen months as her community share of husband's profit sharing plan at Lockwood; and (4) wife would receive sixty percent of the remaining marital assets.

The trial court approved the settlement and granted a divorce. The attorneys were instructed to prepare a divorce decree that reflected the agreement of the parties. The judge stated that if the parties could not agree on a written order, the statement of facts would be transcribed to act as a decree.

Husband's attorney drafted a divorce decree and submitted it to wife's attorney and the trial court. This proposed decree did not comport with the agreement read into the record in several material respects. Specifically, the decree awarded husband (1) all of his stock in Lockwood Green Engineering; (2) two IRA's in his name; (3) the unpaid bonuses that accrued while he was employed at Lockwood; and (4) a Honda automobile. The decree also ordered wife to pay certain medical expenses and a portion of any tax liability for 1988.

On August 21, 1989, wife's attorney sent a letter to the judge objecting to the payment of medical expenses and income taxes set forth in the divorce decree. Counsel also requested a telephone conference prior to the entry of the decree. On August 24, 1989, husband's attorney wrote to the judge stating that the matters raised by wife's attorney had been resolved and that a telephone conference would not be necessary. The judge struck the provisions pertaining to the payment of medical expenses.

The divorce decree was signed on August 29, 1989. On that same day, the judge sent a letter to counsel for both parties enclosing a copy of the signed divorce decree. The judge instructed husband's attorney to file the original decree by September 19, 1989, whether or not it was approved by opposing counsel. The signed decree was tendered to the clerk on September 19,

**Page 254**

1989. The decree was never approved by wife's attorney.

………………………….

Husband attached an affidavit from the judge's personal secretary to his motion for

**Page 257**

summary judgment. This affidavit states that the signed divorce decree was sent to wife's attorney on August 29, 1989. A copy of the transmittal letter to the attorneys for both parties is attached as an exhibit to the affidavit. This evidence is uncontroverted. The affidavit and exhibits are sufficient to show compliance with the duties imposed on court clerks under rule 306a(3) of the Texas Rules of Civil Procedure and to negate any allegation of official

mistake.

Husband has conclusively negated one essential element of wife's cause of action. We conclude that the trial court properly granted husband's motion for summary judgment. Wife's third point of error is overruled.

ATTORNEY'S FEES

Finally, wife contends that the trial court erred in granting attorney's fees to her former husband. Specifically, she contends that there is no basis in law for awarding attorney's fees in a bill of review proceeding.

A party who successfully defends a bill of review is entitled to recover attorney's fees if attorney's fees are authorized in the prosecution or defense of the underlying case. *Meece v. Moerbe,* 631 S.W.2d 729, 730 (Tex.1982). The legislature has authorized trial courts to award reasonable attorney's fees and expenses in divorce proceedings. TEX.FAM.CODE ANN. §§ 3.65, 3.77, and 3.93 (Vernon Supp.1992). Trial courts also have the discretion to award reasonable attorney's fees for the appeal of divorce actions. *Dickson v. McWilliams,* 543 S.W.2d 868, 870 (Tex.App.--Houston [1st Dist.] 1976, no writ). Because husband could have recovered attorney's fees if wife had appealed the divorce decree, the trial court did not err in awarding attorney's fees in this bill of review proceeding. Wife's fourth point of error is overruled.

The judgment of the trial court is affirmed.

# APPENDIX
# #16

# Black's Law Dictionary, 10th ed. (2014)

Legal Proceeding – "Any proceeding authorized by law and instituted in a court or tribunal to acquire a right or to enforce a remedy."

BOOKS WRITTEN OR EDITED BY BRYAN A. GARNER

*Black's Law Dictionary*
(all post-1995 editions)

*Garner's Dictionary of Legal Usage*

*Garner's Modern American Usage*

*Reading Law: The Interpretation of Legal Texts*
with Justice Antonin Scalia

*Making Your Case: The Art of Persuading Judges*
with Justice Antonin Scalia

*The Winning Brief*

*100 Tips for Persuasive Briefing in Trial and Appellate Courts*

*The Redbook: A Manual on Legal Style*

*Garner on Language and Writing*
(preface by Justice Ruth Bader Ginsburg)

*Legal Writing in Plain English*

*The Elements of Legal Style*
(preface by Charles Alan Wright)

*The Winning Oral Argument*

*Ethical Communications for Lawyers*

*The Chicago Manual of Style, ch. 5, "Grammar and Usage"*

*HBR Guide to Better Business Writing*

*Securities Disclosure in Plain English*

*The Rules of Golf in Plain English*
with Jeffrey Kuhn

*Quack This Way,*
David Foster Wallace and Bryan A. Garner Talk Language and Writing

*A New Miscellany-at-Law*
by Sir Robert Megarry

*Texas, Our Texas: Remembrances of the University*

# Black's Law Dictionary®

## Tenth Edition

Bryan A. Garner

Editor in Chief



THOMSON REUTERS™

Mat # 41572510
Mat # 41513401 --debate

JUN 2 0 2014

procedural due process

procedural due process. See DUE PROCESS.

procedural error. See ERROR (2).

procedural law. (1896) The rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves. — Also termed adjective law. Cf. SUBSTANTIVE LAW.

procedural main motion. See incidental main motion under MOTION (2).

procedural motion. See MOTION (2).

procedural point. See POINT (2).

procedural presumption. See PRESUMPTION.

procedural right. See RIGHT.

procedural rule. See RULE OF PROCEDURE.

procedural ultra vires. See ULTRA VIRES.

procedural unconscionability. See UNCONSCIONABILITY.

procedure. (16c) 1. A specific method or course of action. 2. The judicial rule or manner for carrying on a civil lawsuit or criminal prosecution. — Also termed *rules of procedure*. See CIVIL PROCEDURE; CRIMINAL PROCEDURE.

proceeding. (16c) 1. The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. 2. Any procedural means for seeking redress from a tribunal or agency. 3. An act or step that is part of a larger action. 4. The business conducted by a court or other official body; a hearing. 5. *Bankruptcy.* A particular dispute or matter arising within a pending case — as opposed to the case as a whole.

"'Proceeding' is a word much used to express the business done in courts. A proceeding in court is an act done by the authority or direction of the court, express or implied. It is more comprehensive than the word 'action,' but it may include in its general sense all the steps taken or measures adopted in the prosecution or defense of an action, including the pleadings and judgments. As applied to actions, the term 'proceeding' may include — (1) the institution of the action; (2) the appearance of the defendant; (3) all ancillary or provisional steps, such as arrest, attachment of property, garnishment, injunction, writ of *ne exeat*; (4) the pleadings; (5) the taking of testimony before trial; (6) all motions made in the action; (7) the trial; (8) the judgment; (9) the execution; (10) proceedings supplementary to execution, in code practice; (11) the taking of the appeal or writ of error; (12) the remittitur, or sending back of the record to the lower court from the appellate or reviewing court; (13) the enforcement of the judgment, or a new trial, as may be directed by the court of last resort." Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3-4 (2d ed. 1899).

adjudicatory proceeding. See administrative hearing under HEARING.

administrative proceeding. See administrative hearing.

civil proceeding. See CIVIL PROCESS.

collateral proceeding. (18c) A proceeding brought to address an issue incidental to the principal proceeding.

competency proceeding. (1939) A proceeding to assess a person's mental capacity. • A competency hearing may be held either as an incidental part of a trial or as a separate proceeding to assess whether a person should be committed...

summary proceeding. (18c) A nonjury proceeding that settles a controversy or disposes of a case in a relatively prompt and simple manner. — Also termed *summary trial*. Cf. *plenary action*.

to a mental-health facility or should have a guardian appointed to manage the person's affairs.

contempt proceeding. (1859) A judicial or quasi-civil hearing conducted to determine whether a person has committed contempt.

core proceeding. See CORE PROCEEDING.

criminal proceeding. See CRIMINAL PROCEEDING.

ex parte proceeding (eks pahr-tee). (18c) A proceeding in which not all parties are present or given the opportunity to be heard. — Also termed *ex parte hearing*.

in camera proceeding (in kam-ər-ə). (1959) A proceeding held in a judge's chambers or other private place out of the presence of the jury and the public.

informal proceeding. (18c) A trial conducted in a relaxed manner than a typical court trial, such as an administrative hearing or a trial in small-claims court.

judicial proceeding. (16c) Any court proceeding; any proceeding initiated to procure an order or decree, whether in law or in equity.

legal proceeding. (17c) Any proceeding authorized by law and instituted in a court or tribunal to acquire a right or to enforce a remedy.

involuntary proceeding. See involuntary bankruptcy under BANKRUPTCY.

in rem proceeding. See proceeding in rem.

nonsuit proceeding. See RELATED PROCEEDING.

parallel proceeding. (1959) A criminal, civil, or administrative proceeding that runs concurrently with another, relating to the same acts or events.

proceeding in rem. (18c) A proceeding brought to enforce rights in or against specific property; an action in which the court's jurisdiction over property determines its power to adjudicate. — Also termed *in rem proceeding*.

quasi-criminal proceeding. (1844) A proceeding that is criminal in nature but is conducted in a civil court. • For example, a juvenile-delinquency proceeding may be a quasi-criminal proceeding.

related proceeding. (18c) 1. A proceeding that is connected in some way with another.

special proceeding. (18c) 1. A proceeding that can be commenced independently of a pending action and from which a final order may be appealed immediately. 2. A proceeding involving statutory remedies that are outside the ordinary rules of procedure; a proceeding conducted under rules other than those governing actions.

summary proceeding. (18c) A nonjury proceeding that settles a controversy or disposes of a case in a relatively prompt and simple manner. — Also termed *summary trial*. Cf. *plenary action*.

1399

supplementary proceeding. (17c) 1. A proceeding held in connection with the enforcement of a judgment, for the purpose of identifying and locating the debtor's assets available to satisfy the judgment. 2. A proceeding that in some way supplements another.

proceeds (proh-seedz). (17c) 1. The value of land, goods, or investments when converted into money; the amount of money received from a sale. • Proceeds differ from other types of collateral because they constitute any collateral that has changed in form. For example, if a farmer borrows money and gives the creditor a security interest in the harvested wheat as collateral. If the farmer then exchanges the harvested wheat for a tractor, the tractor becomes the proceeds of the wheat. The term *proceeds* includes the amount arising when the right to payment is converted into a contract right. See CONTRACT RIGHT.

net proceeds. (16c) The amount received in a transaction minus the costs of the transaction (such as expenses and commissions). — Also termed *net balance*.

process, n. (14c) 1. The proceedings in any action or prosecution. 2. A summons or writ, esp. to appear or respond in court; a subpoena.

"The term 'process' is not limited to summonses, writs, and the like, but in its broadest sense is equivalent to 'proceedings' or 'procedure.' Sometimes the term is also used in order to bring the defendant into court to answer the charge preferred against him, and signifies the writ or judicial means by which he is brought to answer." 1 Joseph Chitty, *A Practical Treatise on the Criminal Law* 338 (2d ed. 1826).

"'Process' is so denominated because it proceeds or issues forth in order to bring the defendant into court, to answer the charge preferred against him, and signifies the writ or judicial means by which he is brought to answer." 72 C.J.S. *Process* § 2, at 591 (1987).

alias process. (18c) A process issued after an earlier process has failed for some reason. • Among the types...

TARLTON LAW LIBRARY

# APPENDIX
# #17

EXCERPTED

Page 674

406 S.W.3d 674 (Tex.App.-Fort Worth 2013)

CENTERPLACE PROPERTIES, LTD., Appellant

v.

COLUMBIA MEDICAL CENTER OF LEWISVILLE SUBSIDIARY, L.P. d/b/a Medical Center of Lewisville and Raymond Dunning, Appellees.

No. 02-11-00049-CV.

Court of Appeals of Texas, Second District, Fort Worth

May 30, 2013

Rehearing Overruled Aug. 1, 2013.

Page 675

John H. Cayce Jr., Adrienne N. Wall, Kelly Hart & Hallman LLP, Fort Worth, TX, for Appellant.

Sherri T. Alexander, Angela R. Joyce, Bell Nunnally & Martin LLP, Dallas, TX, for Appellees.

PANEL: GARDNER, WALKER, and MEIER, JJ.

OPINION

ANNE GARDNER, Justice.

I. Introduction

This is a breach of contract case. Appellant CenterPlace Properties, Ltd. (CenterPlace) appeals an adverse judgment following a bench trial in a suit for breach of a lease agreement that CenterPlace filed against Appellee Columbia Medical Center of Lewisville Subsidiary, L.P. d/b/a Medical Center of Lewisville (MCL) and Raymond Dunning.[1] The trial court's judgment ordered that CenterPlace take nothing against MCL based upon findings that CenterPlace materially breached the parties' lease agreement and that CenterPlace's breach excused MCL's failure to pay rent after November 1, 2007. The judgment further ordered that CenterPlace pay MCL $34,071.15 in statutory damages and a total of $319,700 in attorneys' fees and costs. CenterPlace contends in four issues, which include several subissues, that the evidence is legally and factually insufficient to support the findings and judgment and that the trial court erred by awarding attorneys' fees to MCL and in failing to award attorneys' fees to

Page 676

CenterPlace. We reverse and render in part and affirm in part.

II. Background

Ganesh Harpavat, general partner of CenterPlace, formed CenterPlace in 1998 to develop a commercial property complex on three tracts of land that he owned in Flower Mound, Texas. Harpavat's development plan was to construct three medical office buildings referred to as CenterPlace I, CenterPlace II, and CenterPlace III. CenterPlace I was completed in 1998, and CenterPlace II was completed in 2004.[2]

In 2004, CenterPlace and MCL began negotiations for MCL to lease space in CenterPlace II for an ambulatory surgery center or medical and administrative offices. On November 22, 2004, CenterPlace and MCL entered into a ten-year lease (the lease) covering approximately 17,300 square feet, the entire first floor of CenterPlace II (the premises). At that time, MCL planned to build out the premises for use as an ambulatory surgery facility.

Section 10 of the lease provided that " [t]he parties acknowledge and agree that [MCL] may make alterations and improvements to the interior of the Leased Space in order to prepare the Leased Space for use by [MCL] as medical offices and/or an outpatient surgery facility." Another part of Section 10 required that CenterPlace provide MCL an allowance of $536,200 for tenant improvements (the TI funds) to finish out the premises. CenterPlace was required to provide the TI funds to MCL " on or before the Commencement Date, or if Landlord and Tenant shall agree, in installments as the [w]ork progresse[d]." [3]

Section 10(c) of the lease required that MCL, within thirty days of the lease date, submit to CenterPlace for approval " a space plan which in outline form shows the layout and configuration of the Leased Space." If CenterPlace did not make any written comments or objections to the space plan within ten days, the lease provided that CenterPlace was " deemed to have approved" the plan. MCL submitted a space plan for an ambulatory surgical center to CenterPlace on December 21, 2004. The parties disagreed at trial as to whether the space plan provided by MCL complied with the lease's terms, but it is undisputed that CenterPlace did not comment about or object to the space plan within ten days.

Although it had provided a space plan to CenterPlace, MCL did not start finishing out the interior of the premises. MCL presented evidence that it did not find adequate physician interest to support its plans for an

ambulatory surgery center and that it proposed to move forward immediately with alternate plans for a diagnostic imaging center and a pediatric urgent-care clinic. CenterPlace expressed its disapproval with MCL's alternate plans, particularly regarding the proposed imaging center as possibly competing with an existing tenant, but Harpavat testified that it was very important to him that MCL had represented to him that it was going to proceed immediately. The parties then disputed whether MCL had breached the lease or fraudulently induced CenterPlace into the lease. The parties' dispute evolved into discussions about amending the lease.

…………..

## V. Attorneys' Fees

CenterPlace argues in its fourth issue that the trial court erred by awarding MCL its attorneys' fees and costs and by concluding that CenterPlace was not entitled to recover its attorneys' fees and costs pursuant to Section 27 of the lease agreement.

### A. Lease Language

Section 27 of the lease states:

In the event any litigation ensues with respect to the rights, duties and obligations of the parties under this Lease, the unsuccessful party in any such action or proceeding shall pay for all costs, expenses and reasonable attorney's fees incurred by the prevailing party in enforcing the covenants and agreements of this Lease. The term " *prevailing party,* " as used herein, shall mean the party that obtains substantially the relief sought by such party, whether by compromise, settlement or judgment. Further, in the event Landlord retains legal counsel to enforce any of Tenant's obligations hereunder, Tenant shall reimburse Landlord for all reasonable legal fees incurred by Landlord.

### B. MCL as Prevailing Party

CenterPlace first argues that MCL will no longer be the " prevailing party" as defined by the lease if CenterPlace succeeds on its first three issues because, in that event, MCL would not have obtained substantially the relief sought by it in the judgment. We held above, however, that legally and factually sufficient evidence supports the trial court's determination that CenterPlace breached the lease by refusing to release the remaining TI funds to MCL. That breach excused MCL's further payment of rent, a conclusion of law by the trial court of which CenterPlace does not complain. Thus, MCL was and remains the " prevailing party" under Section 27 of the lease because it obtained through the judgment substantially the relief it sought in the lawsuit. *See Johnson v. Smith,* No. 07-10-00017-CV, 2012 WL 140654, at *3 (Tex.App.-Amarillo Jan. 18, 2012, no pet.) (mem. op.); *Silver Lion, Inc. v. Dolphin St., Inc.,* No. 01-07-00370-CV, 2010 WL 2025749, at *18

(Tex.App.-Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op.) (op. on reh'g) (concluding defendant who successfully defended against

**Page 687**

 breach of contract claim was a " prevailing party" under attorneys' fees provision of contract); *see also Fitzgerald v. Schroeder Ventures II, LLC,* 345 S.W.3d 624, 629 (Tex.App.-San Antonio 2011, no pet.) (holding defendants who successfully obtained jury findings of no liability resulting in take-nothing judgment in suit relating to contract were each a " prevailing party" entitled to attorneys' fees as provided by contract). We overrule the part of CenterPlace's fourth issue that asserts that the trial court erred by awarding attorneys' fees and costs to MCL based on Section 27 of the lease and MCL's status as the prevailing party in the litigation.[16]

### C. MCL's Recovery Under Property Code Section 93.002

MCL's recovery of attorneys' fees under property code section 93.002 is a different matter. The trial court awarded MCL $37,700 in attorneys' fees for CenterPlace's alleged violation of section 93.002(c), but we held above that legally insufficient evidence supports the trial court's determination that CenterPlace violated property code section 93.002(c). Thus, MCL's attorneys' fees can only be awarded pursuant to the contract and cannot be awarded pursuant to section 93.002(g). *See* Tex. Prop.Code Ann. § 93.002(g)(2) (providing that tenant may recover reasonable attorneys' fees and court costs less any delinquent rents or other sums for which tenant is liable to landlord if landlord or landlord's agent violates that section). MCL did not prevail on its claim under section 93.002(g), nor is it the " prevailing party" under the contract language on its counterclaim for damages based on violation of property code section 93.002. We therefore sustain the part of CenterPlace's fourth issue that challenges the trial court's award of attorneys' fees to MCL based on CenterPlace's alleged violation of section 93.002(c).

### D. CenterPlace's Claim for Attorneys' Fees

CenterPlace argues in the final part of its fourth issue that the trial court erred by failing to award it recovery of its attorneys' fees because the last sentence of Section 27 mandates an award of reasonable attorneys' fees to CenterPlace, even if it is not the prevailing party. In other words, CenterPlace contends that MCL's obligation to pay attorneys' fees to CenterPlace under Section 27 is not contingent upon CenterPlace's litigation success. We are not, however, persuaded that CenterPlace's proposed interpretation of Section 27 is correct.

The interpretation of an unambiguous contract is a question of law that we review de novo. *MCI Telecomms. Corp. v. Tex. Utils. Electric Co.,* 995 S.W.2d 647, 650-51

(Tex.1999). " Our primary concern in construing a written contract is to ascertain the objective intent of the parties as expressed in the contract." *DaimlerChrysler Motors Co. v. Manuel,* 362 S.W.3d 160, 178 (Tex.App.-Fort Worth 2012, no pet.) (citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *City of the Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 722 (Tex.App.-Fort Worth 2008, pet. dism'd)). " We examine and consider the entire document in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *Id.* (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006); *Coker,* 650 S.W.2d at 393; *City of the Colony,* 272 S.W.3d at 722); *see*

**Page 688**

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 805 (Tex.2012). " When the provisions of a contract appear to conflict, they should be harmonized if possible to reflect the intentions of the parties." *Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 332 (Tex.1983) (op. on reh'g) (citing *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979)). " Generally, the parties to a contract intend every clause to have some effect[,] and the Court will not strike down any portion of the contract unless there is an irreconcilable conflict." *Id.* (citing *Woods v. Sims,* 154 Tex. 59, 64, 273 S.W.2d 617, 620 (1954)).

The first two sentences of Section 27 provide for the mandatory award of attorneys' fees to the prevailing party if litigation ensues relating to the lease. MCL, as stated above, is the prevailing party entitled to recover its costs and attorneys' fees under that portion of Section 27. But in arguing that it should also be awarded its attorneys' fees, CenterPlace relies on the last sentence of Section 27, which states, " Further, in the event Landlord retains legal counsel to enforce any of Tenant's obligations hereunder, Tenant shall reimburse Landlord for all reasonable legal fees incurred by Landlord."

CenterPlace, even though it is not a prevailing party, argues that it is entitled to recover its attorneys' fees because the last sentence of Section 27 does not require that CenterPlace prevail, only that CenterPlace retain legal counsel to enforce MCL's lease obligations. But CenterPlace is asking that we ignore the first two sentences of Section 27 and read the last sentence in isolation. This we cannot do because we must consider the entire document in order to give each provision meaning if possible. *See DaimlerChrysler Motors Co.,* 362 S.W.3d at 178. Giving effect to all parts of Section 27, it seems clear that the parties intended that CenterPlace would be entitled to reimbursement of its reasonable legal fees if CenterPlace retained counsel to enforce MCL's obligations under the lease agreements so long as litigation did not ensue. But if litigation ensued, only the prevailing party in the litigation would be entitled to recover its attorneys' fees. That the parties intended the last sentence of Section 27 to apply in the

absence of litigation and for the first two sentences to apply in the event of litigation is confirmed by the parties' use of " [f]urther" as an introduction to the last sentence and " [i]n the event any litigation ensues" as an introduction to the first sentence. *See generally Gen. Fin. Servs., Inc. v. Practice Place, Inc.,* 897 S.W.2d 516, 522 (Tex.App.-Fort Worth 1995, no writ) (" The language of a contract should be given its plain, ordinary, and commonly accepted meaning. Courts are required to follow elemental rules of grammar for a reasonable application of the legal rules of construction." (citations omitted)). The use of " [f]urther" as an introduction to the last sentence of Section 27 suggests that the last sentence applies only to a circumstance different than the first two sentences of Section 27. And the introductory " [i]n the event any litigation ensues" language in the first sentence of Section 27, particularly compared to the more general language used in the last sentence of Section 27, suggests that the parties intended for only the first two sentences to apply once the parties' dispute led to litigation, and the first two sentences permit only the prevailing party in the litigation to recover its costs and attorneys' fees. MCL is the prevailing party and is thus the only party entitled to recover its costs and attorneys' fees. Had CenterPlace prevailed in the litigation, then only CenterPlace would have been entitled to recover its costs and attorneys' fees. Contrary to CenterPlace's contention, the only reasonable manner in which

**Page 689**

to construe Section 27 to give effect to all three sentences is to interpret it to mean that CenterPlace would have been entitled to recover its attorneys' fees if the parties' dispute had not resulted in litigation but that because " litigation ensue[d]" from the parties' dispute, only MCL is permitted to recover its costs and attorneys' fees as the prevailing party. We therefore hold that the trial court did not err by refusing to award CenterPlace its attorneys' fees under Section 27 of the lease. Accordingly, we overrule the remainder of CenterPlace's fourth issue.

### VI. Conclusion

Having sustained the first part of CenterPlace's first issue and part of its fourth issue, and having overruled the remainder of CenterPlace's dispositive issues, we reverse the portions of the trial court's judgment relating to MCL's claim for statutory damages and attorneys' fees under property code section 93.002. We render judgment that MCL take nothing on its property code section 93.002 claim. We affirm the remainder of the trial court's judgment.

---------

Notes:

[1] Dunning was named as a defendant, individually, in the trial court, having been CEO of MCL at the time the

lease was negotiated and executed. He retired in 2005. The final judgment orders that CenterPlace take nothing both as to MCL and Dunning. Although he is named in the style of the case on appeal, CenterPlace has not sought reversal of the take-nothing judgment as to him.

[2] At the time of trial, construction had not begun on CenterPlace III.

[3] The lease defined " Commencement Date" as the earlier of the date MCL opened for business in the leased space or 180 days from the date the lease was executed by both parties.

[4] The $33,557.59 rent amount was later increased by 2% to $34,071.15 pursuant to section 2(c) of the lease.

[5] It is undisputed that CenterPlace had retained the key to the premises at all times and that MCL had previously gained access to the premises by contacting Harpavat and meeting him at the premises.

[6] MCL paid a total of $1,017,149.48 in rent from the inception of the lease to November 1, 2007.

[7] The trial court granted MCL's motion for directed verdict as to CenterPlace's fraud claims. CenterPlace has not appealed that ruling.

[8] The parties agree that the three exceptions are inapplicable in this case.

[9] MCL contended, and the trial court found, that prior to the time MCL ceased paying rent in November 2007, CenterPlace notified MCL that its right of possession was terminated and that it would no longer be allowed to enter the premises, which notice— under the circumstances of this case— physically excluded MCL from the premises, thus " intentionally prevent[ing]" MCL from entering the premises and constituting both a breach of the lease agreements and a violation of property code section 93.002.

[10] The same question— what is meant by " intentionally preventing" — applies both to the trial court's finding that CenterPlace violated section 93.002 and to its separate finding that CenterPlace breached the lease and amended lease by " intentionally preventing" MCL from entering the leased premises.

[11] Two of the three cases address property code section 92.0081, which is the residential-lease version of section 93.002. The two statutes are identical in all material respects for the purposes of this case, and we thus look to interpretations of section 92.0081 to guide our analysis here. *Compare* Tex. Prop.Code Ann. § 92.0081(b) (West Supp.2012), *with id.* § 93.002(c).

[12] The predecessor statute stated in relevant part as follows: " It shall be unlawful for a landlord or his agent to willfully exclude a tenant from the tenant's premises in any manner except by judicial process. *Willful exclusion shall mean preventing the tenant from entering into the premises with intent to deprive the tenant of such entry. ...*" *Id.* at 175 (emphasis added) (quoting Tex.Rev.Civ. Stat. Ann. art. 5236c (1973)).

[13] The preceding sentence in the December 21, 2006 letter states, " Please provide details on how you would like the invoice process for this project to be handled."

[14] The December 29 and January 11 letters also highlight the lack of an agreement between the parties as to how the remaining TI funds would be released, whether by lump sum or by CenterPlace's direct payment of invoices. In the absence of such agreement, the trial court could have reasonably concluded that CenterPlace was obligated to release to MCL the remaining TI funds upon MCL's November and December requests.

[15] Because we have overruled the fourth part of CenterPlace's first issue, we need not address the second and third parts of CenterPlace's first issue. *See* Tex.R.App. P. 47.1. We also need not address CenterPlace's second or third issues because those issues are contingent upon CenterPlace's success on the entirety of its first issue.

[16] CenterPlace does not argue that MCL would not be a prevailing party under the lease language in the event we overrule any part of CenterPlace's first three issues.

---------

# APPENDIX
# #18

**EXCERPTED**

Page 624

345 S.W.3d 624 (Tex.App.-San Antonio 2011)

**Wade P. FITZGERALD and Minot Tully Pratt, IV and Michael G. Panzarella, as Trustee of the MTPIV Trust and Cinco Family Trust, Appellants,**

**v.**

**SCHROEDER VENTURES II, LLC, Appellee.**

**No. 04-10-00371-CV.**

**Court of Appeals of Texas, Fourth District, San Antonio**

**April 6, 2011**

Page 625

[Copyrighted Material Omitted]

Page 626

Beth Watkins Squires, Law Office of Beth Squires, Jeff Small, Law Office of Jeff Small, San Antonio, TX, for Appellant.

G. Thomas Coghlan, Langley & Banack, Inc., San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, KAREN ANGELINI, Justice and MARIALYN BARNARD, Justice.

### OPINION

KAREN ANGELINI, Justice.

The issue presented in this appeal is whether defendants who successfully defended claims arising from a real estate transaction should have been awarded attorney's fees and costs under the parties' earnest money contract. The trial court refused to award attorney's fees and costs under the contract, relying on the Texas Supreme Court's decision in *Intercontinental Group P'ship v. KB Home Lone Star, L.P.,* 295 S.W.3d 650 (Tex.2009). We conclude *Intercontinental* is not applicable here, and the defendants were entitled to attorney's fees and costs under the plain language of the parties' contract. We, therefore, reverse and render judgment awarding attorney's fees and costs.

### BACKGROUND

Schroeder Ventures II, LLC, purchased a tract of land from Minot Tully Pratt, IV, and Michael G. Panzarella, as Trustee of the MTPIV Trust and Cinco

Family Trust. Wade P. Fitzgerald, a real estate broker, represented Pratt in the sales transaction. The attorney's fees provision in the parties' earnest money contract provided:

16. ATTORNEY'S FEES: If Buyer, Seller, any broker, or any escrow agent is a *prevailing party* in any legal proceeding brought under or with relation to this contract or this transaction, such party is entitled to recover from the non-prevailing parties all costs of such proceeding and reasonable attorney's fees. This Paragraph 16 survives termination of this contract.

(emphasis added). The contract, which was a standard contract promulgated by the Texas Association of Realtors, did not define the term " prevailing party." Although not a signatory to the contract, Schroeder Ventures assumed the buyers' rights and obligations under the contract by assignment.

After the sale closed, Schroeder Ventures sued Fitzgerald, Pratt, and Panzarella for fraud, fraudulent misrepresentation, negligence, gross negligence, and negligent misrepresentation in the sales transaction. The suit alleged Fitzgerald, Pratt, and Panzarella failed to disclose the existence of a sinkhole adjacent to the real property. Fitzgerald, Pratt, and Panzarella filed pleadings seeking to recover attorney's fees based on the parties' earnest money contract, but sought no other affirmative relief.

At trial, the jury found in favor of Fitzgerald, Pratt, and Panzarella— and against Schroeder Ventures— on all of the liability questions. Specifically, the jury found Fitzgerald, Pratt, and Panzarella did not commit statutory fraud or fraud against Schroeder Ventures in the transaction. The jury also found Fitzgerald, Pratt, and Panzarella did not make a negligent misrepresentation to Schroeder Ventures in the transaction. Finally, the jury found Fitzgerald, Pratt, and Panzarella were not negligent in the transaction. In fact, the

Page 627

only party the jury found to be negligent in the transaction was Schroeder Ventures.

The jury also made findings as to reasonable and necessary attorney's fees. The jury found the reasonable and necessary fees for Fitzgerald's attorneys to be $104,063.00 for trial and $25,000.00 for a successful appeal to the court of appeals. The jury found the reasonable and necessary fees for Pratt's and Panzarella's attorneys to be $195,688.00 for trial and $25,000.00 for a successful appeal to the court of appeals. The jury also found Pratt and Panzarella incurred $5,100.00 in costs.

Fitzgerald, Pratt, and Panzarella moved for entry of

judgment in accordance with the jury's verdict. In response, Schroeder Ventures argued Fitzgerald, Pratt, and Panzarella were not entitled to attorney's fees based on the Texas Supreme Court's analysis of the term " prevailing party" in *Intercontinental*. Schroeder also argued the attorney's fees provision in the contract did not apply because Schroeder's claims were not contractual in nature, and the attorney's fees provision in the contract covered only contractual claims.

The trial court concluded *Intercontinental* precluded recovery of attorney's fees by Fitzgerald, Pratt, and Panzarella, and refused to render judgment in accordance with the jury's findings on attorney's fees. Instead, the trial court rendered judgment denying Fitzgerald, Pratt, and Panzarella recovery on their counterclaim for attorney's fees, and ordered all attorney's fees and costs to be paid by the party who incurred them. The trial court rendered a take-nothing judgment in accordance with the jury's liability findings.

Thereafter, Fitzgerald, Pratt, and Panzarella brought this appeal to challenge the trial court's denial of attorney's fees and costs under the contract.

### STANDARD OF REVIEW

Generally, a trial court's award of attorney's fees is reviewed for an abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 20-21 (Tex.1998); *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990). The trial court has discretion to fix the amount of attorney's fees, but it does not have discretion to deny attorney's fees entirely if they are proper. *Mercier v. Sw. Bell Yellow Pages, Inc.,* 214 S.W.3d 770, 775 (Tex.App.-Corpus Christi 2007, no pet.); *World Help v. Leisure Lifestyles, Inc.,* 977 S.W.2d 662, 683 (Tex.App.-Fort Worth 1998, pet. denied).

Texas follows the " American Rule" which prohibits awards of attorney's fees unless specifically authorized by statute or by a contract between the parties. *MBM Fin. Corp. v. The Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 669 (Tex.2009). An issue concerning the availability of attorney's fees under a statute or a contract presents a question of law that appellate courts review de novo. *Holland v. Wal-Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999); *In re Lesikar,* 285 S.W.3d 577, 583 (Tex.App.-Houston [14th Dist.] 2009, orig. proceeding). Therefore, we apply the de novo standard of review in this case.

### DOES *INTERCONTINENTAL* APPLY?

Fitzgerald, Pratt, and Panzarella argue that *Intercontinental* did not preclude an award of attorney's fees in this case, and that under the plain language of the parties' earnest money contract, they were entitled to recover their attorney's fees from Schroeder Ventures because they successfully defended against all of its claims. Schroeder Ventures counters that under the

prevailing party analysis provided in *Intercontinental, Fitzgerald, Pratt,* and *Panzarella* were not prevailing parties,

**Page 628**

and therefore, the trial court properly refused to award them attorney's fees.

# APPENDIX
# #19

EXCERPTED

Page 123

120 S.W.2d 123 (Tex.Civ.App. 1938)

FRANZETTI

v.

FRANZETTI.

No. 8715.

Court of Civil Appeals of Texas, Austin.

July 20, 1938

Rehearing Denied September 21, 1938.

Appeal from District Court, Ninety-Eighth District, Travis County; J. D. Moore, Judge.

Suit for divorce by Louis Franzetti against Gertrude Franzetti. Judgment for plaintiff, and defendant appeals.

Reversed and remanded.

Page 124

Cofer & Cofer, of Austin, for appellant.

Judge Ocie Speer and Wright Stubbs, both of Austin, for appellee.

McCLENDON, Chief Justice.

Appeal from a judgment upon a special issue verdict, granting a divorce to Louis Franzetti (appellee) from his wife, Gertrude Franzetti (appellant).

The appeal presents two important questions which appear to be of first impression in this state:

(1) Whether R. C. S. Art. 5529, barring all actions "for which no limitation is otherwise prescribed" in four years, is applicable to actions for divorce; and (2) whether in an action for divorce by the husband on the ground of cruel treatment a single act of adultery on the part of the husband constitutes a complete defense to his suit.

As to the plea of limitation: The suit was predicated upon a series of acts of cruel treatment, culminating in a separation of the spouses June 26, 1930. The instant suit was brought November 2, 1934. The plea of limitation was therefore good as to the case presented by the pleadings, if the article cited applies to actions for divorce.

Page 125

Appellee relies upon the following quotation from 19 C.J. p. 97, § 225: "Statutes limiting in general terms the time within which actions may be brought do not ordinarily apply to divorce suits, but in the absence of statutory limitation the equitable doctrine of estoppel is usually applied."

Three cases are cited as supporting the text: *Mosely v. Mosely,* 67 Ga. 92; *Tufts v. Tufts,* 8 Utah 142, 30 P. 309, 16 L.R.A. 482; *Yeager v. Yeager,* 19 Pa.Dist.R. 726. The case from a district court of Pennsylvania is not available, and we have not examined it.

The Georgia case was predicated upon cruel treatment, abandonment for over twenty years, and adultery, all on the part of the husband. The plea of limitation was predicated upon the ground that divorce was a statutory action as to which the statutes of limitation applied.

It is to be observed that abandonment was one of the grounds alleged. Even in states having specific statutes expressly applicable to divorce, abandonment is held to be a continuing offense as to which limitation does not apply. See *Wickliff v. Wickliff,* 191 Ark. 411, 86 S.W.2d 553.

In the Utah case, after alleged acts of cruelty on the part of the husband, the spouses separated and obtained a "church divorce," which they thought to be legal. The wife (plaintiff) married another man, but ceased to live with him when she discovered the "church divorce" was not legal. The husband had married several times since the "church divorce."

In both of these cases there were elements which would have prevented running of the statute. However, it is clear that the court in each case intended to hold that statutes of limitation in general terms are not applicable to actions for divorce.

A careful reading of the Georgia case leads us to the conclusion that the holding was rested largely upon the fact that divorce, though the grounds therefor may be prescribed by statute, is essentially an equitable action, and is governed by equitable principles derived largely from the English common and ecclesiastical law, and therefore general statutes applicable to actions at law will not be held to apply to them, unless there is some expressed legislative intent to that end. We quote from the opinion: "In other states, where common and ecclesiastical law prevailed, for this cause of action special statutes in bar were enacted, and until the law-making power here so enacts we do not feel authorized by implication to apply any limitation now in force to this character of suit."

The Utah holding is predicated upon the Georgia holding.

While in *Kittle v. Kittle,* 86 W.Va. 46, 102 S.E. 799, the Supreme Court of West Virginia reached the same conclusion, the holding there was rested upon the proposition that "suits for divorce being cognizable only in equity, are controlled solely by principles of equity, and the general statute of limitations does not apply."

On the other hand, it was held by the Supreme Court of North Carolina in *Garris v. Garris,* 188 N.C. 321, 124 S.E. 314, that a statute in general terms, barring all actions, not otherwise provided for, in ten years was applicable to divorce, although there was no statutory provision expressly applicable to divorce.

If the adjudications of other jurisdictions were numerous and uniform, we might be reluctant not to follow them. But the question at issue seems only to have reached the courts of last resort in three other states, and the decisions in these are in conflict. There is also another reason why, in a matter of this sort, decisions of the common law states should have no impelling force with us, namely, the fact that the distinctions between law and equity have never existed in this state, as in those states. True, "Equitable principles are a part of the law of Texas"; but

"Every lawyer is informed as to the peculiar distinctions between the English courts of law and courts of chancery, and the differences between their systems of law and remedies and procedure. Every Texas lawyer is aware also that these distinctions and differences were unknown to the Spanish civil law which prevailed in early times, and that they are of little if any importance under the system which has come into being in this state. In truth, they seem to appertain to the realm of phrases, rather than to that of facts.

" 'The distinctions between law and equity have never obtained in Texas. They were not recognized in the earliest times when the civil law of Mexico was administered. They were unknown to the Constitution of Coahuila and Texas. After independence the Constitution of the republic ignored them. Each succeeding Constitution of the state has expressly denied their

**Page 126**

existence. At most, the distinction in this state is a very narrow one. In some aspects it may be said to be more one of form than of substance.' " 17 Tex.Jur. pp. 4, 5. The quotation is from *City of Dallas v. McElroy, Tex.Civ.App.,* 254 S.W. 599, error dismissed.

The right of trial by jury applies here without distinction, to both law and equity cases, and so far as we have been able to discover our limitation laws apply alike in equity as at law. *Huggins v. Johnston, Tex.Civ.App.,* 3 S.W.2d 937, affirmed 120 Tex. 21, 35 S.W.2d 688;

*Conrads v. Kasch, Tex.Civ.App.,* 26 S.W.2d 732, error refused 119 Tex. 449, 31 S.W.2d 630; 28 Tex.Jur. p. 89, § 15. In like manner, our statutes of limitations in suits for land are held to apply to equitable as well as legal titles. *New York & T. Land Co. v. Hyland,* 8 Tex.Civ.App. 601, 28 S.W. 206, error refused.

Where the wrongful act complained of is continuing in its nature, as is the case in cloud upon title, limitation manifestly does not apply. *State M. Corp. v. Ludwig,* 121 Tex. 268, 48 S.W.2d 950; *Pannell v. Askew, Tex.Civ.App.,* 143 S.W. 364; *Slider v. House, Tex.Civ.App.,* 271 S.W. 644; *White Point Oil & Gas Co. v. Dunn, Tex.Civ.App.,* 18 S.W.2d 267; *Bookhout v. McGeorge, Tex.Civ.App.,* 65 S.W.2d 512.

But for its stated exceptions, Art. 5529 is all-inclusive in its wording. It reads: "Every action other than for the recovery of real estate, for which no limitation is otherwise prescribed, shall be brought within four years next after the right to bring the same shall have accrued and not afterward."

In view of the above considerations, we hold that where the suit for divorce is based upon acts complete in themselves and not of a continuing nature, the four years statute of limitations applies, as in other cases.

There is evidence in the record to the effect that appellant continued her alleged acts of cruelty after the separation in June, 1930. For which reason judgment should not be rendered here.

Upon the second question: While the evidence was circumstantial, and came from appellant and her mother alone, it was clearly sufficient to support a finding that appellee was guilty of a single act of adultery after the separation.

Appellant tendered, and the court refused, the following special issue:

"Do you find from a preponderance of the evidence that the plaintiff since he left defendant, if he did leave her, has been guilty of adultery with another woman? Answer 'Yes' or 'No.

"The term adultery as used in this charge means carnal intercourse between a married person and a single person of the opposite sex."

Appellee contends that to constitute a defense to the husband's suit for divorce on the ground of cruel treatment the adultery of the husband must be such as would entitle the wife to a divorce on that ground, that is that "he shall have abandoned her and lived in adultery with another woman." R.C.S. Art. 4629, Subd. 3. We do not concur in this contention.

It is conceded that adultery is generally held to be a complete defense to an action for divorce upon any

ground including that of cruel treatment. 15 Tex.Jur. p. 493, § 42; 9 R.C.L. p. 390, § 183.

This rule is not predicated upon the ground that the guilty plaintiff has committed an act constituting a statutory ground for divorce in favor of defendant. The basis is thus stated in 9 R.C.L. p. 387, § 180: "It is a general principle of the common law that whoever seeks redress for the violation of a contract resting upon mutual and dependent covenants, to obtain success must himself have performed the obligations on his part. Something analogous to this principle is found in the doctrine of recrimination, or compensatio criminum, which was originally borrowed from the canon law, by which the defendant in divorce proceedings is permitted to contest the plaintiff's application on the ground of his own violation of the marriage contract--to set off, to use the language of the cases, the equal guilt of the plaintiff. The doctrine of recrimination by the defendant as a defense in bar of the plaintiff's relief has become fully established in this country; and though misconduct of the plaintiff, such as adultery, occurs after the commencement of his or her suit, it is as fully effective to bar the right to a divorce therein, as if it had occurred previous to the commencement of the suit."

We have a statute (Art. 4630) which expressly bars a suit for divorce predicated upon adultery, where the plaintiff, whether

**Page 127**

the husband or the wife, is shown likewise to be guilty of adultery.

# APPENDIX
# #20

**EXCERPTED**

Page 124

930 S.W.2d 124 (Tex.App. □Tyler 1996)

G. RICHARD GOINS CONSTRUCTION COMPANY, INC., Appellant,

v.

S.B. McLAUGHLIN ASSOCIATES,INC., Appellee.

No. 12-94-00361-CV.

Court of Appeals of Texas, Twelfth District, Tyler

May 31, 1996

Page 125

Rehearing Overruled Aug. 9, 1996.

Page 126

T. Wesley Holmes, Donovan Campbell, Jr., Dallas, for appellant.

Luke Madole, Dallas, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HOLCOMB, Justice.

This is an appeal from the trial court's judgment that Appellant, G. Richard Goins Construction Co., Inc. ("GCC" or "Appellant"), take nothing from S.B. McLaughlin Associates, Inc. ("SBMA"). We will affirm in part, modify in part, and reverse and render in part.

SBMA is the owner and developer of the Pinnacle Club, a planned residential community located in Henderson County, Texas. On January 13, 1986, SBMA sold Lot 75 in the Pinnacle Club to GCC. A dispute arose between SBMA and GCC regarding SBMA's obligations to develop the Pinnacle Club. On September 19, 1989, GCC brought suit against SBMA. [1] In its petition, GCC alleged that SBMA violated the Texas Deceptive Trade Practices Act [2] ("DTPA"). SBMA responded, asserting, inter alia, the affirmative defenses of limitations and waiver.

At trial, the jury found that SBMA knowingly violated the DTPA, and that such violation was the producing cause of $174,000 in actual damages to GCC. However, the jury also found that GCC discovered, or should have discovered, SBMA's DTPA violations on July 30, 1986. Further, the jury found that

…………

Page 130

In its first cross-point, SBMA claims that it, as the prevailing party in the litigation, was entitled to recover court costs and attorney's fees from GCC pursuant to the terms of the parties' agreement. We agree.

As noted above, SBMA sold lot 75 in the Pinnacle Club to GCC. Paragraph 16 of the earnest money contract provided in relevant part, "[a]ny signatory to this contract, ... who is the prevailing party in any legal proceeding brought under or with relation to this contract or transaction shall be additionally entitled to recover court costs and reasonable attorney fees from the non-prevailing party." At trial, the jury found that SBMA incurred $50,000 in reasonable attorney's fees in defending against GCC's claims.

As a general rule, a prevailing party is not entitled to recover his attorney's fees from his adversary. *Turner v. Turner,* 385 S.W.2d 230, 233 (Tex.1964). However, parties to a contract may provide by agreement that the prevailing party is entitled to recover attorney's fees. *Weng Enterprises v. Embassy World Travel,* 837 S.W.2d 217, 222-23 (Tex.App.--Houston [1st Dist.] 1992, no writ). The "prevailing party" is the party who successfully defends against the action on the main issue. Id. at 223.

In the present case, GCC brought a DTPA action against SBMA for SBMA's actions in the sale and development of the Pinnacle Club. However, SBMA prevailed in the litigation by successfully asserting the defense of limitations. The trial court rendered a take-nothing judgment against GCC. Thus, by the parties' agreement, SBMA was entitled to attorney's fees as the prevailing party. At trial, the jury found that SBMA incurred reasonable attorney's fees in the amount of $50,000 in connection with its defense of claims asserted by GCC. We therefore sustain SBMA's first cross-point and hold that the trial court erred in denying SBMA recovery of its attorney's fees.

In its second cross-point of error, SBMA alleges that the trial court erred in extending an agreed temporary injunction past entry of final judgment. We agree.

The trial court's final judgment ordered in relevant part:

That the Agreed Order made in open court herein on August 25, 1992 and further memorialized in an Agreed Order signed herein on March 10, 1993 are [sic] set aside and held for naught, same expiring upon this judgment becoming final.

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a final trial of the case on its merits. *Transport*

*Co. of Texas v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 552 (1953). A temporary injunction remains in force only until the court renders a final judgment. *Independent American Real Estate, Inc. v. Davis,* 735 S.W.2d 256, 261 (Tex.App.--Dallas 1987, no writ). Therefore, the temporary injunction expires upon entry of the final judgment. Id.

In the instant case, the trial court was without authority to extend the agreed temporary injunction past entry of judgment. Once the trial court rendered judgment, the temporary injunction should have terminated. It was error to extend the injunction until the judgment became final. Therefore, we sustain SBMA's second cross-point.

We reverse the judgment of the trial court only to the extent that it failed to award SBMA attorney's fees, and therefore, we render judgment that SBMA recover $50,000 in attorney's fees from GCC. Additionally, we reform the trial court's judgment to reflect that "the Agreed Order made in open court on August 25, 1992 and memorialized in an Agreed Order on March 10, 1993 is set aside, same expiring upon entry of final judgment in this cause." The remainder of the trial court's judgment is affirmed.

---------

Notes:

[1] Other parties plaintiff participated in the trial, but only GCC appeals the judgment. GCC and the other plaintiffs also sued SBMA's principals. However, GCC only appeals the judgment with regard to SBMA.

[2] TEX. BUS. & COM.CODE ANN. § 17.42 et seq. (Vernon 1987). Although the plaintiffs below asserted numerous theories of liability, GCC only appeals the trial court's judgment relating to its DTPA causes of action.

---------

# APPENDIX
# #21

EXCERPTED

Page 173

851 S.W.2d 173 (Tex. 1992)

Carolyn GREATHOUSE, Independent Executrix of the Estate of

 Clyde R. Greathouse, Deceased, Petitioner,

v.

 CHARTER NATIONAL BANK-SOUTHWEST, Respondent.

No. D-0296.

Supreme Court of Texas.

July 1, 1992

Rehearing Overruled Dec. 22, 1992.

Supplemental Opinion on Rehearing Dec. 22, 1992.

Gary L. McConnell, Angleton, for petitioner.

Larry Huelbig, Audrey Seldon, Houston, for respondent.

OPINION

HECHT, Justice.

Section 9.504 of the Uniform Commercial Code, TEX.BUS. & COM.CODE § 9.504, requires that collateral must be disposed of in a commercially reasonable manner. The Code, however, does not allocate the burden of pleading and proving whether this requirement has been met in an action by a creditor against a debtor for the deficiency due after disposition of the collateral. We granted writ of error to resolve a split among Texas courts of appeals over this procedural issue.

Forrest Allen & Associates, Inc. defaulted on a note payable to Charter National Bank-Southwest, guaranteed by Clyde R. Greathouse, and secured by an assignment of insurance expirations, commissions, accounts receivable, furniture and fixtures. Charter took the pledged collateral and sold it for $100,000, leaving a principal balance due on the note of $151,014.95. Charter then sued Forrest Allen and Greathouse for the deficiency, interest and attorney fees. Greathouse died during the pendency of the suit, and the independent executrix of his estate was substituted as a defendant.

Charter did not plead that it had disposed of the collateral in a commercially reasonable manner, but it did plead generally that: "All conditions precedent have been performed or have occurred. All just and lawful credits, payments and offsets have been allowed." Defendants answered with a general denial. At trial before the court without a jury, Charter's sole witness established the amount due on the note after foreclosure, and Charter rested its case. Greathouse then moved for judgment on the grounds that Charter had failed to plead or prove an element of its cause of action, namely, a commercially reasonable disposition of the pledged collateral. Charter responded that it had satisfied its pleading

Page 174

obligation by alleging generally the performance of all conditions precedent, and that it was not required to prove the commercial reasonableness of the foreclosure absent a specific denial by Greathouse. Charter relied upon Rule 54, TEX.R.CIV.P., which states:

In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred. When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.

Charter also requested a continuance to procure evidence of the commercial reasonableness of the foreclosure sale. The trial court denied both Charter's request for a continuance and Greathouse's motion for judgment, and Greathouse rested its case without offering any evidence. After taking the case under submission, the trial court rendered judgment for Charter in the amount of $252,858.28.

Only Greathouse appealed. [1] The court of appeals affirmed, holding "that the burden of specifically pleading a lack of commercial reasonableness or notice in a deficiency action under section 9.504 ... rests with the debtor." 795 S.W.2d 1, 3. Once the debtor has specifically raised the issue, the court held, the burden of proof is upon the creditor. The court reasoned: "Such an approach informs a creditor which areas (if any) are disputed and which items of proof must be produced; it does not allow a creditor to avoid proving its case.... Without indication of a debtor's objections, a creditor is prejudiced in the preparation of its case." Id. at 2.

On the procedural issue before us, the Uniform Commercial Code has not achieved its purposes of simplification and uniformity of commercial law. Texas courts are severely split on the subject. Many of them indicate that the creditor must plead and prove a commercially reasonable disposition of the collateral, [2] while others have treated commercial unreasonableness as a defense which the debtor must raise in order to shift the burden of proof to the creditor. [3] Our sister states

are equally divided. Some states place the burden on the creditor in a deficiency suit to both plead and prove compliance with the notice and commercial reasonableness requirements of section 9.504. [4] In other states, the debtor raises the issue in pleadings as a

**Page 175**

counterclaim or a defense in order to put the creditor to proof on the matters so challenged, and the secured creditor then bears the burden of proving compliance. [5] A few states treat the issue as an affirmative defense. [6]

# APPENDIX #22

**756 S.W.2d 824 (Tex.App. □Dallas 1988)**

**Roy W. HILL, Appellant,**

**v.**

 **THOMPSON & KNIGHT, Appellee.**

**No. 05-87-01276-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**August 23, 1988**

Page 825

Roy W. Hill, Fairfield, for appellant.

Madeleine B. Johnson, Dallas, for appellee.

Before STEPHENS, HECHT and BAKER, JJ.

HECHT, Justice.

Appellee Thompson & Knight sued appellant Roy W. Hill on a promissory note and obtained a summary judgment for $28,955.77 plus interest and costs. We overrule Hill's three points of error, affirm the judgment of the trial court and, because we determine that Hill has taken this appeal for delay and without sufficient cause, award Thompson & Knight additional damages of $1,500.00.

In his first point of error Hill contends that summary judgment is improper because Thompson & Knight did not establish that it is the present owner, holder and possessor of the note. The affidavit of a partner of Thompson & Knight filed in support of its motion states:

Thompson & Knight is in possession of the original of a Note, a true and correct copy of which is attached hereto and made a part hereof. The Note has never been assigned, transferred, pledged or delivered by Thompson & Knight to any other person or entity.

A copy of the note is attached to the affidavit. This evidence refutes Hill's contention. See *Taylor v. Fred Clark Felt Co.,* 567 S.W.2d 863, 866 (Tex.Civ.App.--Houston [14th Dist.] 1978, writ ref'd n.r.e.); *Lazidis v. Goidl,* 564 S.W.2d 453, 455 (Tex.Civ.App.--Dallas 1978, no writ). Hill's first point of error is overruled.

In his second point of error Hill contends that summary judgment is improper because Thompson & Knight did not establish that it has performed all conditions precedent to recovery on the note. Thompson

& Knight's petition states:

All conditions precedent with respect to Plaintiff's claims against Defendant herein have been performed or have occurred.

Texas Rule of Civil Procedure 54 states:

In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or

Page 826

have occurred. When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.

Hill pleaded:

Defendant denies that all condition precedent to the satisfaction of the claim of Thompson & Knight have been satisfied and demand [sic] strict proof with respect to all conditions precedent.

This denial does not specifically deny, and hence under rule 54 does not cumber Thompson & Knight with proving, the performance or occurrence of any condition precedent to its recovery. Hill's second point of error is overruled.

In his third point of error Hill contends that fact issues as to affirmative defenses raised by his controverting affidavit preclude summary judgment. Assuming that a controverting affidavit is a proper vehicle for raising issues in response to a motion for summary judgment, [1] Hill's affidavit fails to do so. Hill appears to argue that his affidavit raises issues as to lack or failure of consideration, waiver and estoppel. On the contrary, the affidavit reflects that Hill received an assignment in consideration for the note and says nothing about waiver or estoppel. Hill's third point of error is overruled.

This appeal has absolutely no merit. In the eight pages of argument in his brief Hill cites 107 cases, almost none of which have anything to do with the issues raised. This appeal is a complete waste of the parties', counsel's and this court's time and resources. There is no reason for it but delay. This is precisely the sort of appeal for which damages should be assessed against appellant under Texas Rule of Appellate Procedure 84. Rule 84 empowers this court to award damages against Hill up to ten percent of the trial court's judgment, or some $3,000. Under this rule, we award Thompson & Knight $1,500.00 damages against Hill, in addition to all damages awarded

by the trial court.

The judgment of the trial court is affirmed.

---------

Notes:

[1] See Engel v. Pettit, 713 S.W.2d 770, 772 (Tex.App.--Houston [14th Dist.] 1986, no writ); Rosas v. Bursey, 724 S.W.2d 402, 408 (Tex.App.--Fort Worth 1986, no writ). We express no view on this issue.

---------

# APPENDIX
# #23

LARRY DALE SMITH, Appellant [1]

1 This suit was dismissed before any defendant was served or answered. Therefore, there are no appellees.

NO. 01-05-00491-CV

COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON

2007 Tex. App. LEXIS 1153

February 15, 2007, Opinion Issued

**PRIOR HISTORY: [*1]** On Appeal from the 12th District Court. Walker County, Texas. Trial Court Cause No. 22,926.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant, inmate, challenged the order of the 12th District Court of Walker County, Texas, dismissing his lawsuit for failure to comply with Tex. Civ. Prac. & Rem. Code Ann. ch. 14 (2002).

**OVERVIEW:** In May 2004, the inmate filed a lawsuit, cause number 22,656, in the 278th District Court of Walker County, seeking damages and injunctive relief against prison officials. The 278th District Court dismissed the inmate's suit as frivolous and for failing to comply with Tex. Civ. Prac. & Rem. Code Ann. ch. 14. In December 2004, the inmate filed the instant lawsuit, cause number 22,926, a petition for a bill of review, attacking the judgment in cause number 22,656. The lawsuit was filed in Walker County and assigned to the 12th District Court. The appellate court ruled that the 12th District Court lacked jurisdiction over the inmate's bill of review attacking a judgment from a different district court, thus, the 12th District Court's order was void and the cause should have been dismissed for lack of jurisdiction. The inmate's original lawsuit, number 22,656, was filed in and dismissed by the 278th District Court. The current lawsuit, number 22,926, was filed in and dismissed by the 12th District Court. The only court that had jurisdiction over the inmate's bill of review was the court that rendered the judgment attacked by the bill of review, the 278th District Court.

**OUTCOME:** The order was vacated and the case was dismissed.

**CORE TERMS:** lawsuit, bill of review, grievance, inmate, vacate, failure to comply, declaration, attacking, advisory, answered, void

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
[HN1] Lack of subject-matter jurisdiction is fundamental error that the appellate court may properly raise sua sponte. A court's lack of jurisdiction over the subject matter renders a judgment void and requires dismissal of the cause.

1

2007 Tex. App. LEXIS 1153, *

*Civil Procedure > Judgments > Relief From Judgment > Bills of Review*
[HN2] A **bill** of **review** is an independent **legal proceeding** brought to set aside a judgment that is no longer appealable. A **bill** of **review** is a direct attack on a judgment, and as such, only the court that rendered the original judgment has jurisdiction over a bill of review.

**JUDGES:** Elsa Alcala, Justice. Panel consists of Justices Taft, Alcala, and Hanks.

**OPINION BY:** Elsa Alcala

 **OPINION**

**MEMORANDUM OPINION**

Appellant, Larry Dale Smith, appeals an order dismissing his lawsuit for failure to comply with Chapter 14 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 14.001-.014 (Vernon 2002). In his second issue, Smith contends that the trial court erred by dismissing this current lawsuit because the provisions of Chapter 14 of the Texas Civil Practice and Remedies Code concerning inmate litigation do not apply to this lawsuit, in which Smith seeks a bill of review to challenge the dismissal of an earlier lawsuit. In his first, third, and fourth issues, Smith challenges the propriety of the trial court's dismissal of the first lawsuit. We conclude that the trial court lacked jurisdiction over this case. We therefore vacate the trial court's order and dismiss this cause.

**Background**

Smith was an inmate at the Texas Department of Criminal Justice's Ellis unit in Huntsville. In May 2004, Smith filed **[*2]** a lawsuit, cause number 22,656, in the 278th District Court of Walker County. The suit was against Ellis unit officials seeking damages and injunctive relief.[2]   In July 2004, the 278th District Court dismissed Smith's suit as frivolous and for failing to comply with Chapter 14 of the Texas Civil Practice and Remedies Code. In December 2004, Smith filed the instant lawsuit, cause number 22,926, a petition for a bill of review, attacking the judgment in cause number 22,656. This lawsuit was filed in Walker County and assigned to the 12th District Court.

> 2 The record before us does not contain the pleadings from cause number 22,656. This information is taken from Smith's petition in the instant case and the declaration of previous filings, which he filed with his petition in this case.

The 12th District Court requested the Attorney General file an amicus curiae advisory with the court regarding whether Smith had complied with the requirements of Chapter 14 of the Texas Civil Practice and Remedies Code. The Attorney **[*3]** General's advisory stated that Smith had failed to comply with section 14.005 of the Civil Practice and Remedies Code.[3] The 12th District Court dismissed this suit before any defendant was served or answered. The court stated in the order that Smith's suit was being dismissed "for failure to comply with the statutory requirements of Chapter 14 of the Texas Civil Practice and Remedies Code." Smith appealed. No defendant ever answered this suit; thus, this Court did not receive an appellee's brief in this cause.

> 3 Section 14.005, entitled "Grievance System Decision; Exhaustion of Administrative Remedies," provides

(a) An inmate who files a claim that is subject to the grievance system established under Section 501.008, Government Code, shall file with the court:

> (1) an affidavit or unsworn declaration stating the date that the grievance was filed and the date the written decision described by Section 501.008(d), Government Code, was received by the inmate; and

> (2) a copy of the written decision from the grievance system.

(b) A court shall dismiss a claim if the inmate fails to file the claim before the 31st day after the date the inmate receives the written decision from the grievance system.

(c) If a claim is filed before the grievance system procedure is complete, the court shall stay the proceeding with respect to the claim for a period not to exceed 180 days to permit completion of the grievance system procedure.

TEX. CIV. PRAC. & REM. CODE ANN. § 14.005 (Vernon 2002).

### [*4] Jurisdiction

[HN1] Lack of subject-matter jurisdiction is fundamental error that this Court may properly raise sua sponte. *Saudi v. Brieven*, 176 S.W.3d 108, 113 (Tex. App.--Houston [1st Dist.] 2004, no pet.)(citing *Tourneau Houston, Inc. v. Harris County Appraisal Dist.*, 24 S.W.3d 907, 910 (Tex. App.--Houston [1st Dist.] 2000, no pet.)). A court's lack of jurisdiction over the subject matter renders a judgment void and requires dismissal of the cause. *State ex rel. Latty v. Owens*, 907 S.W.2d 484, 485-86, 38 Tex. Sup. Ct. J. 784 (Tex. 1995); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446, 36 Tex. Sup. Ct. J. 607 (Tex. 1993); *Saudi*, 176 S.W.3d at 113.

[HN2] "A bill of review is an independent legal proceeding brought to set aside a judgment that is no longer appealable." *Richards v. Comm'n for Lawyer Discipline*, 81 S.W.3d 506, 507 (Tex. App.--Houston [1st Dist.] 2002, no pet.)(citing *Wembley Inv. Co. v. Herrera*, 11 S.W.3d 924, 926-27, 43 Tex. Sup. Ct. J. 140 (Tex. 1999)). A bill of review is a direct attack on a judgment, and as such, only the court that rendered the original judgment has jurisdiction over a bill of review. [*5] *Id.*

Here, Smith's original lawsuit, number 22,656, was filed in and dismissed by the 278th District Court. The current lawsuit, number 22,926, was filed in and dismissed by the 12th District Court. However, the only court that had jurisdiction over Smith's bill of review is the court that rendered the judgment attacked by the bill of review--in this case, the 278th District Court. *See id.* Because the 12th District Court lacked jurisdiction over Smith's bill of review attacking a judgment from a different court, its order is void and the cause should have been dismissed for lack of jurisdiction. *See Owens*, 907 S.W.2d at 485-86; *Tex. Ass'n of Bus.*, 852 S.W.2d at 446; *Saudi*, 176 S.W.3d at 113. Accordingly, we vacate the order of the 12th District Court and dismiss this cause.

### Conclusion

We vacate the trial court's order and dismiss this cause.

Elsa Alcala, Justice

Panel consists of Justices Taft, Alcala, and Hanks.

# APPENDIX
# #24

Page 650

295 S.W.3d 650 (Tex. 2009)

52 Tex. S.Ct. J. 1204

INTERCONTINENTAL GROUP PARTNERSHIP, Petitioner,

v.

KB HOME LONE STAR L.P., Respondent.

No. 07-0815.

Supreme Court of Texas.

August 28, 2009

Argued March 12, 2009.

Page 651

Edward C. Snyder III, Jesse R. Castillo, Castillo Snyder, P.C., San Antonio, TX, for Petitioner.

Diann M. Bartek, Renee Forinash McElhaney, Natalie L. Hall, Cox Smith Matthews Incorporated, San Antonio, TX, for Respondent.

Justice WILLETT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice GREEN, and Justice JOHNSON joined.

OPINION

WILLETT Justice

This breach-of-contract case poses a straightforward question: What does " prevailing party" mean? We have construed this phrase in a discretionary fee-

Page 652

award statute [1] but not in a mandatory fee-award contract. Specifically, when a contract mandates attorney's fees to a " prevailing party," a term undefined in the contract, has a party " prevailed" if the jury finds the other side violated the contract but awards no money damages? We agree with the United States Supreme Court, which holds that to prevail, a claimant must obtain actual and meaningful relief, something that materially alters the parties' legal relationship.[2] That is, a plaintiff must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief. The plaintiff here secured neither. We thus reach the same conclusion as in another breach-of-contract case decided today: " a client must gain something before attorney's

fees can be awarded." [3] We reverse the court of appeals' judgment and render a take-nothing judgment.

I. Background

KB Home Lone Star L.P. (KB Home), a national homebuilder, contracted with Intercontinental Group Partnership (Intercontinental), a real estate developer, to develop lots in a McAllen subdivision known as Santa Clara and sell them to KB Home. The contract provided:

*Attorney's fees.* If either party named herein brings an action to enforce the terms of this Contract or to declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to his reasonable attorney's fees to be paid by losing party as fixed by the court.

" Prevailing party" was not defined.

Intercontinental began selling Santa Clara lots to other buyers, and KB Home sued for breach of contract (among other theories) and sought specific performance, damages, injunctive relief, and attorney's fees.[4] KB Home did not seek a declaratory judgment under the contract. At trial, KB Home sought only one type of actual damages: lost profits due to Intercontinental's alleged breach. Intercontinental counterclaimed, asserting that KB Home failed to honor an oral agreement to buy Santa Clara at a below-market price in exchange for an exclusive partner arrangement for future property acquisitions.

The jury found that Intercontinental breached the written contract but answered " 0" on damages, though it did award KB Home $66,000 in attorney's fees.[5] The jury rejected Intercontinental's oral-agreement claim and consequently did not answer the conditional question about Intercontinental's attorney's fees related to that claim. Both parties moved for judgment, claiming attorney's fees as the " prevailing party." The trial court sided with KB Home and signed a judgment in

Page 653

its favor for $66,000, concluding that KB Home " should recover its damages against [Intercontinental] as found by the jury...." The court of appeals affirmed.[6]

…………

B. Attorney's Fees Under the Contract

The contract leaves " prevailing party" undefined, so we presume the parties intended the term's ordinary meaning.[10] We have found the United States Supreme Court's analysis helpful in this area.[11] In *Hewitt v. Helms,* the Court was faced with the question of whether

a plaintiff who obtained a favorable judicial pronouncement in the course of litigation, yet suffered a final judgment against him, could be a prevailing party.[12] Helms had sued

**Page 654**

several prison officials alleging a violation of his constitutional rights.[13] The district court granted summary judgment against him on the merits of his claim, but the court of appeals reversed, holding that he had a valid constitutional claim.[14] On remand, the district court still rendered summary judgment against him, finding that the defendants were shielded by qualified immunity.[15] Helms then sought his attorney's fees, claiming that the court of appeals' decision made him the prevailing party.[16] The Supreme Court disagreed, saying " [r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." [17] And since Helms did not obtain a damages award, injunctive or declaratory relief, or a consent decree or settlement in his favor, he was not a prevailing party. [18] Five years later in *Farrar v. Hobby,* a federal civil-rights case, the Court elaborated:

[T]o qualify as a prevailing party, a ... plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to " affect the behavior of the defendant toward the plaintiff." Only under these circumstances can civil rights litigation effect " the material alteration of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party. In short, a plaintiff " prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.[19]

The Court concluded that the plaintiff " prevailed" in *Farrar* because he was awarded one dollar in damages: " A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." [20] *Farrar* did not speak to whether a plaintiff awarded zero damages can claim prevailing-party status, but under the *Farrar* Court's analysis, a plaintiff who receives no judgment for damages or other relief has not prevailed.

The trial-court judgment in today's case recited the jury's finding that " [t]he sum of zero dollars would fairly and reasonably compensate KB" for its damages, if any, resulting from Intercontinental's breach, and that " [t]he

sum of sixty-six thousand dollars and zero cents" constituted a reasonable fee for the necessary services of KB Home's attorneys. The judgment continued, however:

It appearing to the Court that, based upon the verdict of the jury, KB Home Lone Star should recover its *damages* against the International Group Partnership

**Page 655**

as found by the jury, and the Court so finds.

IT IS ACCORDINGLY ORDERED, ADJUDGED AND DECREED that KB Home Lone Star have and recover from the International Group Partnership judgment for the sum of sixty-six thousand dollars and zero cents ($66,000.00).[21]

The court erred in making that award. The jury answered " 0" on damages, and KB Home sought no other type of relief, so the trial court should have rendered a take-nothing judgment against KB Home on its contract claim. [22]

It seems beyond serious dispute that KB Home achieved no genuine success on its contract claim. Whether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable. KB Home got nothing except a jury finding that Intercontinental violated the contract. It recovered no damages; it secured no declaratory or injunctive relief; it obtained no consent decree or settlement in its favor; it received nothing of value of any kind, certainly none of the relief sought in its petition.[23] No misconduct was punished or deterred, no lessons taught. KB Home sought over $1 million in damages, but instead left the courthouse empty-handed: " That is not the stuff of which legal victories are made." [24] Nor do we perceive any manner in which the outcome materially altered the legal relationship between KB Home and Intercontinental. [25] Before the lawsuit, Intercontinental was selling lots that were promised to KB Home. After the lawsuit, Intercontinental had sold the promised lots and was not required to pay a single dollar in damages or do anything else it otherwise would not have done.

As judgment should have been rendered in Intercontinental's favor, it is untenable to say that KB Home prevailed and should recover attorney's fees. A stand-alone finding on breach confers no benefit whatsoever.[26] A zero on damages

**Page 656**

necessarily zeroes out " prevailing party" status for KB Home.[27]

# APPENDIX
# #25

# EXCERPTED

Page 522

**693 S.W.2d 522 (Tex.App. □Corpus Christi 1985)**

**Ethel M. KESSLER, Appellant,**

**v.**

**Robert A. KESSLER, Appellee.**

**No. 13-84-389-CV.**

**Court of Appeals of Texas, Thirteenth District, Corpus Chritsi**

**March 21, 1985**

Rehearing Denied April 18, 1985.

Page 523

C. Gerard Miller, Jr., Corpus Christi, for appellant.

Toufic Nicolas, Corpus Christi, for appellee.

Before BISSETT [1], UTTER and KENNEDY, JJ.

OPINION

BISSETT, Justice.

This is a purported appeal from a judgment rendered in a Bill of Review proceeding filed by the appellant, Ethel M. Kessler, in connection with her prior divorce suit against the appellee, Robert A. Kessler. The first issues to be decided are whether the remedy of a bill of review was available to appellant, and, if so, was the judgment rendered in the bill of review proceeding a final judgment.

The original suit for divorce, child custody and division of community property was filed on February 9, 1982, in the 214th District Court of Nueces County, Texas, and was docketed as Cause No. 82-640-F. A consent judgment was signed by the trial judge on June 29, 1982, which granted a divorce to the parties, made proper provision for the custody and support of the youngest child born to said marriage, and divided the community property of the parties in accordance with an agreed property settlement.

Page 524

On December 20, 1983, appellant filed an original Petition for a Bill of Review in the 214th District Court of Nueces County, Texas, which was docketed as Cause No. 83-6282-F, wherein she attacked the judgment in the divorce proceeding previously granted insofar as it divided the community property of the parties. She did not contest that part of the judgment which divorced her from the appellee, nor did she attack the custodial provisions of the judgment relating to the child (who is now over the age of 18 years).

There is no question but that the judgment rendered in the original divorce proceedings (Cause No. 82-640-F) was separate and divisible. In *Missouri-Kansas-Texas, R. Co. of Texas v. Pluto,* 138 Tex. 1, 156 S.W.2d 265 (1941), the opinion cited with approval the following rule:

A court having power to vacate a judgment entirely may grant less relief by vacating it in part only, where justice so requires. Where only a portion of the judgment is separable from the balance thereof, and the objection goes only to a separable part, the court should not set aside the whole judgment but only the objectionable part.

Therefore, the judgment rendered in the original divorce action is now final with respect to the divorce granted and to the custodial provisions therein contained. Those issues were not before the trial court in the Bill of Review. See *McFarland v. Reynolds,* 513 S.W.2d 620 (Tex.Civ.App.--Corpus Christi 1974, no writ); *Davis v. Walker,* 233 S.W. 521 (Tex.Civ.App.--Ft. Worth 1921, no writ).

Appellant, in her verified petition for Bill of Review, alleged facts which, if true, showed that she was prevented from asserting her right to a greater share of the community property accumulated by the parties during the marriage because of the extrinsic fraud perpetrated on her by appellee in securing her consent to the original property division. She also alleged that appellee had misrepresented the values of some of the property in the inventory filed by him in the divorce action. She further alleged that the failure to discover the fraud until more than 30 days after the rendition of the judgment was not due to lack of diligence on her part. She sought a new trial on the community property division, plus an award of attorney's fees incurred in connection with her prosecution of the Bill of Review.

On August 22, 1984, the trial judge, in a trial to the court, rendered a judgment in Cause No. 83-6282-F, which, in words and figures, reads as follows:

FINAL JUDGMENT

Hearings were held in this cause on April 19, 1984 and July 18, 1984. Both Petitioner and Respondent appeared in person and by their attorneys of record and announced ready for trial.

The Court having considered the evidence presented and the argument of counsel is of the opinion that Petitioner should be awarded $6,233.13.

IT IS THEREFORE ORDERED that the Respondent, ROBERT A. KESSLER pay Petitioner, ETHEL M. KESSLER the sum of $6,233.13 together with 9% interest from the date the parties were divorced on June 29, 1982.

Respondent is further awarded the sum of $3,000.00 as attorney's fees incurred in this cause which amount shall bear interest at the rate of 9% per annum from the date of this Judgment.

The costs of this proceeding are taxed against the Respondent. All other relief not herein granted is denied.

SIGNED this 22nd day of August 1984.

MIKE WESTERGREN,

Judge Presiding

Appellant contends that the trial court erred in failing 1) to set aside the agreed property settlement, 2) to vacate the prior judgment, and 3) to render a substitute judgment for the prior judgment which fairly divided the community property between the parties. Appellee contends: 1) that appellant is not entitled to any relief in this case because she pursued the wrong

**Page 525**

remedy; and 2) that appellant is estopped from pursuing this appeal, having accepted the benefits awarded her by the prior judgment of the trial court. We first dispose of appellee's contentions.

A property settlement, reached by and between the parties in a divorce action, and an agreed judgment, which is rendered which incorporated such an agreement therein, are subject to being set aside in a bill of review proceeding because of extrinsic fraud. *McMurry v. McMurry,* 67 Tex. 665, 4 S.W. 357 (1887); *O'Meara v. O'Meara,* 181 S.W.2d 891 (Tex.Civ.App.--San Antonio 1944, writ ref'd.).

Under the allegations of fact set out in appellant's petition, the remedy by a bill of review was available to appellant. The petition was timely filed.

Appellee admitted that, prior to his filing of an Inventory of the community property, he deposited $8,310.84 (community funds) in the Southern National Bank in the name of another person. He also admitted that he intentionally omitted the above deposit from the Inventory filed by him in the divorce action.

Appellant testified that, at the time the agreed property settlement was made, she was not aware that appellee had deposited $8,310.84 in the Southern National Bank and that she did not learn of such deposit until six or seven months after the divorce decree became final. She also testified that she would not have agreed to the property settlement if she had known at the time that

appellee had secreted money in a bank.

Appellant's acceptance of the community property disposition made in the original judgment does not, as a matter of law, estop her from a review of that disposition since she alleged that she was led into the agreement through fraud and misrepresentation on the part of appellee, through no fault or negligence by her. McFarland, supra, at 625. See *Ragsdale v. Ragsdale,* 520 S.W.2d 839 (Tex.Civ.App.--Ft. Worth 1975, no writ).

Appellant was not limited to a partition suit to recover her just portion of property that was not divided in the decree of divorce under the rule of *Busby v. Busby,* 457 S.W.2d 551 (Tex.1970), as argued by appellee.

The next question to be answered in this case is whether the judgment rendered in the Bill of Review proceeding is a final judgment from which an appeal will lie. We answer that question in the negative.

The final judgment in a bill of review action should either 1) deny any relief to the petitioner or 2) grant the bill of review and set aside the former judgment, insofar as it is attacked, and substitute therefor a new judgment which properly adjudicates the entire controversy. *Texas Employers' Ins. Ass'n v. Arnold,* 126 Tex. 466, 88 S.W.2d 473 (1935); *Humphrey v. Harrell,* 29 S.W.2d 963 (Tex.Comm.App.1930); *Crabtree v. Crabtree,* 627 S.W.2d 486 (Tex.App.--Corpus Christi 1981, no writ); *Smith v. Smith,* 468 S.W.2d 139 (Tex.Civ.App.--Dallas 1971, no writ). Only one final judgment may be rendered in a bill of review proceeding. *Baker v. Goldsmith,* 582 S.W.2d 404 (Tex.1979).

It is a well-established rule of law in this state that, when a judgment rendered in a bill of review proceedings does not dispose of the entire controversy, it is not a final judgment from which an appeal will lie. *Henderson v. Shell Oil Co.,* 143 Tex. 142, 182 S.W.2d 994 (1944); *Hubbard v. Tallal,* 127 Tex. 242, 92 S.W.2d 1022 (1936, judgment adopted); *Shaw v. Cunningham,* 42 S.W.2d 685 (Tex.Civ.App.--Eastland 1931, writ ref'd). In that situation, the appellate court must dismiss the appeal for want of jurisdiction since the judgment from which the appeal is taken is interlocutory; such dismissal is without prejudice to the right to proceed to a final disposition of the entire controversy. *Hubbard v. Tallal,* 127 Tex. 242, 92 S.W.2d 1022 (1936, opinion adopted); *Smith v. Miller,* 285 S.W.2d 413 (Tex.Civ.App.--Galveston 1955, no writ); *Cooper v. Miller,* 100 S.W.2d 753 (Tex.Civ.App.--Waco 1937, no writ).

# APPENDIX
# #26

**EXCERPTED**

Page 795

518 S.W.2d 795 (Tex. 1974)

Herbert KNEBEL et al., Petitioners,

v.

The CAPITAL NATIONAL BANK IN AUSTIN et al., Respondents.

No. B--4546.

Supreme Court of Texas.

December 11, 1974

On Denial of Rehearing March 5, 1975.

Page 796

Charles G. Trenckmann, Russell J. Horn, Byron Lockhart, Austin, for petitioners.

Page 797

Sneed, Vine, Wilkerson & Selman, Louis Scott Wilkerson, Clark, Thomas, Harris, Denius & Winters, Richard T. McCarroll, Hart, Keahey and Hart, James P. Hart, Austin, for respondents.

STEAKLEY, Justice.

This is another stage in proceedings adjudicated in part in 7--Up Bottling Company of Austin, Inc. v. Capital National Bank in Austin, Independent Executor of The Estate of Edmund Perry Knebel, Deceased, 505 S.W.2d 624 (Tex.Civ.App.1974, writ ref'd, n.r.e.). The problems here involve claims for attorneys' fees. The current opinion from which this appeal is taken is reported as *Herbert Knebel, et al. v. Capital National Bank of Austin,* 505 S.W.2d 628.

A narration of the facts and circumstances reviewed in detail in the two opinions of the Court of Civil Appeals will pose the matters now at hand.

Edmund Perry Knebel died September 5, 1965. At that time he was a fifty per cent stockholder in the 7--Up Bottling Company of Austin, Inc. The other fifty per cent of the stock was held by Henry H. Kuempel, et al., who are Respondents here. Prior to incorporation Knebel had done business as a sole proprietor. In November 1962 he entered into a contract with the corporation by the terms of which the corporation was given an option to purchase the stock of a deceased stockholder at its book value. Knebel's will executed under date of November 1, 1955 named the Capital National Bank in Austin and Henry H. Kuempel as Independent Co-executors. The residuary

clause of the will created a testamentary trust upon the termination of which forty-eight per cent of his residuary estate is to be divided among eight named relatives and the remaining fifty-two per cent is to be divided among ten other named persons indicated as being Knebel's general manager and employees. The trust was upheld in Knebel v. Capital National Bank in Austin, 469 S.W.2d 458 (Tex.Civ.App.1971, writ ref'd, n.r.e.).

In time after Knebel's death the corporation sought to acquire Knebel's stock by exercise of the option provided in the 1962 contract mentioned above. The Bank as an Independent Co-executor of Knebel's estate determined the book value of the stock to be $43,394.60 and notified the devisee-beneficiaries that the stock would be sold to the corporation for the option price thus determined. Thereafter the Bank accepted a cash payment of one-fourth of the purchase price and a note for the balance and delivered the Knebel stock to the corporation.

In the meanwhile, several of the devisee-beneficiaries expressed dissatisfaction with the price paid for the stock and in November 1966 the Bank filed suit for construction of the option agreement and for a determination of the book value of Knebel's stock in the corporation. Herbert Knebel, et al., the Petitioners here, a group of the devisee-beneficiaries who were defendants in the suit filed by the Bank, filed a motion for partial summary judgment grounded on the contention that the exercise of the option and subsequent sale was void because of the dual relationship of Henry H. Kuempel, i.e., as an officer, director and stockholder in the corporation and as an Independent Co-executor of Knebel's estate. The trial court in February 1969 rendered partial summary judgment declaring the transaction to be null and void Ab initio and ordered restoration of the status quo. This is the judgment that was affirmed in 7--Up Bottling Company, Inc., et al. v. Capital National Bank in Austin, Supra.

In March 1972, Henry H. Kuempel resigned as Independent Co-executor of the estate of Knebel and in May 1972 the Bank filed an amended petition in the original suit for determination of the question, among others, of whether the option to purchase the stock belonging to the Knebel

Page 798

estate could then be exercised. Herbert Knebel, et al., by way of a cross-action, sought an award of attorney's fees from the Knebel estate, and from the executors, as later noticed in more detail.

.............

Page 799

The rule thus invoked rests in equity and not in contract in charging a common fund with expenses, including attorneys' fees. The equitable objective is that of distributing the burden of such expenses among those who share in an accomplished benefit. The rule has been recognized with approval in Texas and elsewhere, particularly in federal jurisdictions. The court wrote in *Brand v. Denson,* 81 S.W.2d 111 (Tex.civ.App.1935, writ dism'd):

. . . In the language of the authorities, a court of equity will allow reasonable attorney's fees to a complainant who at his own expense has maintained a successful suit or proceeding for the preservation, protection, or increase of a common fund. . . . The rule is founded upon the principle that one who preserves or protects a common fund works for others as well as for himself, and the others so benefited should bear their just share of the expenses, including a reasonable attorney's fee; and that the most equitable way of securing such contribution is to make such expenses a charge on the fund so protected or recovered.

The court cited the Annotation in 49 A.L.R. 1149, 1170, 1171; this Annotation, which has been supplemented in 107 A.L.R. 749, states the rule as follows:

The rule is that a court of equity, or a court in the exercise of equitable jurisdiction, will, in its discretion, order an allowance of counsel fees, or, as it is sometimes said, allow costs as between solicitor and client, to a complainant (and sometimes directly to the attorney) who at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund, or of common property, or who has created at his own expense, or brought into court, a fund in which others may share with him. (49 A.L.R. 1150)

See *Mitchell v. Mitchell,* 151 Tex. 1, 244 S.W.2d 803 (1951); *Thornhill v. Elskes,* 412 S.W.2d 73 (Tex.Civ.App.1967, no writ); *Adler v. Brooks,* 375 S.W.2d 544 (Tex.Civ.App.1964, writ ref'd n.r.e.); *Modern Optics, Inc. v. Buck,* 336 S.W.2d 857 (Tex.Civ.App.1960, writ ref'd n.r.e.); *American National Bank of Beaumont v. Biggs,* 274 S.W.2d 209 (Tex.Civ.App.1954, writ ref'd n.r.e.); *Brand v. Denson,* 81 S.W.2d 111 (Tex.Civ.App.1935, writ dism'd); *Thurber Construction Co. v. Kemplin,* 81 S.W.2d 103 (Tex.Civ.App.1935, writ dism'd); *Texon Oil & Land Co. of Delaware v. Hanszen,* 292 S.W. 563 (Tex.Civ.App.1927, no writ); *Byrne v. First National Bank of Lake Charles,* 20 Tex.Civ.App. 194, 49 S.W. 706 (1899, writ ref'd). *Also cf. Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 58 S.Ct. 387, 28 L.Ed. 915 (1884); *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881); *Gibbs v. Blackwelder,* 346 F.2d 943 (4th Cir. 1965); *Schechtman v. Wolfson,* 244 F.2d 537 (2d Cir. 1957); *Wallace v. Fiske,* 80 F.2d 897 (8th Cir.1936); *Palmer v. Hartford National Bank & Trust Co.,* 160 Conn. 415, 279 A.2d 726 (1971); *In re Interstate Trust & Banking Company,* 235 La. 825, 106 So.2d 276 (1958); *Bosch v. Meeker Cooperative Light & Power Association,* 257 Minn. 362, 101 N.W.2d 423 (1960); *Jesser v. Mayfair Hotel, Inc.,* 360 S.W.2d 652 (Mo.1962); Annot., 107 A.L.R. 726 (1937).

It was recognized in Hall v. Cole, Supra:

Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees 'is part of the original authority of the chancellor to do equity in a particular situation,' *Sprague v. Ticonic National*

**Page 800**

Bank, 307 U.S. 161, 166, (59 S.Ct. 777, 780, 83 L.Ed. 1184) (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever 'overriding considerations indicate the need for such a recovery.' *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 391--392, (90 S.Ct. 616, 625, 24 L.Ed. 593) (1970); see *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718 (87 S.Ct. 1404, 1407, 18 L.Ed.2d 475) (1967).

# APPENDIX
# #27

**EXCERPTED**

Page 293

2 S.W.3d 293 (Tex.App. ☐San Antonio 1999)

Janis LOWE f/k/a Janis Bloodworth, Appellant,

v.

FARM CREDIT BANK OF TEXAS f/d/b as Federal Land Bank of Texas, Appellee

Nos. 04-98-00647-CV, 04-98-00649-CV.

Court of Appeals of Texas, Fourth District, San Antonio

January 27, 1999

Rehearing Overruled Aug. 26, 1999.

Page 294

Appeal from the 38th Judicial District Court, Real County, Mickey R. Pennington, Judge Presiding. [1]

Sharon E. Callaway, Sunny J. Jansma, Crofts, Callaway & Jefferson, P.C., San Antonio, James W. Christian, Chohn T. Hickman, Christian & Smith, L.L.P., Houston, Tom Harwood, Law Offices of Tom Harwood, Uvalde, for appellant.

Barnet B. Skelton, Houston, for appellee.

Before PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, KAREN ANGELINI, Justice.

### OPINION

PHIL HARDBERGER, Chief Justice.

Appellant, Janis Lowe f/k/a Janis Bloodworth ("Lowe"), appeals a summary judgment denying her petition for bill of review. Lowe also brings an accelerated appeal from the trial court's denial of a temporary injunction. We consolidated the two appeals for briefing and argument. Lowe asserts eight issues in her brief relating to the following contentions: (1) the trial court erred in granting summary judgment in favor of Farm Credit Bank f/k/a Federal Land Bank ("Bank"); (2) the trial court erred in denying Lowe's motion for partial summary judgment based on absence of service; (3) the trial court abused its discretion in awarding the Bank attorney's fees; and (4) the trial court abused its discretion in denying Lowe injunctive relief. We affirm the trial court's judgment in favor of Bank, and we dismiss the interlocutory appeal from the trial court's denial of injunctive relief as moot.

### FACTUAL AND PROCEDURAL HISTORY

In March of 1982, Lowe, Winston O. Bloodworth, Jr. ("Bloodworth"), and T.A.A.S., Inc. executed a note payable to the Bank in the original principal amount

Page 295

of $477,000. The Bank was granted a lien against real property owned by T.A.A.S. to secure the note. At the time of the transaction, fifty percent of T.A.A.S.'s stock was owned by Lowe, and fifty percent was owned by Bloodworth. Lowe contends that the Bank, the abstract title company closing the transaction, and Bloodworth represented that the pledged property included an improved 19.09 acre tract; however, the Bank failed to take a lien on that tract.

In October of 1985, Lowe and Bloodworth divorced. Bloodworth received Lowe's stock in T.A.A.S. as part of the property settlement. Lowe contends that she notified the Bank of her name and address change in September of 1988.

Sometime after the divorce, the note went into default, and the Bank foreclosed its lien on the property pledged as security. In 1986, Bloodworth filed bankruptcy, and he received a discharge on March 24, 1997. On January 30, 1990, the Bank obtained a summary judgment against Lowe, Bloodworth, and T.A.A.S. for the deficiency that remained due on the note after the foreclosure. The judgment was in the amount of $47,930.48, with post-judgment interest to accrue at 14.25% per annum.

Lowe contends that she never received any notices relating to the default of the note or the foreclosure, and she was never served with process in the action for the deficiency. Although the judgment recites that an answer was filed on Lowe's behalf, the attorney who filed the answer, Howard L. Pyland, admits that he never spoke with Lowe and was under the impression that Lowe and Bloodworth were married when he was retained by Bloodworth to file the answer. Furthermore, the Bank's documents reflect that notice was sent to Lowe at Bloodworth's home, rather than her new address which she claimed to have given the Bank. Lowe asserts that her first notice of the actions taken by the Bank was a demand letter sent by the Bank's attorney dated May 16, 1997. Since no payments had been made on the judgment, the amount due and owing on that date was $131,259.15. The letter indicated that the Bank would levy on real property owned by Lowe in Galveston County, Texas, if Lowe failed to immediately pay the deficiency.

In August of 1997, Lowe filed her original petition for bill of review and application for temporary

restraining order, temporary injunction, and permanent injunction. The Bank filed a motion for summary judgment, asserting that the bill of review constituted a collateral attack because Lowe had failed to join Bloodworth and T.A.A.S. as necessary parties. Lowe filed a response and a motion for partial summary judgment, contending that the deficiency judgment should be set aside as to her based on the absence of service. Lowe filed an affidavit stating that: (1) she was without notice of the deficiency suit; (2) she did not authorize Pyland to file an answer on her behalf; and (3) she was not served with process. The Bank attached Bloodworth's affidavit to its response in which Bloodworth states that he informed Lowe of the default and potential foreclosure in September of 1988, and after he was served with process in the deficiency suit, he notified Lowe and indicated that he would hire a lawyer.

By the time of the summary judgment hearing, Lowe had amended her petition, adding Bloodworth and Bloodworth's chapter 7 trustee, Robbye Waldron, as potential parties; however, the petition states that no citation against Bloodworth or Waldron is requested. Lowe also had filed a motion to reopen the bankruptcy estate in order to add Bloodworth as a party. The bankruptcy judge denied the motion, stating that the discharge relieved Bloodworth of any personal liability and the motion failed to name Waldron as a party for purposes of determining whether the claim for setting aside the deficiency judgment was an asset of the estate. Waldron also filed an affidavit in his capacity as trustee, stating that he abandoned any interest

**Page 296**

in any potential recovery relating to the claim.

…………………..

**Page 299**

[4]]]]] The deficiency judgment recited that Lowe was a party defendant and appeared through an attorney. Lowe may not attack that judgment in a collateral proceeding. *Akers v. Simpson,* 445 S.W.2d 957, 959 (Tex.1969). The trial court did not err in granting summary judgment in favor of the Bank. [5]

### ATTORNEY'S FEES

In Lowe's fourth issue, she contends that the Bank was not entitled to attorney's fees. The Bank counters that a party who successfully defends a bill of review is entitled to recover attorney's fees if attorney's fees are authorized in the prosecution and defense of the underlying case. The Bank cites the Texas Supreme Court's decision in *Meece v. Moerbe,* 631 S.W.2d 729 (Tex.1982), in support of its assertion. Lowe maintains that the Bank misinterprets the holding in Meece.

In Meece, the complainant filed a bill of review attacking a judgment awarding damages against him based on a usury claim. 631 S.W.2d at 730. The respondent answered and requested attorney's fees for contesting the bill of review. Id. The lower court held that the complainant failed to establish a meritorious defense to the original usury claim, denied the bill of review, and awarded the respondent attorney's fees. Id. The court of appeals reversed the portion of the judgment awarding attorney's fees, holding that since the defense of a bill of review was not the equivalent of pleading and proving a cause of action under the usury statute, attorney's fees were not recoverable under the statute. Id. The Supreme Court reversed the court of appeals, noting that the respondent would have been entitled to attorney's fees if the complainant had been able to pursue the usual course of appeal. Id.

Lowe contends that the Supreme Court's holding limits awards of attorney's fees in bill of review proceedings to instances in which the respondent is required to prove the claim for which the statute authorizes the attorney's fees, i.e, the charging of usurious interest. Id. We disagree with this contention. The focus of the Supreme Court's holding is whether the statute authorizing the recovery of attorney's fees draws a distinction between an award of attorney's fees at trial and an award of attorney's fees on appeal. See id. In the absence of such a distinction, attorney's fees are recoverable in a bill of review proceeding to the same extent as attorney's fees were recoverable at trial. Id. at 730; *Bakali v. Bakali,* 830 S.W.2d 251, 257 (Tex.App.--Dallas 1992, no writ); see also *Rodriguez v. Holmstrom,* 627 S.W.2d 198, 202-03 (Tex.App.--Austin 1981, no writ) (construing bill of review as appeal for purposes of awarding attorney's fees). Since the trial court had the discretion to award the Bank attorney's fees at the trial of the deficiency claim, the Bank was entitled to attorney's fees in the bill of review proceeding.

### INJUNCTION

The fifth through eighth issues raised by Lowe relate to the trial court's denial of injunctive relief and are the subject of the accelerated appeal. Lowe contends that the trial court abused its discretion in denying her request for injunctive relief. The Bank counters that the pleadings did not support injunctive relief and that the

**Page 300**

entry of the final summary judgment caused the injunctive relief to become a moot issue.

# APPENDIX
# #28

# EXCERPTED

Page 390

176 S.W.3d 390 (Tex.App.☐Houston [1st Dist.] 2004)

**Connie MARTIN, Appellant,**

**v.**

**TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee.**

**No. 01-03-01111-CV.**

**Court of Appeals of Texas, First District, Houston**

**August 31, 2004**

On Appeal from the 328th District Court Fort Bend County, Texas Trial Court Cause No. 02-CV-126761.

Page 391

Bobbie Sherril, Richmond, Leonard Mitchell Rubin, Houston, for Ad Litem.

Chris Lynn Branson, Houston, for Appellant.

James Edward Kincade, Stafford, Ramiro Canales, Asst. Atty. General, Austin, for Appellee.

Panel consists of Chief Justice RADACK and Justices BLAND and SULLIVAN. [*]

## OPINION

Jane Bland, Justice.

Appellant Connie Martin moved for sanctions against appellee, the Texas Department of Family and Protective Services (DFPS), [1] alleging that the lawsuit the

Page 392

DFPS had filed against her was frivolous. The same day, the DFPS moved to nonsuit its claims against Martin, and the trial court granted the motion. Thereafter, Martin sought discovery against the DFPS. The DFPS responded by filing a plea to the jurisdiction, contending that the trial court had, by then, lost plenary power over the case. The trial court granted the DFPS's plea and this appeal followed. We conclude that the trial court correctly determined that it lacked plenary power and therefore we vacate its order granting the plea and dismiss this appeal.

### Background

In October 2002, the DFPS sued Martin, seeking protection of a child, conservatorship, and the termination of her parental rights. On November 20, 2002, Martin

moved for sanctions. That day, the DFPS moved to nonsuit its claims, and the trial court granted the motion. In February 2003, Martin served the DFPS with a request for disclosures, and it answered them in March. Martin then served the DFPS with additional discovery requests. When the DFPS did not answer, Martin moved to compel. The DFPS responded by filing a plea to the trial court's jurisdiction. The trial court granted the plea in a written order on September 3, 2003.

### Analysis

We review whether a trial court has subject matter jurisdiction *de novo. Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex. 2004).

*Trial Court Jurisdiction*

A trial court retains jurisdiction over a case for 30 days after it signs a final judgment or order. Tex. R. Civ. P. 329b(d). During this period, the trial court has plenary power to modify its judgment, but, after the 30 days run, the trial court loses its plenary power, and lacks jurisdiction to act in the matter. *Check v. Mitchell,* 758 S.W.2d 755, 756 (Tex. 1988). A party can extend the trial court's plenary power, however, by timely filing an appropriate postjudgment motion, either a motion for new trial, Tex. R. Civ. P. 329b(e), or a motion to modify, correct or reform the judgment, Tex. R. Civ. P. 329b(g), within the 30 days after the trial court signs the final judgment or order. A timely motion for new trial or motion to modify extends the trial court's jurisdiction over its judgment up to an additional 75 days, depending on when or whether the court acts on the motions. *Philbrook v. Berry,* 683 S.W.2d 378, 379 (Tex. 1985); Tex. R. Civ. P. 329b(c). If a motion for new trial or to modify a judgment is not denied in a written order, then the motion is overruled by operation of law 75 days after the trial court signs the judgment. Tex. R. Civ. P. 329b(c). The trial court retains plenary power to alter its judgment for 30 days after it is overruled by operation of law. Tex. R. Civ. P. 329b(c), (e).

*Nonsuits*

Rule 162 provides that a plaintiff may nonsuit a case, ☐at any time☐ before the introduction of all of the plaintiff's evidence, as the DFPS did in this case. Tex. R. Civ. P. 162. It further provides:

Any dismissal pursuant to this rule shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief . . . A dismissal under this rule shall have no effect on any motion for sanctions, attorney's fees or other costs, pending at the time of dismissal, as determined by the court.

*Id.* After a trial court loses plenary power, however, it has

no authority to award sanctions. *Scott & White Mem'l Hosp. v. Schexnider,* 940 S.W.2d 594, 596 (Tex. 1996); *In re T.G.,* 68 S.W.3d 171, 179 (Tex. App.□Houston [1st Dist.] 2002, pet. denied)

**Page 393**

(op. on reh'g); *Jobe v. Lapidus,* 874 S.W.2d 764, 766-68 (Tex. App.□Dallas 1994, writ denied). Thus, a trial court retains jurisdiction for 30 days after signing a final order of nonsuit to rule on pending motions. *See* Tex. R. Civ. P. 329b(d); *In re Bennett,* 960 S.W.2d 35, 38 (Tex. 1997) (□Appellate timetables do not run from the date a nonsuit is filed, but rather from the date the trial court signs an order of dismissal.□).

# APPENDIX
# #29

# EXCERPTED

**Page 660**

**292 S.W.3d 660 (Tex. 2009)**

**52 Tex. Sup.Ct. J. 1221**

**MBM FINANCIAL CORPORATION, et al., Petitioners,**

**v.**

**The WOODLANDS OPERATING COMPANY, L.P., Respondent.**

**No. 08-0390.**

**Supreme Court of Texas.**

**August 28, 2009**

Argued March 12, 2009.

**Page 661**

[Copyrighted Material Omitted]

**Page 662**

Jennifer Bruch Hogan, Richard P. Hogan Jr. and Matthew E. Coveler, Hogan & Hogan, L.L.P., Phillip R. Livingston and Deanna H. Livingston, Livingston & Livingston, LLC, Houston, for Petitioners.

Karen D. Smith, Kirby D. Hopkins and Rachael McDonell Rolon, Drucker, Rutledge & Smith, L.L.P., The Woodlands, for Respondent.

**Page 663**

### OPINION

BRISTER, Justice

Since *Jarndyce v. Jarndyce,* [1] there have been charges that some cases benefit the lawyers more than the clients. But suits cannot be maintained solely for the attorney's fees; a client must gain something before attorney's fees can be awarded. While making losing parties bear their own attorney's fees may add injury to insult, the American Rule has long been that each party pays its own lawyers.

In this case, the plaintiff obtained a judgment for $1,000 in damages and almost $150,000 in attorney's fees. But there was no evidence to support the amount of the $1,000 award, and it is too large to constitute nominal damages. As the award to the client must be set aside, the attorney's fee award must also. Accordingly, we reverse and render a take-nothing judgment.

## I. Background

The Woodlands Operating Company leased the 19 copiers at issue here from MBM Financial Corporation [2] and installed them in late 2000 and early 2001. Each machine was covered by a separate four-year lease, with annual renewals thereafter unless notice was sent between 90 and 180 days before the end of the existing term. The leases required the Woodlands to return the copiers to a location MBM specified.

The Woodlands decided not to renew the leases in mid-2004 and asked MBM for the end-of-term dates and instructions for return. MBM employees provided the dates and approved a draft termination letter from the Woodlands. But when the actual termination letter arrived (viewing the evidence in the light favorable to the trial court's judgment),[3] MBM's president unilaterally changed the dates so the notice would be untimely and demanded rent for another year. To bolster MBM's position, he signed the leases and inserted commencement dates for the first time after the Woodlands filed suit. Until suit was filed, MBM also refused to designate a return location for the bulky equipment.

The Woodlands sued, asserting claims for breach of contract, fraud, and declaratory relief. MBM counterclaimed for additional rent of $160,000, though it later dropped that claim. After a two-day bench trial, the trial court rendered judgment awarding the Woodlands $1,000 in damages and $145,091.59 in attorney's fees through trial. The court of appeals affirmed the damages and part of the fee award.[4] On appeal, MBM challenges both.

## II. Nominal Damages & Breach of Contract

At trial, the Woodlands requested only nominal damages. The judgment describes the $1,000 award as " actual damages," but the trial court's findings and conclusions describe them as " actual damages in the form of nominal damages."

**Page 664**

We agree with MBM that no evidence supports $1,000 as either.

# APPENDIX
# #30

EXCERPTED

Page 55

251 S.W.3d 55 (Tex. 2008)

MEDICAL CITY DALLAS, LTD., Petitioner,

v.

CARLISLE CORPORATION d/b/a Carlisle Syntec Systems, Respondent.

No. 06-0660.

Supreme Court of Texas.

April 11, 2008

Argued Oct. 17, 2007.

Page 56

[Copyrighted Material Omitted]

Page 57

Robert B. Gilbreath , Hawkins, Parnell & Thackston, LLP, Dallas, Melissa M. Davis , Brandy M. Wingate , Attorney At Law, Vernon Childs Howerton, Jr. , Jenkens & Gilchrist, Houston, TX, for Petitioner.

Michael L. Knapek , William David Ellerman , Jackson Walker, L.L.P., Dallas, TX, for Respondent.

Chief Justice JEFFERSON delivered the opinion of the Court.

Texas law permits recovery of attorney's fees for a claim based on an oral or written contract. *See* TEX. CIV. PRAC. & REM.CODE § 38.001 (8). We must determine whether an action for breach of express warranty is such a claim. Because we conclude that it is, we reverse in part the court of appeals' judgment.

I

**Facts and Procedural History**

In 1991, Medical City Dallas contracted with Charley Company of Texas to re-roof one of completed, Carlisle issued express warranties to Medical City, one of which-a Twenty Year Membrane Material Warranty-promised that the roof membrane would not deteriorate prematurely. Each express warranty identified Medical City as the building's owner.

Within months of the installation, Medical City encountered a leak in the building's roof and Charley Co. repaired it. By 1995, leaks became more frequent, and Charley Co. made more repairs. By 1999, the leaks were

"continuous," and complaints from Medical City's tenants prompted a meeting in October 2000 with representatives from Charley Co., Medical City, and Carlisle. In November 2000, Medical City retained LRW Consultants, Inc. to evaluate the roof. LRW found "[o]pen lap seams," "pinholes," "material defects in the roof membrane," and "premature aging of the material." LRW concluded that the roof was "in extremely poor condition" and recommended that Medical City contact the manufacturer to discuss warranty issues. After failed attempts to resolve the dispute, Medical City sued Charley Co. and Carlisle, alleging breach of the express warranties, breach of implied warranties, and negligence. It sought direct costs incurred in replacing the roof in October 2002, attorney's fees, and costs. The trial court granted Carlisle summary judgment on the negligence claim.

A jury returned a verdict in favor of Medical City, finding that Carlisle breached its Twenty Year Membrane Warranty, and awarded Medical City $110,449.59 in damages and $121,277.04 in attorney's fees.[1] Carlisle moved for judgment notwithstanding the verdict, but the trial court denied the motion and signed a judgment for Medical City. Carlisle appealed.

Page 58

On the attorney's fees issue, the court of appeals held that Texas Civil Practice and Remedies Code section 38.001 (8), which allows fees for claims based on oral or written contracts, did not encompass breach of warranty claims. 196 S.W.3d 855, 868-72. It noted that Medical City did not plead or try a breach of contract cause of action and did not recover on that theory. *Id*. at 870. As a result, the court of appeals rendered a take-nothing judgment for Carlisle on the attorney's fees claim and affirmed Medical City's judgment in all other respects. *Id.* at 872. Medical City petitioned this court for review on the sole issue of attorney's fees. We granted the petition to decide whether a party who prevails in a breach of express warranty action is entitled to attorney's fees. 50 Tex. Sup.Ct. J. 712 (May 4, 2007).

II

**Discussion**

A party who prevails in a lawsuit is entitled to recover attorney's fees only if permitted by statute or by contract. *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 310 (Tex.2006) . Here, while there was no separate contract between Medical City and Carlisle, Carlisle issued Medical City several express warranties. Medical City contends that an express warranty is like a contract, and that attorney's fees are therefore authorized by section 38.001 of the Civil Practice and Remedies

Code . We must determine if a claim based on an express warranty is, in essence, a contract action. Because we conclude that it is, Medical City was entitled to attorney's fees when it prevailed.

## A

### Historical Background

Nearly 100 years ago, the Texas Legislature created a statutory right to attorney's fees for judgments in select claims. *See* Act of March 13, 1909, 31st Leg., R.S., ch. 47, § 1, 1909 Tex. Gen. Laws 93, 94 (creating a right to a "reasonable amount" of attorney's fees, limited to twenty dollars, for persons obtaining judgment for the full amount of their claim in actions for "personal services rendered or for labor done, or for material furnished, or for overcharges on freight or express, or for any claim for lost or damaged freight, or for stock killed or injured" ). Over time, the statute has been modified to expand the types of claims eligible for an award of fees. It was amended in 1923 to allow fees for loss of or damage to express shipments. *See* Act of March 26, 1923, 38th Leg., R. S., ch. 144, § 1, 1923 Tex. Gen. Laws 312, 312. In 1949, it was amended to allow attorney's fees upon a judgment "for any amount" recovered. *See* Act of June 29, 1949, 51st Leg., R.S., ch. 494, § 1, 1949 Tex. Gen. Laws 915, 915. Four years later, the Legislature extended article 2226 to "suits founded upon a sworn account or account." *See* Act of April 21, 1953, 53d Leg., R.S., ch. 67, § 1, 1953 Tex. Gen. Laws 101, 101. As the statute evolved, so did Texas jurisprudence.

In 1958, we held that a contract for the drilling of an oil well was not an action on a sworn account and thus disallowed attorney's fees under article 2226. *Meaders v. Biskamp,* 159 Tex. 79, 316 S.W.2d 75, 78 (1958) . A 1973 court of appeals decision declared that attorney's fees were generally unavailable in contract actions at that time. *M.C.Winters, Inc. v. Cope,* 498 S.W.2d 484, 491 (Tex.Civ.App.-Texarkana 1973, no pet.) . And we strictly construed those claims allowing fees. *See, e.g.,Tenneco Oil Co. v. Padre Drilling Co.,* 453 S.W.2d 814, 820-21 (Tex.1970) (interpreting article 2226's "labor done" and "personal services" provisions);

**Page 59**

*Van Zandt v. Fort Worth Press,* 359 S.W.2d 893, 896 (Tex.1962) (construing "personal services" rendered under article 2226).

# APPENDIX
# #31

631 S.W.2d 729 (Tex. 1982)

Frank MEECE, Petitioner,

v.

Bob MOERBE, d/b/a Bob's Air Conditioning, Respondent.

No. C-919.

Supreme Court of Texas.

April 28, 1982

Larry Parks, Austin, for petitioner.

Dale E. Muller, Austin, for respondent.

CAMPBELL, Justice.

This is an appeal of a bill of review proceeding. The only question is whether article 5069-1.06(2) [1] authorizes an award of attorneys' fees to the bill of review defendant, Frank Meece. We hold Meece is entitled to his attorneys' fees.

Bob Moerbe, d/b/a Bob's Air Conditioning, originally filed suit against Meece

alleging an unpaid balance on charges for repairing an air conditioning system. Meece counterclaimed alleging the 11/2% per month interest charge for late payment assessed by Moerbe was usurious. The jury found for Moerbe on all issues. However, the trial court held as a matter of law that Meece had established his counterclaim for usury. Under article 5069-1.06(2), judgment was rendered that Moerbe take nothing and that Meece receive penalties and attorneys' fees. These attorneys' fees are not contested.

The clerk of the court failed to send notice that the judgment had been signed. Moerbe subsequently filed a bill of review attacking the judgment. Meece responded and requested attorneys' fees for contesting the bill of review. The district court found Moerbe had not established a meritorious defense to the original usury claim; denied the bill of review; and awarded attorneys' fees to Meece under article 5069-1.06(2) for his successful defense of the bill of review and, if appealed, upon affirmance of the bill of review judgment.

Article 5069-1.06(2) states:

Any person who contracts for, charges or receives interest which is in excess of double the amount of interest allowed by this Subtitle shall forfeit as an additional penalty, all principal as well as interest and all other charges and shall pay reasonable attorney fees set by the court....

The court of appeals severed and reversed that part of the judgment awarding Meece attorneys' fees. That court held Meece must plead and prove a cause of action under the usury statute in order to recover attorneys' fees. The defense of a bill of review was not considered the equivalent of establishing an affirmative cause of action under the statute. 630 S.W.2d 278 (Tex.App.). We disagree.

The purpose of article 5069-1.06(2) is to authorize attorneys' fees for the successful prosecution of a usury claim to final judgment. While a bill of review is an equitable action, separate from the original suit, Meece had the burden of proving his original cause of action. *Baker v. Goldsmith,* 582 S.W.2d 404, 409 (Tex.1979).

Meece would have been entitled to attorneys' fees if Moerbe had been able to pursue the usual course of appeal. In *International Security Life Ins. Co. v. Spray,* 468 S.W.2d 347 (Tex.1971), this Court considered whether attorneys' fees in the event of appeal were recoverable under art. 3.62 of the Insurance Code. The Code provides that under certain circumstances the insurance company becomes liable for 12% of a loss "together with reasonable attorney fees for the prosecution and collection of such loss." We said:

The purpose of the statute would be defeated if only the fees incurred in the trial court were recoverable and the fees incurred during the appeal remained the expense of the policyholder. No such distinction or limitation may be found in Article 3.62.

Id. at 349. Likewise, we find no distinction or limitation in article 5069-1.06(2) that would bar the award of attorneys' fees in a bill of review proceeding.

The part of the judgment of the court of appeals reversing the award of attorneys' fees is reversed; and the judgment of the trial court awarding Meece attorneys' fees is affirmed. The remainder of the judgment of the court of appeals is affirmed.

---------

Notes:

[1] All statutory references are to Texas Revised Civil Statutes Annotated.

---------

# APPENDIX
# #32

# EXCERPTED

Page 123

60 S.W.3d 123 (Tex.App. ☐Houston [14 Dist.] 2000) 2000)

**Mr. and Mrs. Herman E. MITCHELL, Veronica O. Pierre, and Susan Olivierre, Appellants,**

**v.**

**Joe LAFLAMME, Paul LaFlamme, Texas Cattlemen'S Trust, Kevin Frawley, and Robert Frawley, Appellees and Cross-Appellants,**

**v.**

**American Housing Foundation and the Courtyards of Baytown Owners Association, Inc., Appellees and Cross-Appellees.**

**No. 14-98-00185-CV.**

**Court of Appeals of Texas, Fourteenth District, Houston**

**October 12, 2000**

Page 124

[Copyrighted Material Omitted]

Page 125

[Copyrighted Material Omitted]

Page 126

Rod E. Gorman, Mark H. Ritchie, Casey J. Lambright, Houston, for appellants.

Robert L. Templeton, Amarillo, for appellees.

Panel consists of Justices SEARS, CANNON, and LEE. [*]

## OPINION

ROSS A. SEARS, Justice (Assigned).

In this case, we address two appeals arising from an action against The Courtyards of Baytown Owners Association (the Association). In the first appeal, several townhome owners (the Owners) appeal a denial of attorneys' fees and damages for the common areas and exteriors of their homes. In the second, several former majority townhome owners and board members of the townhome owners' association (the Former Owners) appeal the trial court's order requiring them to indemnify the new majority property owner for judgment against the Association and for costs, expenses, and attorneys' fees.

In the Owners' appeal, we affirm the portions of the trial court's judgment that disallowed the jury's verdict for damages to the common areas and exteriors of the Owners' townhomes. We reverse that portion of the trial court's judgment that denied the Owners attorneys' fees and render judgment that the Owners collect attorneys' fees in the amount awarded to them by the jury. In the Former Owners' appeal, we find that the trial court erred by permitting a trial amendment after it signed the final judgment. Further, because we find that there were no live pleadings upon which the trial court could enter judgment regarding indemnification, we reverse and render to delete that portion of the judgment awarding indemnification against the Former Owners.

## BACKGROUND

The Owners who brought this suit are Herman and Roseann Mitchell, Veronica O. Pierre (Roseann Mitchell's mother), and Susan Olivierre (Roseann Mitchell's sister). They bought four townhomes in The Courtyards of Baytown in 1991. The Courtyards of Baytown was maintained by the Association, of which all townhome owners were members and to which each owner paid monthly assessments.

The Owners testified that by 1993, the Association stopped caring for the common area of The Courtyards of Baytown. It closed the swimming pool permanently; driveways and roads had large potholes; instead of fixing the paving, the Association filled the holes with shell; wires hung from electrical boxes; the topsoil was never leveled to prevent draining into the townhomes; and it failed to plant grass.

The evidence also showed that the Association had stopped maintaining the exteriors of the townhomes. Even simple things, like cleaning out the gutters, were left undone. The lack of maintenance caused many problems to the Owners' townhomes. For example, their townhomes developed extensive leaking in the roofs and walls, pooling of water around the homes, flooding, and rotting to walls, doors, and window frames. In Mrs.

Page 127

Pierre's townhome, kitchen walls rotted to such an extent that she could see outside if she opened a kitchen cabinet door. The flooding and leaking caused damage to the interior walls, ceilings, and floors of the Owners' townhomes. In December 1993, Mrs. Pierre wrote to the Association about the problems, but received no response. In frustration, the Mitchells stopped paying their monthly assessments fees to the Association, although Mrs. Pierre and Ms. Olivierre continued to pay.

At trial, the jury found that the Association failed to comply with its covenants and bylaws. It awarded Mr.

and Mrs. Mitchell $11,850, Mrs. Pierre $28,000, and Ms. Olivierre $37,400 for costs of repair to the interior of their townhomes, loss of use, and costs of repairs to the exteriors and common areas. The jury also awarded attorneys' fees to the Owners. However, the trial court entered a judgment not withstanding the verdict, which disallowed the attorneys' fees and limited the damages to $400 for Mr. and Mrs. Mitchell, $9,300 for Mrs. Pierre, and $13,400 for Ms. Olivierre for the costs of repair to the interiors and loss of use only.

## EXTERIORS & COMMON AREAS DAMAGES

In their first point of error, the Owners claim that the trial court erred in granting judgment notwithstanding the verdict on the issue of damages to common areas and the exterior of the Owners' townhomes. The trial court's judgment disallowed these damages because the Owners did not sue in a derivative suit on behalf of the Association.

### A. Standard of Review

A trial court may render a judgment notwithstanding the verdict if a directed verdict would have been proper and may, upon notice and motion, disregard any jury finding on a question that has no support in the evidence. See TEX.R.CIV.P. 301. We will affirm a judgment notwithstanding the verdict if there is no evidence to support an issue, or conversely, the evidence establishes an issue as a matter of law. See *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987). "No evidence" exists, and a judgment notwithstanding the verdict should be entered, when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. See *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). To determine whether there is any evidence, we must review the record in the light most favorable to the verdict, considering only the evidence and inferences that support the verdict and rejecting the evidence and inferences contrary to the verdict. See *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990). When there is more than a scintilla of competent evidence to support the jury's findings, the judgment notwithstanding the verdict should be reversed. See id. at 228; *Holeman v. Landmark Chevrolet Corp.,* 989 S.W.2d 395, 402 (Tex.App.--Houston [14th Dist.] 1999, pet. denied).

### B. Application

The jury's verdict compensated the Owners for the following three elements of damages: (1) cost of repairs to the interior of their townhomes; (2) loss of use; and (3) costs of repairs to the common areas and exteriors of their townhomes. The trial court's judgment notwithstanding the verdict allows only interior damages and

**Page 128**

loss of use. The judgment explains that "[b]ecause the plaintiffs did not sue on behalf of the non-profit corporation, Courtyards of Baytown Owners Association, Inc., the corporation is not entitled to recover damages to the exterior of the units." We thus examine the record in the light most favorable to the verdict to determine whether the Owners could sue individually for exterior and common area damages.

………………..

**Page 130**

We overrule the Owners' point of error one.

### ATTORNEYS' FEES

In their second point of error, the Owners contend that the trial court erred in disregarding the jury's award of attorneys' fees. [3] They claim that they are entitled to attorneys' fees under section 5.006(a) of the Property Code, which states: "In an action based on breach of a restrictive covenant pertaining to real property, the court shall allow to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." TEX.PROP.CODE ANN. § 5.006(a) (Vernon 1984). The award of attorneys' fees under this statute is mandatory. See *Inwood N. Homeowners' Ass'n v. Meier,* 625 S.W.2d 742, 744 (Tex.Civ.App.--Houston [1st Dist.] 1981, no writ).

Appellees respond that the Owners never raised the applicability of Property Code section 5.006(a) before the trial court, thus waiving the issue for appeal. However, if a party pleads facts which, if true, entitle him to the relief sought, he need not specifically plead the applicable statute in order to recover under it. See *Bellefonte Underwriters Ins. Co. v. Brown,* 663 S.W.2d 562, 575 (Tex.App.--Houston [14th Dist.] 1983), rev'd in part on other grounds, 704 S.W.2d 742 (Tex.1986); see also *O'Connell v. Hitt,* 730 S.W.2d 16, 18 (Tex.App.--Corpus Christi 1987, no writ). Further, "pleading an incorrect or inapplicable theory or statute, as was done here, does not preclude an award." Bellefonte, 663 S.W.2d at 575. The Owners' petition includes a detailed recitation of the declaration's restrictions and of Appellees' breach of those restrictions. Although the petition seeks attorneys' fees under the Declaratory Judgment Act or the Uniform Condominium Act, it also includes a general prayer for attorneys' fees. We find that the pleadings suffice to recover attorneys' fees.

We are further persuaded that the Owners should recover their attorneys' fees under section 5.006(a) because it is so similar to the attorneys' fees provision of the Condominium Act, which they pleaded, and because

of the theories under which the case was tried and submitted to the jury. First, the Uniform Condominium Act provides attorneys' fees for a prevailing party in a suit to enforce a dedicatory instrument. [4] Thus, the Appellees were on notice that the Owners were seeking attorneys' fees because of the Association's failure to comply with its declaration. Cf. Horizon/CMS Healthcare Corp. v. Auld, 43 Tex.Sup.Ct.J. 1151, 2000 WL 1199263 at *7 (Aug. 24, 2000) (Reference to incorrect version of statute excused; Texas follows a fair notice standard, which looks to whether

**Page 131**

the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant.). Second, the case was tried and submitted to the jury on the theory of breach of covenants, not on declaratory judgment claims. Thus, the attorneys' fees sought were always tied to the breach of covenants, not the Declaratory Judgment Act, under which the Owners had also pleaded.

In conclusion, we do not agree that the Owners waived the applicability of section 5.006(a) of the Property Code. Because award of attorneys' fees to the prevailing party is mandatory under section 5.006, we sustain point of error two and reverse and render that the Owners be awarded $82,000 for preparation and trial, $15,000 for their appeal to this Court, and $10,000 if this case is appealed to the Texas Supreme Court, as originally awarded by the jury in its verdict.

# APPENDIX
# #33

**EXCERPTED**

Page 536

126 S.W.3d 536 (Tex.App.□Houston [1st Dist] 2003)

**MOORE LANDREY, L.L.P., Appellant,**

**v.**

**HIRSCH & WESTHEIMER, P.C., Stephen P. Glover, and Groves & Glover, L.L.P., Appellees.**

**No. 01-03-00316-CV.**

**Court of Appeals of Texas, First District, Houston**

**October 16, 2003.**

Page 537

Clay Dugas, Clay Dugas & Associates, Beaumont, TX, for Appellant.

Jesse R. Pierce, Clements, O'Neill, Pierce & Nickens, Donald Burger, Jessie Alliene Amos, Clements, O'Neill, Pierce, Wilson & Fulkerson, L.L.P., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

**OPINION**

ELSA ALCALA, Justice.

This is an attempted appeal from an attorney's fees dispute in which appellant, Moore Landrey, L.L.P., seeks to challenge summary judgments rendered in favor of appellees, Hirsch & Westheimer, P.C. (Hirsch & Westheimer), Stephen P. Glover, and Groves & Glover (collectively, Glover) on Moore Landrey's claims for breach of contract, negligent misrepresentation, fraudulent inducement, and claims alleging a joint enterprise.[1] In addition to defending the summary judgment rendered in its favor, Hirsch & Westheimer alternatively challenges Moore Landrey's right to prosecute this appeal, on the grounds that the trial court no longer had plenary power when it signed a rule 306a(4) order to establish the date on which Moore Landrey received notice of the trial court's final judgment.[2] We sustain Hirsch and Westheimer's jurisdictional challenge and dismiss the appeal.

**Procedural Background**

After entering a series of interlocutory orders, the trial court signed a final judgment

Page 538

on April 9, 2002. On May 28, 2002, the 49th day after that judgment, Moore Landrey filed a notice of appeal.[3] No party filed a motion for new trial or any other rule 329b motion.[4]

On June 12, 2002, the 64th day after the April 9, 2002 judgment, Moore Landrey filed a "Motion under Texas Rule of Procedure Rule 306a5 [sic]."[5] The motion was supported by Moore Landrey's counsel's affidavit, to which he had attached a verified copy of a notice from the Harris County District Clerk, dated May 15, 2002, which reported that the trial court had signed an order granting summary judgment on April 9, 2002. Moore Landrey's motion and its counsel's affidavit asserted that the May 15, 2002 notice occurred more than 20 days after the April 9, 2002 order and was Moore Landrey's and its counsel's first notice that the April 9, 2002 order had been signed. The motion requested that, "Texas Rule of Civil Procedure 306a 4[sic] applies to the appellate deadlines in this case."

But Moore Landrey did not file a notice of hearing on its rule 306a(5) motion until December 9, 2002, almost six months after the motion was filed. The trial court nevertheless heard and granted the motion seven days later, on December 16, 2002. The trial court's order of December 16, 2002 recites that relief was granted after considering the motion and the supporting affidavit and exhibit and decrees that, "the Order entered by the Court on April 9, 2002, was received by [Moore Landrey] on May 15, 2002." Moore Landrey filed an amended notice of appeal on March 25, 2003.

**Hirsch & Westheimer's Jurisdictional Challenge**

Hirsch & Westheimer contends that Moore Landrey cannot prosecute this appeal because the trial court's plenary power over its April 9, 2002 judgment had expired when it signed the December 16, 2002 order, and that the December 16, 2002 order is, therefore, void. Moore Landrey disputes Hirsch & Westheimer's challenge by arguing that nothing in rule 306a imposes a deadline, either to set a hearing on a rule 306a(5) motion or to obtain a ruling.

**Plenary Power**

A trial court retains plenary power over a final judgment for at least 30 days after signing that judgment. *See* TEX.R. CIV. P. 329b(d) ("[R]egardless of whether an appeal has been perfected," trial court retains "plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed."). The date on which the trial court signs the judgment "determine[s] the beginning of the periods ... for the court's plenary power." TEX.R. CIV. P. 306a(1).

Parties may extend this initial 30-day period of

plenary power by timely filing, within that 30-day period, a motion that seeks a substantive change in the judgment. TEX.R. CIV. P. 329b(a), (g); *seeLane Bank Equip. Co. v. Smith Southern Equip., Inc.,* 10 S.W.3d 308, 310, 314 (Tex.2000); *In re T.G.,* 68 S.W.3d 171, 176 (Tex.App.-Houston [1st Dist.2002], pet. ref'd).

**Page 539**

Appropriate motions include a motion for new trial or a motion to modify, correct, or reform the judgment. *See* TEX.R. CIV. P. 329b(g); *Lane Bank Equip. Co.,* 10 S.W.3d at 310; *In re T.G.,* 68 S.W.3d at 176.

# APPENDIX
# #34

# EXCERPTED

Page 198

627 S.W.2d 198 (Tex.App. □Austin 1981)

Jose C. RODRIGUEZ, a/k/a Joe C. Rodriguez, Appellant,

v.

Jon HOLMSTROM, d/b/a Hill Country Car Center, Appellee.

No. 13367.

Court of Appeals of Texas, Third District, Austin

December 16, 1981

Page 199

Vincent J. Scanio, Jr., Scanio & Scanio, San Marcos, for appellant.

Thomas N. Bluntzer, Bartram, Reagan, Burrus & Dierksen, New Braunfels, for appellee.

PHILLIPS, Chief Justice.

This is an appeal of an equitable proceeding in the nature of a bill of review which set aside a judgment alleged to be voidable. The county court at law of Hays County granted the bill of review, set aside the prior default judgment, retried the cause, and entered a take-nothing judgment against both parties. From that judgment, the appellant perfected his appeal.

We reverse the judgment of the county court at law, render that appellee take nothing by his bill of review and award appellant attorney's fees.

The original suit, underlying this bill of review, was filed by appellant against appellee, on May 25, 1979, in the county court at law of Hays County. Appellant alleged that on or about July 17, 1978, he purchased a 1976 Ford Mustang from appellee. Appellant contended he was induced to acquire the automobile as a result of Holmstrom's representation the sale included a 12-month/12,000 mile warranty on the drivetrain. In February of 1979, after approximately 4,000 miles of usage, the transmission, a component of the Mustang's drivetrain, failed. On or about April 19, 1979, Mr. Rodriguez made written demand on Holmstrom to repair or replace the transmission in accordance with the warranty. Holmstrom, however, disputed the existence of a warranty and refused to effect repairs.

Suit was instituted and, following service, settlement negotiations between Holmstrom and Rodriguez's attorney commenced. Appellant alleges these culminated in an agreement on June 7, 1979, under which Holmstrom agreed to pay Rodriguez $250 in cash and to reimburse a mechanic for necessary repairs to the drivetrain.

In any event, Holmstrom did arrange for the repair of the vehicle and, on the morning of June 15, 1979, telephoned Mr. Rodriguez to come take delivery of the Mustang. Upon Mr. Rodriguez's arrival, Holmstrom produced an instrument for his signature purporting to release Holmstrom and Hill Country Car Center from any further liability. Rodriguez, whose command of the English language was stipulated as "very poor," signed the release but later testified at the bill of review hearing Holmstrom had demanded his signature as a prerequisite to the "release" of the automobile. Despite his interested party status, Holmstrom himself notarized the document.

Later in the afternoon of June 15, 1979, Holmstrom telephoned Rodriguez's attorney and informed him of the purported release, to which the attorney responded that he considered the release ineffective. Subsequently, on June 19, 1979, no answer or

Page 200

affirmative defense of release being filed by Holmstrom, Rodriguez obtained a default judgment.

……….

Page 202

Although the language of the Act provides for attorney's fees "reasonable in relation to the amount of work expended" at the trial level, it has been interpreted to authorize payment of attorney's fees on appeal as well. *Volkswagen of America, Inc. v. Licht,* 544 S.W.2d 442 (Tex.Civ.App.-El Paso 1976, no writ). The court in Volkswagen reasoned, as the statute does not in any way limit "the amount of work expended," the Legislature intended to include all work expended. Logically, if all work expended is included, "then it must necessarily include the work expended on appeal, since that work is just as essential to the recovery as is the work in the trial court," supra at 496. *Accord, Chrysler-Plymouth City, Inc. v. Guerrero,* 620 S.W.2d 700 (Tex.Civ.App.-San Antonio 1981, no writ); *Chrysler Corporation v. Schuenemann,* 618 S.W.2d 799 (Tex.Civ.App.-Houston (1st Dist.) 1981, writ ref'd n.r.e.). *Cf. International Security Life Insurance Co. v. Spray,* 468 S.W.2d 347 (Tex.1971). (Statutory attorney's fees under the Texas Insurance Code.)

Appellant, in the original Deceptive Trade Practices suit, obtained a default judgment which provided, in addition to treble damages, for the recovery of $2,280 in attorneys fees, with a credit of $1,500 should the

defendant forego appeal of the judgment.

The issue raised is whether the appellee's institution of a bill of review and the appellant's subsequent appeal of the granting of the bill can be considered an "appeal" for the purposes of awarding the attorneys fees allocated by the original default judgment.

In Roman law, to appeal was to resort to court. Ballentine's Law Dictionary 82 (3rd ed. 1969). Today, an appeal incorporates "any form of appellate review other than by one of the extraordinary writs." 4 Am.Jur.2d Appeal & Error § 2 (1962). While the word "appeal" has a strict technical definition, it is frequently used as embracing all kinds of proceedings for the review of causes. 1 Bouviers' Law Dictionary, 209 (3rd ed. 1914).

The English Court of Chancery was imbued with jurisdiction in equity and the method by which review was obtained in that court was termed an "appeal." Black's Law Dictionary 428 (4th ed. 1968). A bill of review is the equitable procedure for appeal of a judgment.

Although the mechanics of an appeal, a writ of error, and a bill of review are dissimilar, all three constitute "direct attacks" upon a judgment. 4 R. McDonald, Texas Civil Practice § 18.24 (1971).

Texas courts have long recognized a writ of error constitutes a method of "appeal." *White v. Taylor,* 11 S.W.2d 374 (Tex.Civ.App.-Beaumont 1928), rev'd on other grounds ; 36 S.W.2d 181 (Tex.1931); *Scaling v. Williams,* 284 S.W. 310 (Tex.Civ.App.-Fort Worth 1926, no writ); *Martin v. Martin,* 229 S.W. 695 (Tex.Civ.App.-Austin 1921, no writ); *Eppstein & Co. v. Holmes & Crain,* 64 Tex. 560 (1885); *Magee v. Chadoin,* 30 Tex. 644 (1876).

The right to appeal by writ of error is viewed as existing by virtue of the common law and, where omitted by statute, it has been held not to be repealed or revoked. *Hofheinz v. Wilson,* 281 S.W. 273 (Tex.Civ.App.-Austin 1926, no writ); *Humble Oil & Refining Co. v. Andrews,* 279 S.W. 300 (Tex.Civ.App.-Eastland 1925, no writ).

Accordingly, a bill of review has been deemed to be in the nature of a writ of error; *Rogers v. Searle,* 533 S.W.2d 433 (Tex.Civ.App.-Corpus Christi), rev'd on other grounds, 544 S.W.2d 114 (Tex.1976), and both writs of error and bills of review have been demarcated as methods of appeal. In fact, an "appeal," by writ of error or a bill of review to set aside the judgment, is the exclusive method by which a default judgment may be vacated or set aside. *Surety Insurance Co. v. State,* 514 S.W.2d 454 (Tex.Cr.App.1974), citing, *McEwen v. Harrison,* 162 Tex. 125, 345 S.W.2d 706 (1961).

We hold the term "appeal," as employed in the appellant's default judgment, necessarily encompassed consideration of that judgment by way of a bill of review.

The

**Page 203**

attorney's fees decreed therein are hereby confirmed.

---------

Notes:

[1] Holmstrom, who had consulted a local justice of the peace prior to the execution of the "release," alleged he had reasonably relied on "erroneous official information given by an official court functionary" which prevented the timely filing of a motion for new trial.

A justice of the peace is not an official court functionary of the county court at law and cannot, therefore, supply erroneous official information under the Baker v. Goldsmith qualification of Alexander v. Hagedorn, infra. Her duties are totally unrelated to the machinations of the county court nor do they include the dispensation of legal advice. See also Buckler v. Tate, 572 S.W.2d 562 (Tex.Civ.App.-Houston (1st Dist.) 1978, no writ); Thomason v. Freberg, 588 S.W.2d 821 (Tex.Civ.App.-Corpus Christi 1979, no writ). Compare Brice v. Brice, 581 S.W.2d 699 (Tex.Civ.App.-Dallas 1979, writ dism'd) (reliance on an official for information not within his duties).

[2] § 17.50 provided, in pertinent part:

"(a) A consumer may maintain an action if he has been adversely affected by any of the following:

(1) the use or employment by any person of an act or practice declared to be unlawful by Sec. 17.46 of this sub-chapter;

(2) breach of an express or implied warranty;

(3 and 4 have been omitted)

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) three times the amount of actual damages plus court costs and attorney's fees reasonable in relation to the amount of work expended"

(2, 3, 4 & C have been omitted).

---------

# APPENDIX
# #35

**827 S.W.2d 63 (Tex.App. Houston [1 Dist.] 1992)**

**Mannouch SHAHBAZ, Individually, d/b/a Tabriz Imports, a/k/a**

**Tabrizi Imports, Appellant,**

**v.**

**FEIZY IMPORT & EXPORT COMPANY, Appellee.**

**No. 01-91-00260-CV.**

**Court of Appeals of Texas, First District, Houston**

**March 12, 1992**

Page 64

William R. Henderson, Houston, for appellant.

Angelo Parrish, Houston, for appellee.

Before TREVATHAN, MIRABAL and PRICE, [*] JJ.

OPINION

TREVATHAN, Justice.

This is an appeal from a bill of review proceeding. The trial court granted a bill of review and set aside a previous order in another cause which dismissed appellee's suit for want of prosecution. Appellant complains on appeal that the trial court erred in the granting of the bill of review and the reinstatement of the prior cause.

On July 23, 1987, appellee filed its suit against appellant to recover damages of $47,015.50 based on a sworn account for merchandise delivered, and $6,154.40 for checks returned to appellee because of insufficient funds. In September 1988, the trial court sent a notice of its intent to dismiss appellee's cause of action to an incorrect address. On October 21, 1988, the trial court dismissed appellee's cause of action for want of prosecution. The notice of the dismissal order was sent to the same incorrect address. Appellee did not receive notice that its cause of action had been dismissed until May 1989. Since the time for direct appeal had expired, on July 21, 1990, appellee filed a bill of review in the trial court seeking to have its cause of action reinstated. The trial court conducted a hearing and granted appellee's bill of review. In two points of error, appellant argues the trial court erred in granting appellee's bill of review and reinstating its cause of action because the findings of fact

and conclusions of law are insufficient to support the trial court's granting of the bill of review, and there is insufficient evidence to support the existence of a meritorious cause of action.

An appeal may be prosecuted only from a final judgment which disposes of all issues and parties in the case. *North East Indep. School Dist. v. Aldridge,* 400 S.W.2d 893, 895 (Tex.1966). The final judgment in a bill of review action should either deny any relief to the petitioner or grant the bill of review and set aside the former judgment, insofar as it is attacked, and substitute a new judgment which properly adjudicates the entire controversy. *Kessler v. Kessler,* 693 S.W.2d 522, 525 (Tex.App.--Corpus Christi 1985, writ ref'd n.r.e.).

In this case, the bill of review set aside the prior judgment of dismissal but did not address the merits of appellee's cause of action. A bill of review that sets aside a prior judgment but does not dispose of all the issues of the case on the merits is interlocutory in nature, not a final judgment,

Page 65

and therefore, not appealable. *Tesoro Petroleum v. Smith,* 796 S.W.2d 705, 705 (Tex.1990), *Warren v. Walter,* 414 S.W.2d 423, 423-24 (Tex.1967).

The judgment being interlocutory, this Court is without jurisdiction to review it. Tesoro, 796 S.W.2d at 705.

The appeal is dismissed for want of jurisdiction.

---------

Notes:

[*] Honorable Frank C Price, former justice, Court of Appeals, First District of Texas, at Houston, sitting by assignment.

---------

# APPENDIX
# #36

# EXCERPTED

Page 104

327 S.W.3d 104 (Tex. 2010)

54 Tex. Sup.Ct. J. 238

SOLAR APPLICATIONS ENGINEERING, INC., Petitioner,

v.

T.A. OPERATING CORPORATION, Respondent.

No. 06-0243.

Supreme Court of Texas.

December 3, 2010.

Argued Oct. 16, 2010.

Page 105

Douglas W. Alexander, Alexander Dubose & Townsend LLP, Austin, TX, Jeffrey D. Small, Law Office of Jeff Small, Jonathan Yedor, Heinrichs & DeGennaro, P.C., Myron E. East Jr., Barton, Schneider & East, L.L.P., San Antonio, TX, for Petitioner.

Sharon E. Callaway, Crofts & Callaway, P.C., R. Wes Johnson, The Gardner Law Firm, William W. Sommers, Gardner & Ferguson, Inc., San Antonio, TX, for Respondent.

Richard Gary Thomas, Thomas Feldman & Wilshusen, LLP, Dallas, for Amicus Curiae.

## OPINION

WAINWRIGHT, Justice.

In this case, a general contractor and an owner dispute performance and final payment under a construction contract.[1] Solar Applications Engineering, Inc. d/b/a Wade Construction (Solar), the general contractor, and T.A. Operating Corporation d/b/a TravelCenters of America (TA), the owner, entered a contract to build a truck stop in San Antonio, Texas. After Solar substantially completed the project, disputes arose regarding the completion of certain remaining work and the attachment of liens on the property by subcontractors and Solar. TA eventually terminated the contract and refused to make final payment to Solar. Solar sued TA for breach of contract to recover the contract balance, and TA counterclaimed for delay and defective work. At trial, the court's jury charge focused primarily on damages. The verdict substantially favored Solar, with the jury awarding actual damages of $400,000 offset by $8,000 in defects and omissions.

On appeal, TA argued that because Solar did not provide a lien-release affidavit, which TA argues was a condition precedent to final payment under the contract, Solar cannot recover for breach of contract. On rehearing, the court of appeals reversed the trial court's judgment, holding that the lien release provision was a condition precedent and that Solar failed to prove it complied with the lien-release provision. It rendered a take-nothing judgment in favor of TA.[2]

Page 106

The issue before this Court is whether the lien-release provision is a condition precedent to Solar's recovery for breach of contract and whether failure to provide it is a bar to recovery. TA reasonably argues that an owner who has paid the contract amount to the general contractor is entitled to a building free of subcontractor's liens. Solar contends, also reasonably, that it is entitled to the balance remaining under the contract for completing the project offset by the cost to remedy defects and omissions. Under normal circumstances, Solar might have provided a conditional lien-release affidavit to allow Solar to fulfill its obligation under the contract, to allow TA to be assured that it will not be double-billed for work on the project, and to allow the parties to resolve their dispute regarding the scope of the work. But the standard operating procedure broke down here, and the court of appeals ultimately ruled that TA was entitled to a windfall, even though the issue of breach or satisfaction of conditions precedent was not tried to the jury.

We hold that the lien-release provision is a covenant, not a condition precedent to Solar's recovery on the contract. We reverse the judgment of the court of appeals, reinstate the trial court's judgment, and remand to the trial court for further proceedings consistent with this opinion.

………………………..

Page 108

provision was a condition precedent and held that the doctrine of substantial performance did not excuse Solar's failure to provide a lien-release affidavit, and thus Solar forfeited final payment under the contract. 191 S.W.3d 173, 180-81 (Tex.App.-San Antonio 2005, pet. granted). Solar petitioned this Court, complaining that the court of appeals erred because: (1) the lien-release provision was not triggered; (2) the lien-release provision is not a condition precedent; and (3) even if the lien-release provision is a condition precedent and was triggered, the court of appeals' decision results in a forfeiture of Solar's right to recover under the contract instead of delaying payment until the liens are released, which is inconsistent with the doctrine of substantial performance and the

purpose of statutory lien rights. We granted Solar's petition.

## II. LAW AND ANALYSIS

Whether Solar is barred from receiving the contract balance depends on whether the lien-release provision is a condition precedent to Solar's recovery for breach of contract. " A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992) (citations omitted); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981) (" A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." ); *id.* § 225 (noting the effects of the non-occurrence of a condition). A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way. *Reinert v. Lawson,* 113 S.W.2d 293, 294 (Tex.Civ.App.-Waco 1938, no writ). Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach. *E.g., Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 692-94 (Tex.1994); RESTATEMENT (SECOND) OF CONTRACTS §§ 236 cmt. a, 241, 242 cmt. a. Conversely, if an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to perform. *See Dalton,* 840 S.W.2d at 956; RESTATEMENT (SECOND) OF CONTRACTS § 225.

Solar claims that the court of appeals erred in concluding that the lien-release provision is a condition precedent because it lacks conditional language normally associated with express conditions. *See Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990). When the lien-release provision is read in context, Solar contends it constitutes a " hoop" or step that the general contractor must follow in order to collect final payment, not a condition precedent to sue and recover under the contract. Because a different and reasonable interpretation of the contract is possible, Solar argues the Court should construe the provision to prevent a forfeiture. *See id.* Further, the lien-release provision should not be applied as a condition precedent because its purpose-to protect TA from the possibility of having to pay twice-was accomplished by the trial court's severance of the subcontractors' claims against the project and order that the sums awarded to Solar be held in trust to pay outstanding sub-contractor liens.

TA responds that the court of appeals correctly held Solar was not entitled to the contract balance because it did not show that it complied with an express condition precedent to final payment. Section 53.085 of the Texas Property Code specifically authorizes an owner to require a lien-release affidavit as a condition of final payment. *See* TEX. PROP.CODE § 53.085(a),

**Page 109**

(c)(1).[7] Consistent with section 53.085, section 14.07(A) of the contract requires that an application for final payment include a lien-release affidavit, and section 14.07(B) provides that TA's obligation to pay the final amount is conditioned on its review of the final application. Contending that the language of the contract is " unmistakable," TA concludes that forfeiture does not excuse Solar's failure to comply with this express condition. *See* RESTATEMENT (SECOND) OF CONTRACTS § 229 cmt. a (1981) (" [I]f the term that requires the occurrence of the event as a condition is expressed in unmistakable language, the possibility of forfeiture will not affect the interpretation of that language." ). Being quite candid, TA offered at oral argument that the Legislature may well have intended such a windfall for owners.

# APPENDIX
# #37

**EXCERPTED**

Page 590

923 S.W.2d 590 (Tex. 1996)

The TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, Relator,

v.

The Honorable Alan MAYFIELD, Judge, Respondent.

No. 95-1209.

Supreme Court of Texas.

May 31, 1996

Argued April 17, 1996.

Rehearing Overruled July 8, 1996.

Page 591

James Lee Williams, Jr., Fort Worth, Angus E. McSwain, Waco, P. Michael Jung, D. Bradley Kizzia, Dallas, for relator.

Tom L. Ragland, Waco, for respondent.

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which GONZALEZ, HECHT, ENOCH, OWEN, and ABBOTT, Justices, joined.

In the workers' compensation suit underlying this original mandamus proceeding, the trial court appointed an attorney to represent the claimant, ordering the carrier to pay opposing counsel's fees as the case progressed. While not challenging the appointment itself, the carrier contends that the trial court abused its discretion and caused irreparable harm by requiring it to pay for the claimant's attorney. Because we agree, we conditionally grant the writ of mandamus.

I

Real party in interest Allene Reed, a 49 year-old office administrator, suffered a slip and fall at work while moving file boxes. Reed contends that she struck her head on the floor during the fall, aggravating a preexisting medical condition referred to as "syrinx condition and symptomatic, previously compensated hydrocephalus" ("hydrocephalus"). While the record does not contain a lay definition of this condition, it apparently involves abnormal fluid levels in the cranium.

Travelers Indemnity Company of Connecticut, the workers' compensation carrier for Reed's employer, denied that Reed's hydrocephalus, if it existed at all, was caused by or aggravated by her fall. After a benefit review conference failed to resolve this issue, the parties proceeded to a contested case hearing. See TEX. LAB.CODE § 410.151. Reed was not represented by counsel at this hearing, although she was assisted by a Workers' Compensation Commission ombudsman. See id. § 409.041.

The hearing officer ruled in favor of Reed, concluding that she suffered from preexisting hydrocephalus aggravated by her on-the-job injury. The hearing officer further found that Reed had not yet reached maximum medical improvement, rejecting the contrary conclusion of the designated doctor. Accordingly, the hearing officer ordered Travelers to pay temporary income benefits to Reed until she reached maximum medical improvement or no longer suffered from a disability, as well as medical benefits associated with Reed's condition. The record does not disclose the amount of the temporary income benefits, which are paid weekly at a rate based on the claimant's average weekly wage. See TEX. LAB.CODE § 408.103. Travelers was apparently still paying these weekly benefits at the time of the trial court proceedings which form the basis of this complaint.

Travelers appealed to a Commission appeals panel, which affirmed the hearing officer's decision. Reed again represented herself in this administrative appeal, apparently without assistance from an ombudsman.

Travelers then filed suit in district court for judicial review of the Commission's decision. See TEX. LAB.CODE § 410.251. Reed, appearing pro se, filed an answer and a counterclaim seeking "weekly indemnity benefits for 401 weeks from June 9, 1993; all medical expenses, costs of court and general relief." [1] A short time later, she filed a motion asking the court to appoint an attorney for her, to be paid by the county or by Travelers. Reed contended that, despite diligent efforts, she had been unable to obtain a lawyer to represent her on a contingency

Page 592

basis. She further argued that this inability resulted from the fee restrictions imposed by the new Workers' Compensation Act, see TEX. LAB.CODE § 408.221, which became effective in January 1991. See Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 17.18. Reed contended that these restrictions, by depriving her of counsel, violated her due course, due process and equal protection rights under the Texas and United States Constitutions. She also filed an affidavit attesting that she was "too poor to employ counsel to represent [her] in this case."

…………

presumption that an indigent litigant has a right to appointed counsel only where physical liberty is at stake). The narrow issue presented is whether the trial court, having appointed an attorney to represent Reed, could require Travelers to pay the fees for that attorney. We conclude that placing this burden on Travelers constituted an abuse of discretion.

In Texas, attorney's fees may not be recovered from an opposing party unless such recovery is provided for by statute or by contract between the parties. See *Dallas Central Appraisal Dist. v. Seven Investment Co.,* 835 S.W.2d 75, 77 (Tex.1992); *New Amsterdam Cas. Co. v. Texas Indus.,* 414 S.W.2d 914, 915 (Tex.1967). The authorization of attorney's fees in civil cases may not be inferred; rather it "must be provided for by the express terms of the statute in question." *First City Bank--Farmers Branch v. Guex,* 677 S.W.2d 25, 30 (Tex.1984).

There is no statute which authorizes recovery of attorney's fees under the circumstances of this case. To the contrary, the Workers' Compensation Act provides that the claimant's attorney's fee "shall be paid from the claimant's recovery," TEX. LAB.CODE § 408.221(b), [2] with two exceptions, neither of which is present here. The first exception applies where an insurance carrier unsuccessfully challenges a Commission order awarding supplemental income benefits. See id. § 408.147(c). In that situation, the claimant is entitled to recover reasonable attorney's fees in addition to any accrued benefits. Id. Because there has been no Commission determination that Reed is entitled to supplemental income benefits, this exception clearly does not apply here. The second exception allows claimants to recover attorney's fees when suing to enforce a final order of the Commission which the carrier has failed to comply with. See TEX. LAB.CODE § 410.208. Because a Commission order which is timely appealed for judicial review is not "final," see id. § 410.205(a), this provision likewise does not apply in this case.

Reed also does not contend that she may recover attorney's fees based on any agreement between the parties. Specifically, she does not claim that the workers' compensation insurance contract between her employer and Travelers authorizes her recovery of attorney's fees. Indeed, she cannot do so, as section 38.001 of the Texas Civil Practice and Remedies Code, which generally authorizes recovery of attorney's fees for suits on a written contract, does not apply to insurance contracts subject to article 21.21 of the Texas Insurance Code. See TEX. CIV. PRAC. & REM.CODE § 38.006. The compensation policy issued by Travelers falls within this exception. See *Aetna Cas. & Sur. Co. v. Marshall,* 724 S.W.2d 770, 772 (Tex.1987).

Instead, Reed attempts to justify the trial court's order under section 24.016 of the Texas Government Code and under the trial court's inherent authority. We address each purported justification.

The Government Code vests district judges with the following discretion to appoint counsel:

A district judge may appoint counsel to attend to the cause of a party who makes an affidavit that he is too poor to employ counsel to attend to the cause.

TEX. GOV'T CODE § 24.016. Whatever the reach of this provision, it contains no language authorizing judges to shift the fees for appointed counsel to the opposing party, and it has never been so interpreted. Because the authority for a fee award "may not be supplied by implication but must be provided for by the express terms of the statute in question," Guex, 677 S.W.2d at 30, we may not construe section 24.016 as impliedly authorizing a trial court to place the financial burden of appointed counsel on the opposing party.

The original statutory predecessor to section 24.016 provided as follows:

The judges in any case, civil or criminal, in which a party may swear that he is too poor to employ counsel, shall appoint counsel

for such party, who shall attend to the cause in behalf of such party without any fee or reward.

# APPENDIX
# #38

**EXCERPTED**

Page 860

315 S.W.3d 860 (Tex. 2010)

53 Tex. Sup.Ct. J. 745

The TRAVELERS INSURANCE COMPANY (The Automobile Insurance Company of Hartford Connecticut), Petitioner,

v.

Barry JOACHIM, Respondent.

No. 08-0941.

Supreme Court of Texas.

May 14, 2010

Argued Feb. 17, 2010.

Rehearing Denied Aug. 27, 2010.

Page 861

Jeffrey B. Jones, Christopher Bradley Slayton, Jones Flygare Brown & Wharton, Lubbock, for Petitioner.

Stace Lawrence Williams, The Stace Williams Law Firm, P.C., Lubbock, for Respondent.

## OPINION

GREEN, Justice.

In this procedural dispute, we must decide whether a trial court's erroneous dismissal of a suit with prejudice, following the plaintiff's filing of a nonsuit, operates to bar a later suit because of res judicata. We conclude that it does. Therefore, we reverse the court of appeals' judgment and order the case dismissed.

### I

Barry Joachim sued his insurer, The Travelers Insurance Company,[1] alleging he was entitled to benefits from Travelers for damages caused by Joachim's accident with an underinsured driver. On the day before trial, Joachim filed a " Notice of Non-Suit" stating that he " no longer wishes to pursue his claims against Defendants," [2] and therefore " gives notice to all parties that his claims against the same are hereby dismissed without prejudice." No motions or counterclaims were pending at that time. Several months later, the

Page 862

trial court sent notice that if a final order was not filed within 10 days of the notice, the court would dismiss the case for want of prosecution. Joachim asserts he did not receive this notice. The trial court then entered an order that the case " is hereby dismissed in full with prejudice for want of prosecution." Joachim claims he did not receive a copy of that order either. Unaware of the dismissal order, Joachim neither contested it while the court retained plenary power, *see* TEX.R. CIV. P. 329b, nor perfected an appeal.

Joachim later refiled the same cause of action, and the case was assigned to a different trial court. Travelers filed a motion for summary judgment based on res judicata. The second trial court granted Travelers' motion and ordered that Joachim take nothing by his suit. Joachim appealed that judgment. The court of appeals reversed, holding that a nonsuit removes a trial court's jurisdiction to enter a dismissal with prejudice. 279 S.W.3d 812, 817 (Tex.App.-Amarillo 2008). The court of appeals therefore determined that the first trial court's order was void, not merely voidable. *Id.* at 818. Thus, it concluded that Travelers failed to establish the defense of res judicata. *Id.*

……..

The question remains whether the trial court's voidable order of dismissal is sufficient

Page 866

to establish Travelers' affirmative defense of res judicata. We conclude it is. Because Joachim failed to attack the trial court's order directly, it became a final judgment for purposes of res judicata.[5] Joachim alleges that he never received notice of the judgment dismissing his cause of action with prejudice. Certainly, if this is true, the lack of notice would not bind him to the effects of the first trial court's erroneous judgment without some potential remedy.[6] However, there is a remedy: an equitable bill of review is a direct attack on a judgment. *See* TEX.R. CIV. P. 329b(f) (providing that a judgment may be set aside by the trial court by bill of review for sufficient cause); *McEwen v. Harrison,* 162 Tex. 125, 345 S.W.2d 706, 709 (1961) (" A bill of review filed in the proper court and against proper parties is one authorized method of making a direct attack on a judgment." ); *Baker v. Goldsmith,* 582 S.W.2d 404, 406 (Tex.1979) (" A bill of review is an independent equitable action brought by a party to a former action seeking to set aside a judgment, which is no longer appealable or subject to motion for new trial." ); *see also Levit v. Adams,* 850 S.W.2d 469, 470 (Tex.1993) (per curiam) (allowing a bill of review to proceed because when a party first receives notice of a final judgment more than 90 days after the order is signed, the time limit under Texas Rule of Civil Procedure 306a(4), a bill of

review is a proper method of seeking relief); *Wolfe v. Grant Prideco, Inc.,* 53 S.W.3d 771, 775 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (reversing summary judgment dismissing a bill of review claim filed after the plaintiff's earlier case was dismissed for want of prosecution). Had the trial court set aside the judgment, either by timely motion for new trial or by bill of review, Joachim's underlying claim would no longer be barred by res judicata, as there would no longer be a final determination on the merits.[7] Yet, because the first trial court's order stands, Joachim's claim is barred. Accordingly, we reverse the court of appeals' judgment and render judgment dismissing Joachim's cause of action with prejudice based on Travelers' defense of res judicata.

## III

We hold that because a trial court has jurisdiction to enter orders dismissing a case with prejudice upon filing of a nonsuit, the trial court's order here was voidable, not void, and subject only to direct attack. Because Joachim failed to attack the trial court's order directly, it became a final determination on the merits for purposes of res judicata. Therefore, we reverse the court of appeals' judgment and render judgment dismissing the case with prejudice.

---------

Notes:

[1] The parties agree that The Automobile Insurance Company of Hartford, Connecticut issued Joachim's policy. For convenience, however, we refer to the respondent in this case as Travelers because The Travelers Insurance Company is the entity Joachim named first in his trial court petitions.

[2] Joachim's first petition included several insurance companies as defendants.

[3] We have used similar language in discussing a dismissal. *See Crofts v. Court of Civil Appeals,* 362 S.W.2d 101, 104 (Tex.1962) (" It is elementary that a dismissal is in no way an adjudication of the rights of parties; it merely places the parties in the position that they were in before the court's jurisdiction was invoked just as if the suit had never been brought." ). However, *Crofts* did not involve a nonsuit. The court in *Crofts* dismissed a divorce petition, while a related suit was pending in Maryland. *See id.* at 103. *Crofts* held that a trial court could not be ordered by writ of mandamus to give possession of children to a mother after the trial court had dismissed the case. *See id.* at 104-05. Even if the circumstances of that dismissal could be considered analogous to a nonsuit, however, we do not read the *Crofts* language so strictly as to deprive the trial court of all authority after it dismisses a case-or after it should dismiss a case, as in a typical nonsuit scenario.

[4] In *Scott & White,* our holding was limited to the situation where the trial court granted a collateral motion for sanctions during the period when it retained plenary power. *See* 940 S.W.2d at 596. In this case, however, the trial court's plenary power is not at issue because after Joachim filed his nonsuit, the record shows that the trial court never entered a judgment until it entered its dismissal with prejudice. *See* TEX.R. CIV. P. 329b(d) (" The trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed." ); *Shultz,* 195 S.W.3d at 100 (observing that although a nonsuit is effective upon its filing, expiration of plenary power is determined from the date on which a trial court signs an order dismissing the suit).

[5] We note that none of Joachim's allegations in the trial court, even when construed liberally, can plausibly be considered as being in the nature of a claim for bill of review or similar relief.

[6] The United States Supreme Court recently observed, for instance, that comparable relief under Federal Rule of Civil Procedure 60(b)(4) (relief from a final judgment that is void) " applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. __, __, 130 S.Ct. 1367, 1377, 176 L.Ed.2d 158 (2010). Here, however, although Joachim mentions his lack of notice, Joachim asserted only jurisdictional error as a legal argument.

[7] We offer no opinion as to whether Joachim might have succeeded in having the trial court set aside its judgment by pursuing an equitable bill of review or any other remedy in the trial court.

---------